RICHARD H. RAHM (SBN 130728)
richard.rahm@us.dlapiper.com
DLA PIPER LLP (US)
555 Mission Street, Suite 2400
San Francisco, CA  94105-2933
Telephone: 415.836.2500
Facsimile: 415.836.2501

NORMAN M. LEON (IL SBN 6239480) (*pro hac vice* motion forthcoming)
norman.leon@us.dlapiper.con
DLA PIPER LLP (US)
444 W. Lake Street, Suite 900
Chicago, IL  60606

JEFFREY M. ROSIN (MA 629216) (admitted *pro hac vice*)
jrosin@ohaganmeyer.com
O'HAGAN MEYER
111 Huntington Avenue, Suite 719
Boston, MA 02199
Telephone: 617.843.6800
Facsimile: 617.843.6810

Attorneys for Defendant
JAN-PRO FRANCHISING INTERNATIONAL, INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLORIA ROMAN, GERARDO VASQUEZ, JUAN AGUILAR, and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>JAN-PRO FRANCHISING INTERNATIONAL, INC.<br><br>Defendant. | Case No.  3:16-cv-05961-WHA<br><br>**DEFENDANT JAN-PRO FRANCHISING, INTERNATIONAL, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>The Honorable William H. Alsup<br><br>Date:  May 11, 2022<br>Time:  10:00 a.m.<br>Location: Courtroom 12, 19th Floor |

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ........................................................................1

II.   RELEVANT BACKGROUND FACTS...........................................................3

    A.    JPI's Three-Tiered Franchising Business Is Recognized And Regulated By State And Federal Law..........................................................3

    B.    JPI Has No Relationship With the Plaintiffs Or Any Other Unit Franchisee And Does Not Dictate The Terms of The Unit Franchise Agreements, Which Vary Among The Regional Master Franchisees. ..........................................4

    C.    Virtually Every Putative Class Member Signed an Agreement That Requires Them to Submit These Claims To Individual Arbitration......................6

    D.    Every Franchisee Operates A Different Type of Franchise That Can Significantly Impact Both The Time They Spend And The Amount Of Revenue They Generate. ..........................................6

I.    ARGUMENT ................................................................................................12

    A.    The Applicable Standards. ........................................................................12

    B.    Certification Is Not Appropriate, and Plaintiffs Are Not Typical or Adequate Class Representatives, Because Virtually Every Putative Class Member Has Agreed to Arbitrate These Claims...............................13

        1.    JPI Has the Right to Enforce the Arbitration Agreements........................13

        2.    The Claims Are Within the Scope of the Arbitration Agreements...........15

        3.    Because All Putative Class Members Must Arbitrate, Class Certification Is Inappropriate. ...............................................15

    C.    Plaintiffs Have Done Nothing to Show That They Satisfy the Rule 23 Requirements Under the Proper Legal Standard. ...................................16

    D.    Individual Issues Predominate on Each of Plaintiffs' Substantive Claims...........17

        1.    The Minimum Wage and Overtime Claims...............................................17

            a.    Given The Many Different Ways Unit Franchisees Operate Their Franchises, Plaintiffs Have Failed to Demonstrate How Their Alleged Misclassification Establishes Liability For Minimum Wages And Overtime. ...............................18

            b.    For The Same Reason, Even If Plaintiffs Could Show Class-Wide Liability, The Difficulty in Ascertaining Individual Damages Would Predominate......................................................20

        2.    The Reimbursement Claims.......................................................................21

            a.    Plaintiffs Have Done Nothing to Show That They Satisfy the Rule 23 Requirements Under the Proper Legal Standard..............21

i

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

b.   Plaintiffs Have Presented No Evidence of Any Expenses Incurred by Any Unit Franchisee After 2018 or How Claims For those Expenses Could Be Resolved on a Class-wide Basis ...................................................................................23

E.   Individual Issues Predominate Under the ABC Test ................................................24

F.   There Are Individualized Issues Regarding Which Franchisees Are Properly Considered Members of the Putative Class ...............................................25

II.   CONCLUSION............................................................................................................25

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

EAST\190457113.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrahim & Sons Enters. v. Equilon Enters., LLC*,
    292 F.3d 958 (9th Cir. 2002) ........................................................................24

*Am. Zurich Ins. Co. v. Dep't of Indus. Accidents*,
    2006 WL 2205085 (Mass. Super. Ct. June 1, 2006)......................................24

*Berman v. Freedom Financial Network, LLC*,
    400 F. Supp. 3d 964 (N.D. Cal. 2019) ........................................................15

*Blanton v. Domino's Pizza Franchising, LLC*,
    962 F.3d 842 (6th Cir. 2020) ........................................................................13

*Bowman v. CMG Mortg. Inc.*,
    2008 WL 3200662 (N.D. Cal. Aug. 4, 2008) ...............................................24

*Brennan v. Opus Bank*,
    796 F.3d 1125 (9th Cir. 2015) ......................................................................14

*Buchanan v. Homeservices Lending L.L.C.*,
    No. 11cv0922, 2013 WL 1788579 (S.D. Cal. Apr. 25, 2013) .................................23

*California Trucking Ass'n v. Su*,
    903 F.3d 953 (9th Cir. 2018) ........................................................................21

*Castillo v. Bank of Am.*,
    980 F.3d 723 (9th Cir. 2020) ........................................................17, 18, 19

*Chebotnikov v. LimoLink, Inc.*,
    No. 14 Civ. 13475 (FDS), 2017 WL 2909808 (D. Mass. July 6, 2017)..................................10

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013).....................................................................12, 20, 23

*Cook v. Estes Express Lines, Corp.*,
    No. 1:16-cv-11538-RGS, 2018 WL 1773742 (D. Mass. Apr. 12, 2018)................................11

*Coopers & Lybrand v. Livesay*,
    437 U.S. 463 (1978).....................................................................................12

*Debnam v. FedEx Home Delivery*,
    No. 10-11025-GAO, 2013 WL 5434142 (D. Mass. Sept. 27, 2013).......................................11

*Dynamex. Dynamex Operations W., Inc. v. Sup. Ct.*,
    4 Cal. 5th 903 (2018)...........................................................11, 20, 21, 22

*Epic Sys. Corp. v. Lewis*,
__ U.S. __, 138 S. Ct. 1612 (2018) .................................................................................6

*Franklin v. Cmty. Reg'l Med. Ctr.*,
998 F.3d 867 (9th Cir. 2021) .........................................................................................14

*Haitayan v. 7-Eleven, Inc.*,
No. CV 17-7454 DSF, 2021 WL 757024 (C.D. Cal. Feb. 8, 2021) ...............................16, 22

*Henry v. Cent. Freight Lines, Inc.*,
No. 2:16-cv-00280-JAM-EFB, 2019 WL 2465330 (E.D. Cal. June 13, 2019) ....................21

*Jinks v. Credico (USA) LLC*,
177 N.E.3d 509 (Mass. 2021) ..........................................................................................2

*Kramer v. Toyota Motor Corp.*,
705 F.3d 1122 (9th Cir. 2013) .......................................................................................13

*Ladore v. Ecolab, Inc.*,
No. CV-11-09386 GAF, 2012 WL 12861141, *12 (C.D. Cal. Apr. 11, 2012) ...................19

*Lawson v. Grubhub, Inc.*,
13 F.4th 908 (9th Cir. 2021) .......................................................................1, 15, 16, 21

*Lou v. Ma Labs., Inc.*,
No. C 12-05409 WHA, 2014 WL 68605 (N.D. Cal. Jan. 8, 2014)..................................17, 19

*Martinez v. Combs*,
49 Cal. 4th 35 (2010) ....................................................................................................16

*Mora v. Harley-Davidson Credit Corp.*,
No. 1:08–cv–01453–AWI–BAM, 2012 WL 1189769 (E.D. Cal. Apr. 9, 2012)....................13

*Moreno v. JCT Logistics, Inc.*,
2019 WL 3858999 (C.D. Cal. May 29, 2019) ..................................................................22

*In re Novatel Wireless Secs. Litig.*,
No. 08-CV-1689 ............................................................................................................22

*Okeke v Dynamex Ops. E., Inc.*,
2013 WL 7085617 (Mass. Super. Dec. 03, 2013) .........................................................23, 24

*In re Pac. Fertility Ctr. Litig.*,
814 Fed. Appx. 206 (9th Cir. 2020)...............................................................................14

*In Re Paxil Litig.*,
212 F.R.D. 539 (N.D. Cal. 2003)...................................................................................12

*People v. Pac. Landmark, LLC*,
129 Cal. App. 4th 1203 (2005) .....................................................................................24

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

EAST\190457113.1

*Portland Gen. Elec. Co. v. Liberty Mut. Ins. Co.*,
   862 F.3d 981 (9th Cir. 2017) ...................................................................................13

*Richardson v. Coverall N. Am., Inc.*,
   811 F. App'x. 100 (3d Cir. 2020) ............................................................................15

*S. G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*,
   48 Cal. 3d 341 (1989) ...................................................................................3, 20, 21, 22

*Salazar v. McDonald's Corp.*,
   944 F.3d 1024 (9th Cir. 2019) ................................................................................16

*Stiller v. Costco Wholesale Corp.*,
   298 F.R.D. 611 (S.D. Cal. 2014) .......................................................................19, 20

*In re TFT–LCD (Flat Panel) Antitrust Litig.*,
   No. M 07-1827 SI, 2011 WL 1753784 (N.D. Cal. May 9, 2011)...........................13

*Vaquero v. Ashley Furniture Industries., Inc.*,
   824 F.3d 1150 (9th Cir. 2016) ................................................................................19

*Vazquez v. Jan-Pro Franchising International, Inc.*,
   10 Cal. 5th 944 (2021) ...........................................................................................21

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 388 (2011).................................................................................11, 18, 22

*Wang v. Chinese Daily News, Inc.*,
   737 F.3d 538 (9th Cir. 2013) ..................................................................................19

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
   268 F.R.D. 604 (N.D. Cal. 2010) ...........................................................................12

**Statutes**

Cal. Corp. Code § 31008.5...........................................................................................3

Cal Lab. Code §§ 2775, *et seq.*...................................................................................20

Cal Lab. Code § 2785(c)...............................................................................................21

California Labor Code Sections 218.5, 221, and 2802 ................................................21

California Labor Code §§ 221 and 2802........................................................................20

California Labor Code § 2802 ............................................................................3, 16, 21, 22

Federal Arbitration Act ................................................................................................13

Labor Code § 2802(a) .............................................................................................. 25

Massachusetts Independent Contractor Law ............................................................ 11

**Other Authorities**

Assembly Bill No. 5 .................................................................................................. 20

https://www.dir.ca.gov/iwc/MinimumWageHistory.htm ......................................... 10

Rule 23 ............................................................................................... 12, 16, 20, 22

Rule 23(a) ................................................................................................... 12, 16

Rule 23(b) .......................................................................................................... 12

Rule 23(b)(3) ............................................................................................... 12, 20

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

EAST\190457113.1

## I.     PRELIMINARY STATEMENT

This action arises out of Plaintiffs' continuing efforts to hold Jan-Pro Franchising International, Inc. ("JPI")—an entity that had no relationship (contractual or otherwise) with Plaintiffs, never interacted with Plaintiffs, never paid Plaintiffs anything, never took any deductions from Plaintiffs' alleged "wages," and whom Plaintiffs did not know existed before this suit—liable for the alleged failure of the parties they actually contracted with to "properly" classify these business owners as employees and to ensure they were paid minimum wage and overtime. The instant Motion takes that effort a big step further. Plaintiffs now ask this Court to certify a class of every person and entity that signed a franchise agreement in the past eighteen (18) years within any one of the more than thirteen (13) regional master franchisees that have operated in California during that period. (*See* Doc. 290-1, [Proposed] Order Granting Plaintiffs' Motion for Class Certification). There is no factual or legal basis for doing so.

Although Plaintiffs' Motion fails for several reasons, two issues, standing alone, each compel its denial. *First*, the class Plaintiffs propose to represent is comprised almost entirely of franchisees who agreed to arbitrate the disputes at issue here. And, under what is now settled law, JPI has every right to enforce those agreements under the doctrine of equitable estoppel. In two recent decisions, the Ninth Circuit has made clear that a class that encompasses members with valid arbitration agreements and others not subject to arbitration agreements cannot be certified. *See*, *e.g.*, *Lawson v. Grubhub, Inc.*, 13 F.4th 908 (9th Cir. 2021). Because virtually every member of this putative class (other than Plaintiffs themselves) must arbitrate these claims individually, no class may be certified.

*Second*, Plaintiffs' Motion is premised on the wrong legal standard. According to Plaintiffs, this Court can certify a class on all of their substantive claims because it can resolve the predicate question—*i.e.*, whether the class members were misclassified—on a class-wide basis, as whether JPI can pass the ABC test is subject to common proof. Even if that were true (it is not), and even if it addressed how this Court could resolve any of Plaintiffs' substantive claims on a class-wide basis (it does not), it would not justify certification because Plaintiffs' Motion presumes,

incorrectly, that the ABC test governs here. As the Massachusetts Supreme Judicial Court recently held, where, as here, the putative employee does not provide services directly to the putative employer, the Court must apply a joint employer test—*not* the ABC test—unless the "employee" shows that (i) the hiring party is the alter ego of the indirect putative employer, or (ii) the corporate structure was set up to evade the obligations imposed by the wage and hour laws. *Jinks v. Credico (USA) LLC*, 177 N.E.3d 509, 516-17 (Mass. 2021). Because Plaintiffs have neither addressed nor made any effort to satisfy either prong of this test (they cannot), and because they have made no effort to show that certification is appropriate under the joint employer test, their Motion must be denied.

These two failures aside, Plaintiffs' Motion fails for a far more mundane reason: they have done nothing to show how any of their claims can be resolved on a class-wide basis. Plaintiffs assert that a class should be certified because this Court can supposedly resolve the Prong B issue uniformly across the class. But there is no stand-alone claim for misclassification under California law that Plaintiffs can bring. To obtain certification, it is Plaintiffs' burden to show how this Court can determine, on a class-wide basis, whether JPI is liable to any particular unit franchisee for either minimum wage or overtime. They have proffered nothing which shows that, and for good reason: every franchisee operates its business quite differently. Some work in their business consistently, and some do not; some use employees and some do not, and some use them only sporadically; some operate competitive businesses, and some do not; and some are set up as entities, while others are not. Moreover, the amount of time franchisees spend at a particular account can vary from week to week based on both the changing conditions of the account and the customer's demands.

Plaintiffs' claim for expense reimbursement is not amenable to class treatment for similar reasons. In addition to the fact-intensive inquiries that will be needed to determine whether (as required by statute) amounts paid for supplies were reasonably and necessarily incurred, determining whether Plaintiffs are entitled to marketing fees or the franchise fees they were statutorily required to pay will require a host of individualized analyses, including whether those

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

EAST\190457113.1

1    fees were actually paid, whether the fees were paid by silent partners or family members, whether

2    the fees were refunded in whole or in part, and whether the accounts the franchisees purchased, or

3    their franchises in their entirety, were sold to others. But more importantly, for the 16-year period

4    prior to January 1, 2020, Plaintiffs' entitlement to relief under California Labor Code § 2802 must

5    be assessed (assuming it is not assessed under the joint employer test) under the *Borello* test. *See*

6    *S. G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*, 48 Cal. 3d 341 (1989) ("*Borello*"). Because

7    Plaintiffs make no effort to show how that multi-factor test can be resolved on a class-wide basis,

8    their Motion should be denied.

9    **II.    RELEVANT BACKGROUND FACTS**

10          **A.    JPI's Three-Tiered Franchising Business Is Recognized And Regulated By State And Federal Law.**

12          As this Court previously observed, JPI is engaged in the business of selling the right to use

13    its logo and "the exclusive right to sell cleaning franchises" —called "unit franchises" —to entities

14    known as regional master franchisees. (*See* Doc. 265, May 24, 2017, Order Granting Defendant's

15    Motion for Summary Judgment ["Order"], at 1.) JPI itself does not sell unit franchises and is not

16    involved in the master franchisees' sales processes (Doc. 247-3 at 7-8 (¶¶4-7), 188-189 ¶¶3-5), nor

17    does it provide any of the services (*i.e.*, sales and marketing and billing and collections) that master

18    regional franchisees provide for their unit franchisees. (*Id*. at 3-4 (¶¶ 9, 12).)

19          This sort of three-tiered franchise structure—where a franchisor licenses another entity to

20    sell and oversee the operation of unit franchises—is hardly unique to JPI. Both the Federal Trade

21    Commission ("FTC") and the State of California recognize and regulate the use of this business

22    model. Notably, the rule that regulates the sale of franchises in the United States—the FTC's

23    Franchise Rule—specifically provides that the term "Franchisor" includes sub-franchisors, which

24    it defines as "a person who functions as a franchisor by engaging in both pre-sale activities and

25    post-sale performance." 16 C.F.R. § 436.1(k); *accord* Cal. Corp. Code § 31008.5 (defining a sub-

26    franchise as a "contract… between a franchisor and a sub-franchisor whereby the sub-franchisor

27    is granted the right" to sell franchises).

28

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

EAST\190457113.1

1
2

**B.     JPI Has No Relationship With the Plaintiffs Or Any Other Unit Franchisee And Does Not Dictate The Terms of The Unit Franchise Agreements, Which Vary Among The Regional Master Franchisees.**

3

4
5
6
7
8
9
10

Between 2004 and 2007 (when these Plaintiffs signed their franchise agreements), there were seven (7) different regional master franchisees in California that, collectively, operated in eight (8) different geographical territories. (Declaration of Gary Bauer ["Bauer Decl."] ¶ 3.) An eighth regional master franchisee bought another territory in 2008 and, since then, several of these franchises have been sold and consolidated under different ownership. (*Id*.) All of these regional master franchisees were separately owned and operated entities, and all have their own, distinct employees (*see id.*; *see also* Doc. 247-3 at 7-8 (¶¶4-8), 188-189 (¶¶3-45, 8), 247-4 (Claringbole Dep. at 40-41, Garcia Dep. at 11-12, 36).

11
12
13
14

The named Plaintiffs in this case purchased unit franchises from two of those regional master franchisees. Plaintiff Vazquez purchased his unit franchise from an entity named New Venture of San Bernardino, LLC in 2007, and Plaintiffs Roman and Aguilar (along with a business partner) purchased their unit franchises from Connor-Nolan, Inc. in 2004. (Order at 2.)

15
16
17
18
19
20
21

None of the Plaintiffs ever had any contact with or spoke to anyone at JPI and, in fact, none of the Plaintiffs knew JPI *existed* at the time they purchased their franchises. (Doc. 247-4 (Aguilar Dep. at 41, Vazquez Dep. at 46-48, Roman Dep. 5/15/09 at 49, 51-52).) JPI was similarly unaware of Plaintiffs' existence. JPI never exercised any direct oversight over any of the Plaintiffs (or any other unit franchisee), had no records about any of the cleaning accounts they serviced and, at least prior to the institution of this suit, had no records which even identified who the Plaintiffs were. (*Id*. ¶ 35, 40.)

22
23
24
25
26
27

Despite these facts, Plaintiffs contend that JPI—an entity with which they had no relationship—somehow "misclassified" them as independent contractors and failed to reimburse them for expenses and pay them minimum wage and overtime they contend they were entitled to under California law. More than that, Plaintiffs claim that JPI did this to *every* unit franchisee of *every* regional master franchisee in the State of California over the past 18 years, and that this Court should certify (on each of their substantive claims) a class consisting of *all* those franchisees.

28

4

1    Certification is appropriate, Plaintiffs assert, because each of the contracts and policies used by the

2    regional master franchisees were drafted, implemented and dictated by JPI. (*See* Doc. 290,

3    Plaintiffs' Motion for Class Certification ["Motion"], at 7.)

4            The facts tell a very different story. Although JPI provides regional master franchisees with

5    a template franchise agreement, they are not required to use that template. (Doc. 247-4 (Kissane

6    Dep. at 25-27, 57-58, 178, Thompson Dep. at 17-19).) Because they are franchisors in their own

7    right, regional master franchisees have discretion as to the provisions they choose to include in the

8    franchise agreements they offer to their unit franchisees. (Doc. 247-4 Kissane Dep. at 26:7-22.)

9    Regional master franchisees are also free to charge their unit franchisees whatever franchise fees

10    they want and whatever royalty fees they want (*id*. at 32:14-18, 34:22-35:1). In fact, regional

11    master franchisees can elect not to charge unit franchisees a sales and marketing fee at all. (Doc.

12    247-4 (Kissane Dep. at 26, Doc. 247-3 at 7-8 (¶8) at 188-189 (¶5).)

13            This same autonomy extends to the manner in which regional master franchisees run their

14    respective businesses. While JPI makes its template manuals available to them, each of JPI's

15    regional master franchisees are free to set their own policies (Doc. 247-4 (Garcia Dep. at 39,

16    Claringbole Dep. at 57-58, Bentley Dep. at 20, 96-98), to determine which accounts to solicit, to

17    decide how (based on local conditions) to price accounts (Doc. 247-4 (Kissane Dep. at 38:18-

18    39:13, 43:1-8), and to decide what oversight (if any) they exercise over their unit franchisees'

19    operations (*id*. at 75:22-76:3).

20            Aside from the three unit franchise agreements Plaintiffs executed—two of which were

21    signed in 2004 with the same regional master franchisee and one of which was signed in 2007 with

22    a different regional master franchisee—Plaintiffs have not put any documents before this Court

23    which show (i) whether the terms of the franchise agreements issued by other regional master

24    franchisees and signed by members of the putative class were consistent with the two forms those

25    Plaintiffs signed at least 15 years ago, (ii) that the experiences of Plaintiffs (two of whom severed

26    their relationship with their respective regional master franchisees 13 years ago) are typical of the

27    experiences of other unit franchisees, or (iii) that the allegedly unlawful policies that were in place

28

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

all those years ago remained in place, either consistently among the regional master franchisees or at all, during the entire class period.

### C. Virtually Every Putative Class Member Signed an Agreement That Requires Them to Submit These Claims To Individual Arbitration.

Although there are numerous variations between the contracts signed by the members of this putative class, some consistencies exist. Most notable is the fact that virtually every franchise agreement—including the three signed by the named plaintiffs—contains a provision that obligates unit franchisees to arbitrate all claims arising out of or relating to the franchise agreement or the parties' rights and obligations. In fact, by 2007, every regional master franchisee included an arbitration clause in its franchise agreements, almost all of them (8 of the 10) had such a clause by 2006, and most (6 of the 10) included an arbitration agreement since at least 2005. (Bauer Decl. ¶ 4). As a matter of law, that requires individual arbitration. *See Epic Sys. Corp. v. Lewis,* __ U.S. __, 138 S. Ct. 1612, 1622 (2018) (arbitration under the FAA means "individualized arbitration").

### D. Every Franchisee Operates A Different Type of Franchise That Can Significantly Impact Both The Time They Spend And The Amount Of Revenue They Generate.

Although Plaintiffs attempt to portray the way franchisees operate their businesses as consistent (such that liability can be determined on a class-wide basis), the reality is drastically different. For example:

● *Because Franchisees Do Not Need to Personally Perform Cleaning Services and Use Employees to Varying Degrees, the Extent to Which a Franchisee Actually Spends Time Working Varies Significantly from Franchisee to Franchisee*: The franchise agreements Plaintiffs executed confirm they were not required to perform any cleaning services themselves. *See* Doc. 247-3, Aguilar Franchise Agreement, at 225, ¶ 5.B (requiring franchisee to "use its best efforts to hire qualified and competent employees" and noting that the franchise's services would be performed "by Franchisee or its authorized agents/employees"); *accord* Doc. 247-3, Vazquez Franchise Agreement, at 257, ¶ 5.B. For this reason, many franchisees—including some of the Plaintiffs—hired employees to perform some or all the cleaning work their businesses provided.

The extent to which Plaintiffs and other franchisees (as opposed to their employees) spent time working (and would potentially be entitled to wages if they were misclassified) therefore varied significantly.

Plaintiff Roman, for example, hired employees to service her cleaning accounts, trained those employees, decided when they would work and how much they would be paid, and supervised their work. (Doc. 247-4 (Roman Dep. 5/15/19 at 35-37, 39-40).) While Plaintiff Aguilar and his business partner (Cesar Lazaro) originally cleaned their franchise's accounts themselves (either together or separately), after two or three years, they began hiring different employees to service those accounts. (*Id.* (Aguilar Dep. at 52-53).) By 2008, Aguilar stopped doing any cleaning work and focused his efforts on customer service. (*Id.* ¶¶ (Aguilar Dep. at 57-59, 81-83, 86-87) Other franchisees, including some of the Plaintiffs, have employed family members to service their accounts: Lazaro's wife at times helped Aguilar and Lazaro clean accounts (*id.* (Aguilar Dep. at 72-76, 79-81, 85, 117, 120); Vazquez occasionally used his mother to help clean accounts and, for her services, paid her half the fees the franchise generated from those accounts. (*Id.* (Vasquez Dep. at 48, 99, 100-101, 105, 107, 114).)

Another franchisee, Jose Rodriguez, testified that he and his partner sometimes used an employee, that he and his partner would sometimes clean an account by themselves, and at other times all three of them would clean that same account. (*See* Rosin Decl. Ex. 1 [Rodriguez Dep. Vol. 1 39:4-40:18, 44:19-45:11].)

● *The Amount of Revenue Franchisees Generated Varied Significantly and Is Not Necessarily Accurately Reflected in any Documents*: Although some franchisees operate small businesses or use their franchises to supplement their income, others run extensive operations that, in several cases, gross between $30,000 and $40,000/month. (James Smith Declaration ¶ 4.) The figures, however, do not always reflect each franchisee's total revenue.

Unit franchisees are entitled to do their own billing and collecting if they so choose. (Doc. 247-4 (Kissane Dep. at 107.) And, at times, franchisees bill customers separately for services that are not reflected on any documents they receive from their respective regional master franchisees.

EAST\190457113.1

For instance, former franchisee Jose Rodriguez provided services to a customer called Pac Tech through the franchise he and his partner acquired from their regional master franchisee. (*See* Rosin Decl. Ex. 1 [Dep. Vol. 1 91:1-92:3 and Ex. 4.) At certain times, Mr. Rodriguez and his partner provided "special services"—*i.e.*, services (like floor buffing) beyond those required in the customer's contract—to Pac Tech. In November of 2020, for example, Mr. Rodriguez and his partner, who also ran a cleaning business called "E&J Commercial Cleaning," sent Pac Tech an invoice for $3,000 for special services. (*See* Rosin Decl. Ex. 4 [Dep. Ex. 11].) Even though the customer was one they acquired through their Jan-Pro franchise, the invoice for those special services was run through E&J Cleaning, *not* the regional franchise developer. (*Id.*; *see also* Rosin Decl. Ex. 2, Dep. Tr. Vol. 2 at 9:22-11:1.)

●      *There Are No Records Which Show The Hours Franchisees Work, Which Vary Greatly from Franchisee to Franchisee*: As independent contractors, unit franchisees control entirely the number of hours they spend (if any) doing cleaning work for their customers. For example, there are some franchisees, like Esmerelda Nunez (Jose Rodriguez's partner), who generated revenue from their businesses when they were out of the country and not doing *any* cleaning work. (Rosin Decl. Ex. 3 [Dep. Tr. Vol. 3 27:12-28:14].) And, when two partners (like Nunez and Rodriguez) clean together, it takes them half the amount of time to complete the customer's scope of work (*id.*, Dep. Tr. Vol. 1 28-29).

With respect to those unit franchisees who actually perform cleaning services, no two have the same experience. In fact, while they are pressing an overtime claim on behalf of every unit franchisee, not even all the Plaintiffs claim to have worked overtime hours. Although Roman alleges she worked "47 to 67 hours per week" (Doc. 292-10 [Declaration of Gloria Roman] ¶ 8), Aguilar never makes such a claim. To the contrary, Aguilar admits he worked "much less than 40" hours per week on his accounts. (Doc. 247-4 (Aguilar Dep. at 47, 115.) And while Vazquez now asserts he *may* at times have worked more than 40 hours a week including travel time (*see* Doc. 292-8 [Declaration of Gerardo Vasquez] ¶ 6), even that assertion should be taken with a grain of salt, as: (i) Vazquez admitted that the number of hours he spent cleaning varied significantly

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

EAST\190457113.1

depending on "how messy" the accounts were (Doc. 247-4 (Vazquez Dep. at 92:9-93:2, 105:5-12)) and how many days he visited the account, which varied over time (*id*. at 94:13-19); and (ii) the franchisees that took over Vazquez's accounts after he terminated his franchise advised their regional master franchisee that it took far less time to clean those accounts than Vazquez indicated. (*Cf*. Vazquez Dep. at 105:8-12, where Vazquez testified it took 3-4½ hours to clean an account, and Doc. 247-3 at 189, 216-218 (¶6 and Tab B), where the franchisee that assumed that account said it took just 2 hours.)

●   *The Amount of Hours Worked Are Impacted Greatly by any Number of Factors, Causing the Amount of Revenue Generated by Franchisees to Vary Greatly*: The amount of time franchisees spend working can also be greatly impacted by a variety of other factors, including: the size of the account, the scope of tasks to be performed, the type of facility (retail, restaurant, medical), frequency of services performed, occupant density, fixture and floor types, staffing levels, as well as any special services a customer might request, the number of accounts a franchise cleans, the distance between accounts, account load per day, and the traffic and other conditions affecting any required travel between accounts. (*See* Declaration of James Smith Decl. ¶ 4.) For example, one franchisee generates about $5,066/month in gross revenue from three accounts, one of which requires service once a week and two of which ask for service 5 times a week. *Id*. Another franchisee in the same region generates a little less ($4,832.45/month) from 12 accounts, out of which 4 get service once per week, 4 get service twice per week, one gets service three times per week, and three get service five times per week. *Id*. Similarly, while one franchisee owns four accounts that generate more than $10,000/month in gross revenue, another franchisee who also owns four accounts generates only $2,252/month in gross revenue. *Id*.

●   *The Amount of Revenue Franchisees Generate on an Hourly Basis Varies Over the Course of Each Franchisee's Relationship with Their Regional Master and Varies Greatly from Franchisee to Franchisee*: Just as the hours worked by franchisees vary materially over time and from franchisee to franchisee, so do franchisees' revenues. This Court already noted that each regional master franchisee has "significant discretion" as to how they choose to bid accounts

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

EAST\190457113.1

(Order at 4) and that Plaintiffs' regional master franchisees used their own, individual methods—not those recommended by Jan-Pro—in bidding accounts. *Id*. Further, franchisees are—and always have been—able to (i) accept or decline an account, (ii) negotiate continuing or interim modifications to either rates or scope of services with their customers, and (iii) sell their customers special one-time services. *Id*. As noted above, franchisees sometimes bill customers separately for these special services, and do not advise their regional master franchisees of this additional income.

Determining the monies generated by franchisees (and whether it exceeded the minimum wage, which itself has varied many times over the course of this 18-year class period, *see* https://www.dir.ca.gov/iwc/MinimumWageHistory.htm) will require a month-by-month analysis of both each customer's payments and each franchisee's hours worked, which also varied over time. (*See* ECF 247-3 (Vazquez Dep., at 92:9-93:2, 105:5-12.)) Plaintiffs' own filings evidence the significant variations this analysis will entail. Plaintiff Aguilar, for example, never claims he made less than minimum wage (*see*, *generally*, Doc. 292-9 [Declaration of Juan Aguilar]), and to the extent Plaintiff Roman is making such a claim, it contradicts her own Declaration. Roman claims she worked 47-67 hours a week and made approximately $3,200/month (after payment of any fees she paid her regional master franchisee). (Doc. 292-10 ¶ 8.) Even if that were true—and it conflicts with both the documents and her testimony at deposition—Roman's figures establish that, at worst (when she allegedly worked 67 hours/week), she always made more than the minimum wage (which increased from $6.75/hour to $11.00/hour over the term of her franchise agreement): $3200 / 288.1 hours/month (67 hours/week x 4.3 weeks/month) = $11.1/hour.

● *Many Franchisees Choose to Form Entities, Which Would Themselves Be the Unit Franchisees' Direct Employers*: In its Order, this Court recognized that "[u]nit franchisees could purchase franchises in their individual capacities, operate under fictitious names, or form partnerships or corporations with employees to service the accounts assigned by the respective regional master franchisees." (Order at 2.) Although two of these Plaintiffs purchased their franchises in their individual capacities (Aguilar purchased in partnership with another franchisee), their decision to do so is hardly the norm. Although the percentage can vary, of the 601 unit

franchises presently active in California, about 89% are business entities. (Bauer Decl. ¶ 5.) In determining whether these and similar entities are properly considered members of the putative class, the Court will need to resolve, on an individual basis, whether each such entity can be deemed an employee for purposes of the Labor Code. *See Chebotnikov v. LimoLink, Inc.*, No. 14 Civ. 13475 (FDS), 2017 WL 2909808, at *3 (D. Mass. July 6, 2017) (determining whether an individual can sue on behalf of the corporation it formed will "require[] an individualized and fact-intensive inquiry").[1]

●   *Some Franchisees Operate Competitive Businesses*: Because franchisees are not required to clean accounts themselves, many operate other businesses. In fact, it is undisputed that many franchisees operate cleaning businesses which compete with their Jan-Pro franchises. (Doc. 247-3 (Roman Dep. 6/17/09 at 160-63, 167) From 2004 (when she signed her Franchise Agreement) through 2007, plaintiff Roman cleaned houses for a company called Eco-Care. (*Id.* (Roman Dep. 5/15/09 at 12-13, 15, 17-19, Roman Dep. 6/17/09 at 160-163).) She then started her own commercial and residential cleaning business, which she named Natural Living Professional Housekeeping. (*Id.*) Roman actively solicited additional residential and commercial cleaning accounts to try and grow her business (*id.* (Roman Dep. 6/17/09 at 167) and when she was successful in obtaining such accounts, she did the work on behalf of National Living Professional Housekeeping, not her Jan-Pro franchise. (*Id.*) Unlike Roman, Vazquez did not operate a competitive cleaning business, but he did continue to work in various other capacities during the term of his franchise, including cleaning garages, lawn care, and truck washing. (ECF 247-3 (Vasquez Dep. at 68-71).)

In deciding whether a class member has a viable minimum wage or overtime claim, or if it

---

[1]     This is consistent with the Massachusetts Independent Contractor Law ("ICL"), which the California Supreme Court adopted in *Dynamex Operations W., Inc. v. Sup. Ct.*, 4 Cal. 5th 903 (2018). The ICL requires a plaintiff to prove that he was an "*individual* performing any service" for the defendant before the presumption of employment is triggered. Mass. Gen. L. c. 149, § 148B (emphasis added). And, in the context of the ICL, the term "individual" "refers to single human beings and does not include business entities." *Debnam v. FedEx Home Delivery*, No. 10-11025-GAO, 2013 WL 5434142, at *1 (D. Mass. Sept. 27, 2013); *accord Cook v. Estes Express Lines, Corp.*, No. 1:16-cv-11538-RGS, 2018 WL 1773742, at *1 (D. Mass. Apr. 12, 2018).

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
EAST\190457113.1

incurred reasonable and necessary expenses, the trier-of-fact will need to consider any number of the many factors described above, all of which impact both the time (if any) franchisees spent servicing their accounts, the revenue they generated, and the expenses they incurred.

## I.    ARGUMENT

### A.    The Applicable Standards.

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 388, 348 (2011) (internal quotations omitted). "To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23" through "evidentiary proof." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal quotations omitted). Specifically, "[t]he party seeking class certification bears the burden of demonstrating that it has met all four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)." *In Re Paxil Litig.*, 212 F.R.D. 539, 543 (N.D. Cal. 2003). That means that where, as here, the plaintiffs seek certification under Rule 23(b)(3), they must show with "evidentiary proof" that "questions of law or fact common to class members predominate over any questions affecting only individual members." *Comcast*, 569 U.S. at 33. Class certification is appropriate only if, after a "rigorous analysis," the Court concludes that the requirements of Rule 23 have all been met. *Id*. While a court may not decide the merits of a case in conducting this analysis, its decision on a motion for class certification "generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) (internal quotations omitted). In fact, "[b]ecause the 'nature of the evidence that will suffice to resolve a question determines whether the question is common or individual,' 'a district court *must* formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case.'" *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 268 F.R.D. 604, 609 (N.D. Cal. 2010) (emphasis added).

Here, aside from their bare assertion that this Court can resolve on a class-wide basis the predicate question of whether they were misclassified—an assertion that is itself incorrect and

based on the wrong legal standard—Plaintiffs never explain how any of their substantive claims can be resolved on a class-wide basis. For the reasons set forth below, they plainly cannot be.

**B.      Certification Is Not Appropriate, and Plaintiffs Are Not Typical or Adequate Class Representatives, Because Virtually Every Putative Class Member Has Agreed to Arbitrate These Claims.**

In its Order granting JPI's Motion for Summary Judgment, this Court noted that it was "unclear" why Plaintiffs had "sued only Jan-Pro, not the parties they contracted with directly." (Order at n.1.) The answer to that question—as this Court suspected—is that Plaintiffs' "agreements with their regional master franchisees included mandatory arbitration provisions." *Id.*

But Plaintiffs are scarcely alone in agreeing to arbitrate these claims. Since 2004, **virtually every unit franchisee that signed a franchise agreement**—which includes almost every member of this putative class—agreed to arbitrate either "all" disputes (*see*, *e.g.*, Doc. 247-3 [Page 252 of 365] (Tab 18, Vazquez Franchise Agreement), ¶ 16.2) or "all" disputes arising out of or related to the franchise agreement and the parties' rights and obligations (*see*, *e.g.*, Doc. 247-3 [Page 222 of 365] (Tab 16, Aguilar Franchise Agreement), ¶ 16.A)). Because JPI may enforce those agreements, class certification is inappropriate.[2]

**1.      JPI Has the Right to Enforce the Arbitration Agreements.**

JPI is not a signatory to the putative class members' arbitration agreements, nor is it expressly covered by their terms. Neither fact, however, impacts JPI's right to enforce those agreements.[3]

---

[2]      JPI acknowledges that, because of the time that has elapsed and the litigation that has taken place, it has likely waived its right to enforce those arbitration agreements as to the named Plaintiffs. But it has not waived—and indeed could not have waived—its right to seek to enforce those agreements as to every other unit franchisee because none of those franchisees are presently before the Court. *See In re TFT–LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2011 WL 1753784, at *4 (N.D. Cal. May 9, 2011) ("It does not appear to the Court that defendants could have moved to compel arbitration against such entities prior to the certification of a class in this case because, as defendants point out, 'putative class members are not parties to an action prior to class certification.'"); *accord Mora v. Harley-Davidson Credit Corp.*, No. 1:08–cv–01453–AWI–BAM, 2012 WL 1189769, at *15 (E.D. Cal. Apr. 9, 2012).

[3]      Should it be forced to seek enforcement of the arbitration agreements by individual motions to compel arbitration, JPI reserves the right to assert that its ability to enforce the agreements is a question that must be resolved by an arbitrator. *See Blanton v. Domino's Pizza Franchising, LLC*,

1    "The United States Supreme Court has held that a litigant who is not a party to an

2    arbitration agreement may invoke arbitration under the [Federal Arbitration Act] if the relevant

3    state contract law allows the litigant to enforce the agreement." *Kramer v. Toyota Motor Corp.*,

4    705 F.3d 1122, 1128 (9th Cir. 2013). California has recognized the same principle. Under

5    California law, which applies here, a non-signatory may invoke arbitration under the doctrine of

6    equitable estoppel even when, as here, "a signatory 'attempts to avoid arbitration by suing

7    nonsignatory defendants for claims that are based on the same facts and are inherently inseparable

8    from arbitrable claims against signatory defendants.'" *Franklin v. Cmty. Reg'l Med. Ctr.*, 998 F.3d

9    867, 870-71 (9th Cir. 2021) (quoting *Metalclad Corp. v. Ventana Env't Org. P'ship*, 109 Cal. App.

10   4th 1705 (2003) (quotation marks and citation omitted)). In applying the doctrine, courts "look to

11   'the relationships of persons, wrongs and issues,' and in particular, whether the claims are

12   'intimately founded in and intertwined with the underlying contract obligations.'" *Franklin*, 998

13   F.3d at 871 (quoting *Metalclad*, 109 Cal. App. 4th at 1705); *accord In re Pac. Fertility Ctr. Litig.*,

14   814 Fed. Appx. 206, 209 (9th Cir. 2020).

15   That standard is amply met in this case. Not only do Plaintiffs repeatedly claim that the

16   regional master franchisees act as JPI's agents (*see* Compl. ¶¶ 8-16) and that JPI is a "beneficiary"

17   of the unit franchise agreements (*id.* ¶ 20), but Plaintiffs' Second Amended Complaint is premised

18   entirely on its assertions that JPI (i) dictates the terms of Plaintiffs' franchise agreements (*id.* ¶¶ 16-

19   19), (ii) defrauds unit franchisees and breaches those agreements by failing to supply the required

20   amount of business (*id.* ¶¶ 26-32, 36, 39), and (iii) through its regional master franchisees, uses

21   the franchise agreements to misclassify unit franchisees and deduct "excessive fees" from the

22   revenue paid to unit franchisees (*id.* ¶¶ 41, 42, 44, 55). *See Franklin*, 998 F.3d at 871-76

23   (compelling employee of staffing company to arbitrate wage claims she brought against the

24   hospital she worked at because, even though the plaintiffs "omit[ted] any mention of [her direct

25

26   962 F.3d 842 (6th Cir. 2020) (because the parties agreed to delegate arbitrability questions to
     arbitration, whether non-signatory could enforce arbitration agreement was a question for the
     arbitrator); *accord Portland Gen. Elec. Co. v. Liberty Mut. Ins. Co.*, 862 F.3d 981, 985-86 (9th

27   Cir. 2017) (whether signatory was obligated to arbitrate with non-signatory sureties was a question

28   "of the scope of the arbitration agreement in the Guaranty, delegated to the arbitrators").

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

EAST\190457113.1

employer] from her complaint, the substance of her claims is rooted in her employment relationship with [her employer], which is governed by the Arbitration Agreement").

### 2. The Claims Are Within the Scope of the Arbitration Agreements

To compel a plaintiff to arbitrate its claims against a non-signatory, "the court must decide both that (1) the plaintiff is equitably estopped from escaping the contract, and (2) the claims fall within the scope of the contract's arbitration clause." *Franklin*, 998 F.3d at 872. Here, the agreements before this Court (those signed by Plaintiffs; *see, e.g.*, Doc. 247-3 at pp. 231-32) show that the arbitration agreements incorporate the Commercial Rules of the American Arbitration Association. Therefore, that question has been delegated to the arbitrator. *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (the "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability," at least where the parties are sophisticated, but noting that its holding should not be interpreted "to require that the contracting parties be sophisticated or that the contract be 'commercial' before a court may conclude that incorporation of the AAA rules constitutes 'clear and unmistakable' evidence of the parties' intent").[4] But even if it had not been, broad clauses like those set forth in the franchisees' agreements—which cover "all" disputes relating to or arising out of the franchise agreements—encompass the claims at issue here, which rest on the parties' classification in, the breach of, the control exercised under, and the fees paid pursuant to those agreements.

### 3. Because All Putative Class Members Must Arbitrate, Class Certification Is Inappropriate.

In *Berman v. Freedom Financial Network, LLC*, 400 F. Supp. 3d 964 (N.D. Cal. 2019),

---

[4]       JPI acknowledges that certain district courts have required a showing of a certain level of sophistication before applying this rule. JPI submits that any sophistication requirement would be preempted by the FAA because "sophistication" is not a generally applicable contract requirement as called for under Section 2 of the FAA. *See Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 104 n.3 (3d Cir. 2020) (rejecting the identical "sophistication" argument in a case brought against a commercial cleaning franchisor). Of course, if such a standard were to apply, this Court would need to conduct individualized analyses into the sophistication of each unit franchisee to determinate whether that franchisee clearly and unmistakably agreed to delegate arbitrability questions to an arbitrator.

15

1    this court observed that "the Ninth Circuit has suggested, without expressly holding, that a class

2    encompassing members with valid arbitration agreements and others not subject to the arbitration

3    agreements cannot be certified." *Id.* at 986 (citing *O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087,

4    1094 (9th Cir. 2018)). The Ninth Circuit has since made clear that its decision in *O'Conner*

5    reflected far more than a suggestion. In *Lawson v. Grubhub, Inc.*, 13 F.4th 908 (9th Cir. 2021), the

6    Ninth Circuit noted that, in *O'Conner*, it had "decertified a class because it 'include[d] drivers who

7    entered into agreements to arbitrate their claims and to waive their right to participate in a class

8    action with regard to those claims.'" *Id.* at 913. The situation in *Lawson*, it held, was "even less

9    worthy of certification than O'Connor" because "[a]ll members of Lawson's putative class—

10   except Lawson and one other—signed agreements waiving their right to participate in a class

11   action." *Id.*

12           Because the three named Plaintiffs are likely not bound to arbitrate, and because virtually

13   every other putative class member is bound to arbitrate, Plaintiffs are neither typical nor adequate

14   class representatives. *See Lawson*, 13 F.4th at 913 ("The district court correctly held Lawson could

15   not satisfy the requirements in Rule 23(a) because he is neither typical of the class nor an adequate

16   representative"); *Tschudy v. J.C. Penny, Corp*, Case No. 11cv1011, 2015 WL 8484530, at *3 (S.D.

17   Cal. Dec. 9, 2015) (finding lack of typicality and adequacy where putative class members

18   employed after July 17, 2009 were subject to an arbitration agreement but the named plaintiffs

19   were not subject to the arbitration agreements).

20   **C.     Plaintiffs Have Done Nothing to Show That They Satisfy the Rule 23**
            **Requirements Under the Proper Legal Standard.**

21

22           Plaintiffs' Motion is premised entirely on their contention that their claims for minimum

23   wage and overtime violations and expense reimbursement are governed by the ABC test. In fact,

24   the sole contention they advance in support of their predominance argument is their incorrect claim

25   that "each of the three prongs of the ABC test is capable of class-wide determination" (Motion at

26   20). However, as discussed in JPI's opposition to Plaintiff's motion for summary judgment, the

27   ABC test does *not* apply in this case—the joint employment standard does—and it certainly does

28

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

not apply to Plaintiffs' claims for expense reimbursement. (*See* Opposition at pp. 16-17.)

To be deemed a joint employer, a party must (a) "exercise control over the wages, hours or working conditions" of the workers, or (b) "suffer or permit" those persons to work, or (c) engage those persons, "thereby creating a common law employment relationship." *Martinez v. Combs*, 49 Cal. 4th 35, 64 (2010); *see also Salazar v. McDonald's Corp.*, 944 F.3d 1024, 1027 (9th Cir. 2019) (holding that a franchisor was not a joint employer under this standard). Plaintiffs have made no effort to show that they satisfy the Rule 23 requirements under this standard—nor could they, as this Court already held Plaintiffs could not establish an employment relationship under *any* of these prongs. (*See* Order at 5-9.) As a result, they have failed to satisfy their burden and their Motion must be denied. *See Haitayan v. 7-Eleven, Inc.*, No. CV 17-7454 DSF (ASx), 2021 WL 757024, at *6 (C.D. Cal. Feb. 8, 2021) (denying motion for class certification on Section 2802 claim because Plaintiffs failed to explain why common questions predominated under the correct standard) (on appeal).

### D.     Individual Issues Predominate on Each of Plaintiffs' Substantive Claims

Even if Plaintiffs had addressed the correct standard, their Motion still must be denied because an analysis of their individual claims demonstrates that determining whether liability exists will entail the resolution of a host of individualized issues.

#### 1.     The Minimum Wage and Overtime Claims

Count III of Plaintiffs' Second Amended Complaint asserts that JPI's "misclassification of its cleaning workers as independent contractors has deprived them of the protections of the wage laws of California, including guaranteed minimum wage [citations omitted] [and] overtime[.]" (Complaint at 8.) According to Plaintiffs, this allegedly uniform "policy" of misclassification, standing alone, warrants certification on all their claims. But that presumes far too much, because no liability attaches to misclassification itself. *See, e.g., Castillo v. Bank of Am.,* 980 F.3d 723, 731 (9th Cir. 2020) (affirming denial of class certification, despite common unlawful policy, where "complicated individualized inquiries" would be necessary to determine liability). Rather, liability would result only if the unit franchisees were (i) not generating revenues equal to minimum wage

for the time they worked, or (ii) not receiving overtime wages when they worked as non-exempt employees for more than eight hours in a day or forty hours in a week.

Nowhere in their Motion do Plaintiffs explain how *those* required showings could be made on a class-wide basis. The myriad different ways in which unit franchisees operate their businesses (*see* pp. 6-11, *supra*) show they cannot. Indeed, not even all the Plaintiffs claim to be owed minimum wage or entitled to overtime. In any event, Plaintiffs have provided no indication how this Court could possibly determine, based on representative testimony, whether any particular unit franchisee generated revenues equal to at least minimum wage or was entitled to overtime. That alone warrants the denial of Plaintiffs' Motion—even if they were in fact misclassified. *See Lou v. Ma Labs., Inc.*, No. C 12-05409 WHA, 2014 WL 68605, *3 (N.D. Cal. Jan. 8, 2014) (this Court denied class certification, in part, because "plaintiffs have *not* identified a common method of proof on a classwide basis for their off-the-clock claims in this action").

> **a.    Given The Many Different Ways Unit Franchisees Operate Their Franchises, Plaintiffs Have Failed to Demonstrate How Their Alleged Misclassification Establishes Liability For Minimum Wages And Overtime.**

Plaintiffs argue that common questions predominate because "all class members performed the same work (commercial cleaning)" pursuant to similar franchise agreements "under the same blanket categorization as 'independent contractors'" and were required to follow similar policies with respect to the payment of insurance, marketing and franchise fees. (Motion at 20.) Although these allegedly common features might be considered evidence of whether the members of the putative class were employees or independent contractors, *none* of those features in any way indicate whether *any* particular class member is owed additional minimum wages or overtime pay.

Those questions, which are entirely dependent on individualized facts—such as how long it took to service accounts (which varied over time), whether the franchisees had employees do all or part of the work, performed services themselves and, if so, when and how often, traveled between accounts (and, if so, how often and how far), the condition of the accounts they serviced (which varied from day-to-day), the amounts they were paid (which varied depending on the nature

of the work), and whether franchisees were engaged in personal business (such as operating their other businesses)—must be amenable to class-wide *answers* before a class if certified.[5] *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 388, 350 (2011) ("What matters to class certification ... is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation.") (internal quotations omitted). And to ensure that common answers exist, "the court must 'ensure that the class is not defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct.'" *Castillo*, 980 F.3d at 730.

In *Castillo,* for example, the plaintiffs sought to certify a class of workers who were allegedly paid an incorrect rate for overtime because of bonuses they received. The class, however, included "[t]hose employees who did not work overtime or did not earn a bonus during the same period in 2016 or 2017" and, therefore, "[could] have no claim for compensation based on an erroneous method of overtime-rate calculation*." Id.* at 731. Just as here, the *Castillo* plaintiffs asserted that this issue went to damages, not liability, and that, under *Vaquero v. Ashley Furniture Industries., Inc.,* 824 F.3d 1150, 1154 (9th Cir. 2016), individual damage calculations alone did not defeat predominance. *Id.* But *Vaquero* concerned a situation where liability had been found with respect to the class—*i.e.*, the only issue that remained was the amount of damages to be paid. As *Castillo* confirmed in affirming the denial of class certification, where, as here, "determining liability for all class members would require complicated individualized inquiries," certification is not appropriate. *Castillo*, 980 F.3d at 731; *see also Ladore v. Ecolab, Inc.,* No. CV-11-09386 GAF FMOX, 2012 WL 12861141, *12 (C.D. Cal. Apr. 11, 2012) (denying class certification because plaintiff did "not offer[ ] any evidence to suggest that all putative class members' Weekend Duty

---

[5]     Further, because regional masters may have bid accounts using an industry standard process—the ISSA standards (Doc. 247-4 (Kisane Dep. 39, 41, 46, 119, 121, 124, Thompson Dep. 22-23, W.Parker Dep. 32-33, Claringbole Dep. at 52); Doc. 247-3 at 321-343 (ISSA guidelines) —JPI will challenge, by using both the bid materials and the ISSA standards—any franchisee who claims that (i) the hours it spent cleaning an account were materially in excess of those set forth in the regional master's bid, or (ii) the amount of revenue generated was somehow less than the minimum wage.

was all alike such that it would all be or all would not be compensable overtime under such a fact-driven analysis"); *Wang v. Chinese Daily News, Inc.,* 737 F.3d 538, 835 (9th Cir. 2013) (rejecting district court's conclusion that common questions predominate where plaintiffs relied exclusively on employer's policy of classifying all reporters and account executives as exempt employees).

In sum, even if Plaintiffs were misclassified, they have failed to show how their alleged misclassification would allow a court to determine on a class-wide basis whether JPI was liable to any particular franchisee for either minimum wage or overtime. Plaintiffs' motion should therefore be denied. *See Stiller v. Costco Wholesale Corp.,* 298 F.R.D. 611, 624, 629 (S.D. Cal. 2014) (predominance was not satisfied because liability issues would turn on individualized inquiries, even though employer had *de facto* policy of detaining employees without pay).

### b. For The Same Reason, Even If Plaintiffs Could Show Class-Wide Liability, The Difficulty in Ascertaining Individual Damages Would Predominate.

Even if liability could be determined on a class-wide basis, class certification should be denied because the difficulty in determining individual damages would overwhelm any common issues. *See Lou,* 2014 WL 68605 at *2-3 (predominance could not be established in an off-the-clock claim because, among other things, there was no proof of class-wide damages tethered to plaintiffs' theory of liability) (citing *Comcast Corp. v. Behrend,* 569 U.S. 27, 34 (2013)).

In *Comcast,* the Supreme Court held that for a plaintiff to show Rule 23(b)(3) predominance, he or she must show: (1) that the existence of individual injury resulting from the alleged violation is "capable of proof at trial through evidence that [is] common to the class rather than individual to its members"; and (2) that the damages resulting from the injury are measurable "on a class-wide basis through use of a common methodology." *Comcast,* 569 U.S. at 30 (internal quotations omitted). Plaintiffs cannot show—and have never attempted to explain how they could show—how damages could be calculated on a class-wide basis through a common methodology. Given the numerous situations in which there may not be *any* damages, Plaintiffs' individual damage calculations would "overwhelm questions common to the class." *Id.; See Stiller,* 298 F.R.D. at 627 ("individualized damages determinations can defeat Rule 23(b)(3)'s predominance

1    requirement"). Plaintiffs' motion for class certification should be denied as to the minimum wage

2    and overtime claims for this reason as well.

3              **2.     The Reimbursement Claims**

4              In Count III, Plaintiffs also allege that, as a result of JPI's alleged misclassification, JPI (i)

5    made improper deductions from the franchisees' "pay" by charging franchise fees, and (ii) failed

6    to reimburse Plaintiffs for their business expenses, such as cleaning supplies, equipment, uniforms

7    and insurance, allegedly in violation of California Labor Code §§ 221 and 2802. (*See* Complaint

8    at 8-9.) Because almost all of Plaintiffs' reimbursement claims must be resolved under the *Borello*

9    multi-factored test, and because the unit franchisees run their cleaning businesses in myriad

10   different ways, individual issues will predominate.

11            **a.     Plaintiffs Have Done Nothing to Show That They Satisfy the
                       Rule 23 Requirements Under the Proper Legal Standard**

12

13            In September 2019, the California legislature passed Assembly Bill No. 5 ("AB 5"), which

14   codified the ABC test that the California Supreme Court adopted in *Dynamex Operations West*

15   *Inc. v. Sup.r Ct.,* 4 Cal. 5th 903 (2018). *See* Cal. Lab. Code §§ 2775, *et seq.* Although AB 5

16   extended the reach of the ABC test and made it applicable to the California Labor Code generally,

17   it limited that extension "to work performed on or after January 1, 2020." Cal. Lab. Code

18   § 2785(c); *see also Lawson,* 13 F.4th at 912 (ABC test applied to Labor Code claims

19   "prospective[ly]"). Therefore, assuming the ABC test (as opposed to the joint employer test) had

20   *any* application here, the Court must first determine whether that test or its predecessor—the

21   *Borello* test—applies to Plaintiffs' claims under Sections 218.5, 221, and 2802 of the California

22   Labor Code. At least for the period prior to January 1, 2020, the answer is clear: *Borello* applies.

23            While *Dynamex*'s impact was significant, its reach was actually quite limited. As the Ninth

24   Circuit recognized, "*Dynamex* did not purport to replace the *Borello* standard in every instance

25   where a worker must be classified as either an independent contractor or an employee for purposes

26   of enforcing California's labor protections." *California Trucking Ass'n v. Su*, 903 F.3d 953, 959

27   n.4 (9th Cir. 2018). Rather, as *Dynamex* itself specifically noted, it was deciding the standard to

28

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

EAST\190457113.1

1   be applied "in one specific context" only: namely, "whether workers should be classified as

2   employees or as independent contractors *for purposes of California wage orders ....*" " *Dynamex*,

3   4 Cal. 5th at 913-14 (emphasis in original). The California Supreme Court emphasized this

4   limitation in *Vazquez v. Jan-Pro Franchising International, Inc.*, 10 Cal. 5th 944, 948 (2021),

5   when it repeatedly noted that its ruling in *Dynamex* applied in the context of the wage orders.

6         Plaintiffs' expense reimbursement claims do not arise under a wage order and are not

7   within the scope of the obligations imposed by those orders. *See Dynamex,* 4 Cal. 5th at 942

8   (plaintiffs' other causes of action "include Dynamex's alleged failure to comply with statutory

9   obligations that do not derive directly from the applicable wage order—for example, the obligation

10  to reimburse employees for business-related transportation expenses such as fuel or tolls") (citing

11  CAL. LAB. CODE § 2802). To the contrary, Plaintiffs seek the "reimbursement" of fees—such as

12  the royalties, franchise fees, and insurance payments they may have paid their regional master

13  franchisees—that have nothing to do with the limited expenses (uniforms and equipment) covered

14  by the wage orders. *See, e.g., Henry v. Cent. Freight Lines, Inc.*, No. 2:16-cv-00280-JAM-EFB,

15  2019 WL 2465330, at *7–8 (E.D. Cal. June 13, 2019) (plaintiff's claims for expense

16  reimbursement under § 2802 were "not grounded in the wage orders" and were therefore governed

17  by *Borello*); *Moreno v. JCT Logistics, Inc.*, 2019 WL 3858999, at *12 (C.D. Cal. May 29, 2019)

18  ("the [Wage Orders'] definitions of 'employ' do not extend to purely statutory claims," like claims

19  under Section 2802).

20        Determining whether an individual is an employee or independent contractor under the

21  *Borello* test involves the consideration of not only the principal control test— "whether the person

22  to whom services is rendered has the right to control the manner and means of accomplishing the

23  result desired"—but nine additional factors. *Dynamex*, 4 Cal. 5th at 922. And these "individual

24  factors cannot be applied mechanically as separate tests; they are intertwined and their weight

25  depends often on particular combinations." *Id*. (quoting *Borello,* 48 Cal. 3d at 351). Because the

26  *Borello* test applies prior to January 1, 2020 (at a minimum), and because Plaintiffs have done

27  nothing to show how the *Borello* test can be satisfied on a class-wide basis, their Motion must be

28

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

EAST\190457113.1

denied. *See Haitayan*, 2021 WL 757024, at *6 (denying certification on § 2802 claim because Plaintiffs failed to explain why common questions predominated under the correct standard).

> **b.**      **Plaintiffs Have Presented No Evidence of Any Expenses Incurred by Any Unit Franchisee After 2018 or How Claims For those Expenses Could Be Resolved on a Class-wide Basis**

To the extent the ABC test (as opposed to the joint employer test) is deemed to apply Plaintiffs' claims as of January 1, 2020, certification is still inappropriate. First, Plaintiffs have proffered nothing which shows what fees, if any, were paid since 2017, when the last of them terminated their relationship with their regional master franchisee. (Smith Decl. ¶ 3.) On a motion for class certification, a plaintiff "must demonstrate to the court's satisfaction, and not merely allege, that the suit is appropriate for class resolution." *In re Novatel Wireless Secs. Litig.*, No. 08-CV-1689 H(RBB), 2010 WL 11470156, at *2 (S.D. Cal. May 12, 2010). "Actual, not presumed, conformance" with the requirements of Rule 23 is "indispensable." *Wal-Mart*, 564 U.S. at 351.

Second, individual issues abound. Plaintiffs claim they are owed reimbursement for the franchise fees they paid to acquire their franchises, the cleaning supplies and equipment they purchased, and for uniforms and insurance. But as noted above, how unit franchisees conduct their businesses varies greatly. To determine whether Plaintiffs are entitled to be reimbursed for supplies they purchased, the Court will need to determine whether those supplies were purchased (in whole or in part) for the other cleaning businesses the franchisees operated and whether, based on each franchisees' circumstances, the purchases they made were reasonable and necessary. *See Buchanan v. Homeservices Lending L.L.C.*, No. 11cv0922 L(MDD), 2013 WL 1788579, at *4–5 (S.D. Cal. Apr. 25, 2013) ("Whether a business expense incurred is necessary is a question of fact that requires a look at what was reasonable under the circumstances"). And as to the franchise fees and royalties paid, the Court will need to determine—assuming it concludes such fees are legally compensable—whether those fees were actually paid (in some instances franchisees were not required to pay the fees required by their agreements; *see* p. 5, *supra*), whether the fees were paid (in whole or in part) by silent partners or family members and, if so, whether those loans were paid off (*see* Doc. 247-4 (Vasquez Dep.) at 149:6-149:9; Rosin Decl. Ex. 1 [Rodriguez Dep. 18:7-

19:5]), whether the fees were refunded in whole or in part (Vazquez Dep. at 148:8-149:4), and whether the accounts the franchisees purchased, or their franchises in their entirety, were sold to others (Doc. -247-3 at 233, 247, 267 (§21) ECF-247-3 at 272-274). Plaintiffs never explain how these costs could be calculated such that "[q]uestions of individual damage calculations will [not] inevitably overwhelm questions common to the class." *Comcast,* 569 U.S. at 34.

### E.   Individual Issues Predominate Under the ABC Test

Although Plaintiffs assert that the question of misclassification can be resolved on a class-wide basis solely by looking at Prong B, that argument ignores the inherently individualized nature of the Prong B inquiry when, as here, two businesses are involved. Even if JPI and the unit franchisees were engaged in the same course of business (and they certainly are not), JPI can satisfy Prong B by "establish[ing] that the [plaintiffs are] 'performing services that are part of an independent, separate, and distinct business from that of [JPI].'" *Okeke v Dynamex Ops. E., Inc.*, 2013 WL 7085617, at *2 (Mass. Super. Dec. 03, 2013) (quoting *Awuah v. Coverall N. Am., Inc.*, 707 F. Supp. 2d 80, 82 (D. Mass. 2010)).

Here, unit franchisees operate their own businesses (commercial cleaning businesses) and service their own clients. Where, as here, the prospective employer *and* the prospective worker *both* operate businesses, the prospective employer does not fail Prong B merely because its business operates in the same field as the worker's business. *Okeke*, 2013 WL 7085617, at *1 (noting that were the rule otherwise, "no corporation operating in the Commonwealth could contract with another corporation to perform work in the same field," as "the latter corporation would be an employee of the former, because its services would be provided in the former corporation's usual course of business"). In such cases, the Prong B analysis requires the Court to examine the individual characteristics of *both* businesses to determine whether their relationship falls outside Prong B's scope. *See id*. at *2 (denying summary judgment on Prong B based on evidence concerning plaintiffs' business activities). Individualized evidence relevant to this inquiry includes: (a) Plaintiffs' employment of others to perform work for them (*id*.); (b) Plaintiffs' filing of business tax returns (*id.*); (c) Plaintiffs' business dealings with parties other than JPI; and

1   (d) whether Plaintiffs held themselves out as independent businessmen. *See Am. Zurich Ins. Co. v.*

2   *Dep't of Indus. Accidents*, 2006 WL 2205085, at *5 (Mass. Super. Ct. June 1, 2006). Plaintiffs

3   make no attempt to show how these questions can be resolved on a class-wide basis.

4       **F.    There Are Individualized Issues Regarding Which Franchisees Are Properly**
            **Considered Members of the Putative Class**
5

6           The class Plaintiffs urge this Court to certify consists of "all Jan-Pro franchisees who have

7   signed franchise agreements with Jan-Pro master franchisees in the State of California and

8   performed cleaning services for Jan-Pro since December 12, 2004." (Doc. 290-1 at 2.) This broad

9   definition, however, will require the resolution of a host of individual issues, as it will force the

10  Court to decide whether those franchisees that own and operate their franchises through entities—

11  which are distinct legal entities under California law—can properly be deemed members of the

12  putative class. *See Abrahim & Sons Enters. v. Equilon Enters., LLC*, 292 F.3d 958, 962 (9th Cir.

13  2002) ("[m]embers own and control most [limited liability companies], yet the [limited liability

14  companies] remain separate and distinct from their members" under California law); *People v.*

15  *Pac. Landmark, LLC*, 129 Cal. App. 4th 1203, 1212 (2005) (LLC "has a legal existence separate

16  from its members"). For example, the Court will need to decide, for each of the franchises owned

17  by entities: (a) whether the business entity or its owner can be considered an employee for purposes

18  of Plaintiffs' claims; (b) whether reimbursable expenses were personally incurred by the business

19  entity's owner, as opposed to the entity itself; and (c) if the expenses were incurred by the business

20  entity, whether that deprives the individual owner of standing. *See Bowman v. CMG Mortg. Inc.*,

21  No. C 07–03140 SI, 2008 WL 3200662, at *4 (N.D. Cal. Aug. 4, 2008) ("Plaintiffs do not cite any

22  authority supporting their contention that an individual who personally funds a corporation which

23  pays expenses on behalf of the individual's employer is entitled to be reimbursed as an employee

24  under Labor Code § 2802(a).").

25  **II.    CONCLUSION**

26          For the foregoing reasons, JPI respectfully requests that the Court deny Plaintiffs' motion.

27   Dated: April 18, 2022

28

1

**DLA PIPER LLP (US)**

2

By: */s/ Richard H. Rahm*

3
Richard H. Rahm
DLA Piper LLP (US)
555 Mission Street, Suite 2400

4
San Francisco, CA 94105-2933

5

6
Norman M. Leon (*pro hac vice* motion forthcoming)

7
DLA Piper LLP (US)
444 W. Lake Street, Suite 900

8
Chicago, Illinois 60606

9
Jeffrey M. Rosin
O'HAGAN MEYER

10
111 Huntington Avenue, Suite 2860
Boston, Massachusetts 02199

11

12
*Attorneys for Defendant*
JAN-PRO FRANCHISING
INTERNATIONAL, INC

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION