United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GLORIA ROMAN, GERARDO VAZQUEZ, and JUAN AGUILAR,

Plaintiffs,

v.

JAN-PRO FRANCHISING INTERNATIONAL, INC.,

Defendant.

No.  C 16-05961 WHA

**TENTATIVE ORDER RE MOTION FOR CLASS CERTIFICATION AND MOTIONS FOR SUMMARY JUDGMENT**

**INTRODUCTION**

In this wage-and-hour misclassification action, plaintiffs move for class certification as to all claims.  Plaintiffs and defendant move for summary judgment as to all claims.

This tentative order would: **GRANT IN PART AND DENY IN PART** plaintiffs' motion for class certification; **GRANT IN PART AND DENY IN PART** plaintiffs' motion for summary judgment; and **DENY** defendant's motion for summary judgment as to all certified claims and issues.  A separate order on the instant briefing would resolve the parties' motions for summary judgment as to the uncertified, individual claims and issues that remain in this action.

**BY NOON** on **MAY 27, 2022**, plaintiffs and defendant shall each file a response brief to this tentative order of **NO MORE THAN FIVE PAGES**.  The briefs shall include the parties' rebuttals to this tentative order.  The briefs shall not include declarations or attachments.  The hearing remains set for June 1, 2022, at 10:00 a.m., in-person.

**STATEMENT**

### 1.    PROCEDURAL HISTORY.

Plaintiffs Gloria Roman, Gerardo Vazquez, and Juan Aguilar performed janitorial services on behalf of defendant Jan-Pro Franchising International, Inc.  Plaintiffs claim defendant misclassified them and the putative class members as independent contractors. They allege defendant violated California minimum wage, overtime, expense reimbursement, and unlawful deduction laws, and they seek compensation on behalf of the putative class.

A prior order in this action granted summary judgment in favor of defendant as to the misclassification claim.  Plaintiffs appealed that order.  During the appeal, the California Supreme Court adopted the "ABC test" for determining employee classification for claims governed by California wage orders.  *Dynamex Operations W., Inc. v. Super. Ct. of L.A. Cnty.*, 4 Cal. 4th 903 (2018).  Thereafter, our court of appeals directed the parties to brief the effect of *Dynamex* on the merits of this case.  Our court of appeals did not discuss the factor test outlined in *Borello*, which California courts use to determine employee classification for purposes of non-wage-order claims.  *S. G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*, 48 Cal. 3d 341 (1989).

Our court of appeals certified the issue of whether *Dynamex* applied retroactively to the California Supreme Court. The high court answered yes.  Based on that answer and the parties' briefing, our court of appeals vacated the previous summary judgment order and remanded for this order to consider the merits in light of *Dynamex. Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106, 1110 (9th Cir. 2021).  Specifically, our court of appeals stated that this order "should consider all three prongs of the ABC test . . . ."  *Id.* at 1122.  Our court of appeals also provided significant guidance on whether summary judgment is appropriate as to the misclassification claim.  *Id.* at 1122–28.[1]

---

[1]  This action began in the District of Massachusetts in 2008.  That district severed plaintiffs' claims and transferred them to this district.  Although the District of Massachusetts eventually dismissed the original action (and the Court of Appeals for the First Circuit affirmed), our court of appeals rejected defendant's contention that res judicata or the doctrine of law of the case bar plaintiffs' claims in this severed action.

## 2. FACTUAL BACKGROUND.

Defendant was an international janitorial cleaning business. It implemented a franchising model with three tiers. The top tier consisted of defendant, Jan-Pro International, Inc. The middle tier consisted of "master franchisees" or "master owners" — regional, third-party entities — to whom defendant sold exclusive rights to use the trademarked "Jan-Pro" logo. There were at least 91 master franchisees as of 2009. The bottom tier consisted of "unit franchisees" who contracted with master franchisees to clean small businesses. Unit franchisees did not contract with defendant. A given unit franchisee could have been an individual or a few partners, and those persons could have hired additional workers to help them clean. The First Circuit explained defendant's franchising model:

> Jan-Pro and its master owners are separate corporate entities, and each has its own staff. Moreover, master owners may sell or transfer their individual businesses without approval from Jan-Pro. Jan-Pro also reserves the right to inspect any premises serviced by either the master owner or any of the master owner's [unit] franchisees to ensure the Jan-Pro standards are being maintained. Still, master owners have their own entity names and internal business structures, and are responsible for their own marketing, accounting, and general operations.

> As for master owners and their unit franchisees, under the terms of the model franchise agreement, master owners agree to provide their franchisees with an initial book of business, as well as start-up equipment and cleaning supplies. Moreover, the master owner furnishes a training program for its unit franchisees. Once initial set-up and training is complete, the master owner agrees to (1) assist in the unit franchisee's customer relations (by, for example, providing substitute employees or contractors to supply services in the event of an emergency impacting the unit franchisee); (2) provide the unit franchisee with invoicing and billing services; (3) advance the unit franchisee amounts that have been billed but not yet collected from customers; and (4) make available to the unit franchisee any improvement or changes in services or business methods that are made available to other franchisees. Additionally, the agreement notes that a unit franchisee is at all times an independent contractor solely in business for itself. As such, the unit franchisee may, for example, hire its own employees and decide what to pay them, as well as decide whether or not to pursue certain business opportunities.

*Depianti v. Jan-Pro Franchising Int'l, Inc.*, 873 F.3d 21, 23–24 (1st Cir. 2017).

Our plaintiffs were unit franchisees who purchased their unit franchises from two different master franchisees. (The master franchisees in question are not parties herein.)

3

Plaintiff Vazquez purchased a unit franchise from New Venture of San Bernardino, LLC, for $2800. Plaintiff Roman purchased a unit franchise from Connor-Nolan, Inc., for $2800. Plaintiff Aguilar, with a business partner, also purchased a unit franchise from Connor-Nolan, for which he and his partner paid $9000.

Defendant uniformly collected four percent of all revenue from unit franchisees' cleaning services. Defendant also uniformly collected ten percent of all franchise fees that unit franchisees paid to master franchisees.

The diagram below shows how defendant collected those royalties from unit franchisees. Solid lines represent revenue from cleaning services. Cleaning customers (CCs) paid master franchisees (MFs) for cleaning services based on "pricing agreements" between them. Master franchisees then paid unit franchisees (UFs) from that revenue, with the exception that master franchisees deducted and paid four percent of that revenue to defendant (D). Dotted lines represent revenue from franchise fees. Unit franchisees each paid master franchisees a franchise fee. Then, master franchisees paid ten percent of the franchise fee to defendant.



Plaintiffs seek to certify the following class: all unit franchisees who have signed franchise agreements with master franchisees in the state of California and have performed cleaning services for defendant since December 12, 2004 (Proposed Ord. 1).

This order grants plaintiffs' motion for class certification and summary judgment as to (1) failure to pay minimum wage for (a) travel time during the work day and (b) mandatory training, (2) failure to reimburse for expenses incurred for (a) required uniforms and (b) necessary cleaning supplies and equipment, and (3) unlawful deductions of (a) franchise fee royalties and (b) cleaning revenue royalties for the following group: all unit franchisees who signed a franchise agreement with a master franchisee in the state of California and who

United States District Court
Northern District of California

performed cleaning services for defendant from December 12, 2004, to the latest date on which a named plaintiff terminated employment. This order denies class certification as to the remaining labor code claims and issues. A separate order on the instant briefing shall resolve the parties' motions for summary judgment as to the uncertified, individual claims and issues that remain in this action. This order defers resolving damages until a later phase of the action.

**ANALYSIS**

Before beginning the analysis, this order summarizes the relevant legal framework. The Industrial Welfare Commission of California publishes wage orders that regulate the hours, wages, and working conditions of California employees. The wage orders encompass some, but not all, of the sections in the California Labor Code.

Whether a wage order encompasses a labor code claim dictates the applicable misclassification test. When a wage order encompasses a labor code claim (or a discrete issue within a claim), courts determine employee classification under *Dynamex* for purposes of that claim or issue. When the wage orders do not cover a labor code claim (or a discrete issue within a claim), such as expense reimbursements for gas and tolls, courts determine employee classification under *Borello* for purposes of that claim or issue. *See Dynamex*, 4 Cal. 5th at 915–16, n. 5.

Given this legal framework, this order proceeds as follows:

*First*, this order applies the FRCP 23(a) criteria (numerosity, commonality, typicality, and adequacy) to the misclassification claim and simultaneously to the labor code claims. This order finds the FRCP 23(a) criteria satisfied for all claims.

*Second*, this order considers whether plaintiffs have met their burden under FRCP 23(b)(3) to establish predominance and superiority as to the misclassification question under (1) *Dynamex* and (2) *Borello*. Those considerations show that plaintiffs satisfy FRCP 23(b)(3) for the misclassification question under *Dynamex* but not under *Borello*.

This order then applies FRCP 23(b)(3) to each of the labor code claims that rely on misclassification under *Dynamex*. Those applications show that plaintiffs satisfy FRCP 23(b)(3) for only the following labor code issues: (1) failure to pay minimum wage for (a)

5

travel time during the work day, and (b) mandatory training; (2) failure to reimburse for expenses incurred for (a) required uniforms, and (b) necessary cleaning supplies and equipment; and (3) unlawful deductions of (a) franchise fee royalties, and (b) cleaning revenue royalties.

*Third*, this order considers whether summary judgment is appropriate, on a class-wide basis, for plaintiffs or for defendant as to the misclassification claim under *Dynamex*. Those considerations show summary judgment in favor of plaintiffs is warranted as to the misclassification claim under *Dynamex*.

*Fourth*, this order considers whether summary judgment is appropriate as to the certified issues. Those considerations show summary judgment in favor of plaintiffs is appropriate as to all certified issues.

*Fifth*, this order denies as moot both parties' motions for summary judgment regarding itemized wage statements. A separate order shall resolve the parties' motions for summary judgment as to the uncertified, individual claims that remain in this action. This order defers resolving damages until a later phase of the action.

## 1. FEDERAL RULE OF CIVIL PROCEDURE 23(a).

Plaintiffs must show that the proposed class action satisfies each of the four prerequisites of FRCP 23(a), which are:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

A district court must do a rigorous analysis to determine if the requirements of FRCP 23 are satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011). "Frequently that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. The class determination generally involves considerations that are

6

enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id*. at 351 (cleaned up).

### A.   NUMEROSITY.

The proposed class includes all unit franchisees who signed franchise agreements with master franchisees in California since December 2004. Just one master franchisee had over 100 unit franchisees who signed agreements in California during the class period (Dkt. No. 292-17 at 265). Thus, given there were many master franchisees in California, this order finds numerosity is satisfied.

### B.   COMMONALITY.

The commonality element requires that there be a common contention among all class members which is "of such a nature that it is capable of class-wide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores*, 564 U.S. at 350.

Here, the common misclassification contention is necessarily central to the substantive law claims because no class member can recover if defendant's classification of unit franchisees as independent contractors was proper. And, defendant relies on the classification of unit franchisees as an affirmative defense to all of plaintiffs' substantive law claims (Dkt. No. 245 at 7). This order finds commonality is satisfied.

### C.   TYPICALITY.

"Under [FRCP 23(a)(3)]'s permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

Here, plaintiffs' defining contention is that defendant improperly classified them as independent contractors. That is also the defining contention of the class. Defendant allegedly injured plaintiffs and the putative class members by failing to provide them with minimum wage, overtime pay, and expense reimbursements, and plaintiffs allege unlawful deductions. These alleged injuries arose from defendant's conduct of classifying plaintiffs and the putative class members as independent contractors. Thus, plaintiffs and the putative class members

7

allege the same injuries arising from the same conduct. Although there may be some differences between plaintiffs' experiences and those of the putative class members, plaintiffs' claims are reasonably co-extensive with those of the putative class members. This order finds typicality is satisfied.

### D.   ADEQUACY.

As to adequacy, the representative plaintiffs and class counsel cannot have conflicts of interest with the putative class members and must prosecute the action vigorously on behalf of the class. *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

Here, plaintiffs' lead counsel submitted a declaration describing her qualifications and extensive experience in wage-and-hour litigation, including serving as class counsel in numerous wage-and-hour misclassification actions (Liss-Riordan Decl. ¶¶ 2–17). Her law partner also has experience in wage-and-hour litigation (*id.* ¶ 17).

Thus far, plaintiffs' counsel have vigorously litigated this case. Plaintiffs' counsel have deposed defendant's President and Chief Executive Officer, Vice President, Vice President of Field Services, and Director of Training (Dkt. No. 247-4). They have also successfully appealed the prior order on summary judgment in this matter.

Plaintiffs each submitted declarations stating that they understand their duty to always consider the best interests of the class before their own and to actively participate in the lawsuit. They also declared that they have no conflicts of interest with the putative class members (Vazquez Decl. ¶ 3; Aguilar Decl. ¶ 3; Roman Decl. ¶ 3). Defendant has provided no reason to doubt those declarations. This order finds none. This order finds adequacy of representation is satisfied.

### E.   DEFENDANT WAIVED THE RIGHT TO ENFORCE ARBITRATION AGREEMENTS.

Defendant argues that plaintiffs cannot satisfy typicality and adequacy because "the three named plaintiffs are likely not bound to arbitrate, and . . . virtually every other putative class member is bound to arbitrate" (Opp. 16). To that end, defendant argues it can enforce the

United States District Court
Northern District of California

arbitration provision in plaintiffs' contracts with their master franchisees (to which defendant was not a party).

But defendant has waived the right to enforce the arbitration agreements against the named plaintiffs *and* the putative class members. Defendant, therefore, cannot defeat typicality or adequacy.

*First*, this order must determine whether the issue of waiver is properly before the district court. "The court's role under the [Federal Arbitration] Act is . . . limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). Our court of appeals has stated:

> [T]he Supreme Court [has] distinguished between two categories of gateway issues on motions to compel arbitration, each of which has a different presumption as to whether a court or an arbitrator should decide. The first category of gateway issues is a "question of arbitrability"— that is, "whether the parties have submitted a particular dispute to arbitration." . . . . These disputes are "for judicial determination unless the parties clearly and unmistakably provide otherwise." In contrast, the second category — "procedural" issues — is "presumptively not for the judge, but for an arbitrator, to decide."
>
> *          *          *
>
> We have made clear that waiver by litigation conduct is part of the first category of gateway issues.

*Martin v. Yasuda*, 829 F.3d 1118, 1122–23 (9th Cir. 2016) (citations omitted). Thus, here, this order may determine whether defendant has waived the right to enforce the arbitration agreements unless the parties clearly and unmistakably provided otherwise.

Although defendant's incorporation of the American Arbitration Association rules could constitute clear and unmistakable evidence that the parties agreed to arbitrate arbitrability under *Brennan v. Opus Bank*, that decision is off point. 796 F.3d 1125, 1130 (9th Cir. 2015). *Brennan* expressly limited its holding to commercial contracts between sophisticated parties; here, therefore, the employment contracts with unsophisticated unit franchisees fall outside of *Brennan* (unit franchisees are primarily immigrant workers, of whom many do not speak English). *Ibid.* Moreover, although defendant argues the Federal Arbitration Act preempts the

9

sophistication requirement, the Third Circuit decision it cites for support is not binding on this order.

In *Cox v. Ocean View Hotel Corp.*, an arbitration agreement incorporated the American Arbitration Association rules and included broad language to arbitrate any dispute "arising out of or related to" the agreement. 533 F.3d 1114, 1117 (9th Cir. 2008). Nevertheless, *Cox* held the waiver issue was "properly heard by the district court." *Id.* at 1120. Thus, defendant's argument fails. This order may adjudicate the waiver issue.

*Second*, this order considers the merits of whether defendant has waived its right to enforce the arbitration agreements. Our court of appeals has stated:

> [W]here the waiver of the right to compel arbitration implicates questions of arbitrability that "affect the allocation of power" between a court and arbitrator, we have applied a federal law standard for determining whether an arbitration agreement has been waived.

*Newirth by & through Newirth v. Aegis Senior Communities, LLC*, 931 F.3d 935, 940 (9th Cir. 2019). Because the waiver issue affects the allocation of power between the district court and an arbitrator, the federal law standard applies here. *Newirth* continued:

> Under federal law, waiver is "the intentional relinquishment or abandonment of a known right." A party seeking to prove that the right to compel arbitration has been waived must carry the heavy burden of demonstrating:
> (1) knowledge of an existing right to compel arbitration;
> (2) intentional acts inconsistent with that existing right; and
> (3) prejudice to the person opposing arbitration from such inconsistent acts.

931 F.3d at 940. "[W]e consider the totality of the parties' actions . . . [and] we have generally asked whether a party's actions 'indicate a conscious decision . . . to seek judicial judgment on the merits of [the] arbitrable claims, which would be inconsistent with a right to arbitrate.'" *Id.* at 941.

Defendant concedes that, "because of the time that has elapsed and the litigation that has taken place, it has likely waived its right to enforce [the] arbitration agreements as to the named plaintiffs" (Opp. 13 n. 2). It argues, however, that it "could not have waived . . . its right to seek to enforce those agreements as to every other unit franchisee because none of

those franchisees are presently before the Court" (*ibid.*).  To support that proposition, defendant cites *In re TFT-LCD (Flat Panel) Antitrust Litigation*.  That "extremely close" decision found it "puzzling" that the defendants had not moved to compel arbitration of the putative class members earlier, yet it held the defendants could enforce the right to compel arbitration against the putative class members.  2011 WL 1753784, at *4 (N.D. Cal. May 9, 2011) (Judge Susan Illston).

This order disagrees with *TFT-LCD*, as did *Edwards v. First American Corp.*:

> The Court does not find the reasoning of *TFT-LCD* to be persuasive.  It is true that Defendants likely could not have moved to compel arbitration of the [putative] class members' claims until after the class was certified.  Nevertheless, Defendants could have asserted their intention to raise arbitration as a defense at a much earlier stage in the proceeding. . . . .  This conduct appears to be highly calculated — Defendants would obviously prefer that Plaintiff's claims be dismissed on the merits, as any such ruling may be used for the purposes of issue preclusion and precedential effect in subsequent actions.  Defendants' conduct thus evinced "a conscious decision to continue judicial judgment on the merits."

289 F.R.D. 296, 307 (C.D. Cal. 2012) (Judge S. James Otero).  Other decisions have also expressly disavowed *TFT-LCD*.  *Ambrosio v. Cogent Commc'ns, Inc.*, 2016 WL 4436091, at *6 (N.D. Cal. Aug. 5, 2016) (Judge Richard Seeborg); *Kingsbury v. U.S. Greenfiber, LLC*, 2012 WL 2775022, at *6–7 (C.D. Cal. June 29, 2012) (Judge A. Howard Matz).

Moreover, to accept defendant's argument "would be to condone gamesmanship in the class certification process."  *Kingsbury*, 2012 WL 2775022 at *7.  And, the Ninth Circuit decisions that defendant cites are distinguishable because they did not address waiver as it relates to putative class members.  *Letizia v. Prudential Bache Secs., Inc.*, 802 F.2d 1185, 1187 (9th Cir. 1986); *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691 (9th Cir. 1986).  Thus, this order finds that defendant could have waived its right to arbitrate as to the putative class members.

In fact, defendant did so.  Defendant has had "knowledge of an existing right to compel arbitration" since as early as 2008.  *Newirth*, 931 F.3d at 940.  Defendant moved to dismiss plaintiffs' misclassification and substantive law claims in 2008 *based on the outcome of an*

11

*arbitration proceeding* between some unit franchisees and their master franchisees (Dkt. No. 17). Thus, it is ridiculous for defendant to claim it was unaware of the right to compel arbitration.

Furthermore, defendant acted "inconsistently with exercising the right to arbitrate when it (1) [made] an intentional decision not to move to compel arbitration and (2) actively litigate[d] the merits of [the] case for a prolonged period of time in order to take advantage of being in court." *Newirth*, 931 F.3d at 941. Here, since the original action began in 2008, defendant has moved to dismiss on the merits (Dkt. Nos. 4, 17), and defendant has moved for summary judgment twice, excluding the instant motion (Dkt. Nos. 65, 246). And, to ignore defendant's conduct in the proceedings before the District of Massachusetts would not account for "the totality of [defendant's] actions." *Newirth*, 931 F.3d at 941. Thus, defendant has made "an intentional and strategic decision to take advantage of the judicial forum." *Ibid.*

Additionally, allowing defendant to compel the putative class members to arbitrate would "prejudice" plaintiffs. *Id.* at 940. Plaintiffs' counsel have, since 2008, expended significant time and money conducting discovery, taking depositions, and opposing motions to dismiss and motions for summary judgment. Plaintiffs, therefore, relied to their detriment on defendant's failure to move to arbitrate. *See Kingsbury*, 2012 WL 2775022, at *6.

Put another way, it is manifestly unfair to test the waters in the district court and appellate court, to hold in reserve the arbitration card, and then to play that card once things go the wrong way in court. Having started down the courthouse path, defendant must, in the interest of justice and fairness, stay the course.

Having found that all the requirements of FRCP 23(a) are met as to all claims, this order next considers whether the requirements of FRCP 23(b)(3) are met.

## 2. FEDERAL RULE OF CIVIL PROCEDURE 23(b)(3).

Plaintiffs seek certification under FRCP 23(b)(3), which requires they show:

> [T]he questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

United States District Court
Northern District of California

"[T]he likely difficulties in managing a class action" are pertinent to this inquiry. FRCP 23(b)(3)(D). "Commonly referred to as 'manageability,' this consideration encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974). This order, therefore, "must determine whether the elements necessary to establish liability are susceptible of common proof or, if not, whether there are ways to manage effectively proof of any elements that may require individualized evidence." *Brinker Rest. Corp. v. Super. Ct. of San Diego Cnty.*, 53 Cal. 4th 1004, 1024 (2012). This inquiry "can turn on the precise nature of the element and require resolution of disputed legal or factual issues affecting the merits." *Ibid.*

This order must first consider whether FRCP 23(b)(3) is satisfied for the misclassification claim under *Dynamex*. It must then consider the same for the misclassification claim under *Borello*. Thereafter, it must consider whether FRCP 23(b)(3) is satisfied as to the labor code claims.

### A. MISCLASSIFICATION CLAIM.

"To employ . . . has three alternative definitions. It means: (a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." *Martinez v. Combs*, 49 Cal. 4th 35, 64 (2010) (emphasis in original). In *Dynamex*, the California Supreme Court clarified that the "suffer or permit to work" standard is met when an employer fails to satisfy the requirements of the ABC test. 4 Cal. 5th at 903. The high court explained the ABC test:

> The ABC test presumptively considers all workers to be employees, and permits workers to be classified as independent contractors only if the hiring business demonstrates that the worker in question satisfies *each* of three conditions:
>
> (a) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and*
>
> (b) that the worker performs work that is outside the usual course of the hiring entity's business; *and*
>
> (c) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

United States District Court
Northern District of California

*Id.* at 955–56 (emphasis in original).  The ABC test applies only when a California wage order encompasses the relevant labor code claim.  *Id.* at 915–16.  Yet the "'suffer or permit to work standard in California wage orders' is meant to be 'exceptionally broad.'"  *Vazquez*, 986 F.3d at 1122 (citing *Dynamex*, 4 Cal. 5th at 952–53).  The wage orders are to be "'liberally construed in a manner that serves their remedial purposes.'"  *Ibid.*

Our court of appeals laid out the considerations for Prong B of the ABC test:

> Analytically, courts have framed the Prong B inquiry in several ways.  They have considered whether the work of the employee is necessary to or merely incidental to that of the hiring entity, whether the work of the employee is continuously performed for the hiring entity, and what business the hiring entity proclaims to be in.

*Id.* at 1125.

Plaintiffs need only show, "given the factual setting of the case, if . . . plaintiffs' general allegations are true, common evidence could suffice to make out a prima facie case for the class."  *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005).  "Under the [ABC test], if the employer cannot satisfy *just one* prong of the test, the inquiry into employment status ends."  *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1060 (7th Cir. 2016) (emphasis in original).  Thus, if plaintiffs show "that common evidence will resolve Prong [B], they have made a prima facie showing that they *can* win their case based on evidence common to the class."  *Ibid.* (emphasis in original).  Such a finding is sufficient to satisfy predominance as to the misclassification claim, as the Seventh Circuit explained:

> [C]ertifying the class for purposes of Prong [B] would substantially advance the litigation, regardless of whether the common evidence on Prong [B] turns out in [plaintiffs'] or [defendant's] favor.  If answered in [plaintiffs'] favor, all of [defendant's] couriers would have to be classified as employees, . . . eliminating the need for any individualized factfinding. If answered in [defendant's] favor, [defendant] would not have to litigate its satisfaction of Prong [B] against every individual plaintiff, promoting efficiency. . . . .  Regardless of which party wins, the common answer on Prong [B] "represents a significant aspect of the case and . . . can be resolved for all members of the class in a single adjudication."

*Ibid.*

14

Here, common questions predominate under Prong B.  Defendant classified all unit franchisees as independent contractors.  It provided a standard franchise agreement to master franchisees (Kissane Dep. 56–59), and master franchisees had a common practice of using that agreement as a template for their agreements with unit franchisees (*see* Dkt. Nos. 292-11, 292-12, 292-13).  Although unit franchisees' agreements did not always contain every provision of defendant's standard agreement, "[i]n most ways . . . plaintiffs' agreements substantially follow[ed] [defendant's] requirements."  *Vazquez*, 986 F.3d at 1119.

The policies within the standard agreement were, therefore, applicable to all unit franchisees.  Those common policies will help to adjudicate the misclassification question.  The term of the unit franchisees' agreements, for example, was ten years (*e.g.*, Dkt. No. 292-11 § 18).  This will help to determine, on a class-wide basis, whether unit franchisees "continuously performed" work for defendant for purposes of Prong B.  *Vazquez*, 986 F.3d at 1125.

Moreover, "what business [defendant] proclaim[ed] to be in" for purposes of Prong B is susceptible to common proof, as defendant's statements on its website and advertisements were equally applicable to all unit franchisees.  *Vazquez*, 986 F.3d at 1125.

And, whether unit franchisees' work was necessary or merely incidental to that of defendant is susceptible to common proof.  All unit franchisees did the same work on behalf of defendant: they cleaned small businesses.  Based on the common nature of unit franchisees' work, this order can determine the "necessary or merely incidental" inquiry under Prong B for all unit franchisees in one fell swoop.  *Vazquez*, 986 F.3d at 1125.

Whether Prong A or Prong C is susceptible to common proof does not affect class certification here.  *Costello*, 810 F.3d at 1060; *see James v. Uber Techs., Inc.*, 338 F.R.D. 123, 139 (N.D. Cal. 2021) (Judge Edward M. Chen).  As the discussion of the merits below will show, there is no genuine dispute of material fact as to Prong B, and summary judgment in favor of plaintiffs on the misclassification issue is warranted.  Thus, irrespective of any

decision on Prong A or Prong C, the unit franchisees were employees. Common questions under Prong B will, therefore, predominate.[2]

Even if summary judgment were granted in favor of defendant on Prong B on a class-wide basis, such an outcome would significantly advance the litigation. In that scenario, defendant would not have to litigate Prong B as to each individual plaintiff, promoting efficiency. *Costello*, 810 F.3d at 1060; *James*, 338 F.R.D. at 139.

For the same reasons, superiority is required only as to Prong B. And, that too is satisfied for Prong B. It would be inefficient to try the misclassification issue on an individual basis for the numerous putative class members here when common questions predominate. *See* Alan Wright & Arthur R. Miller, 7AA Fed. Prac. & Proc. Civ. § 1778 (3d ed. 2022). Moreover, plaintiffs are correct in pointing out: (1) the chilling effect that fear of employer retaliation will have on unit franchisees deciding whether to file individual lawsuits; and (2) the difficulty for unit franchisees to bring individual claims, given that the vast majority of them are unsophisticated with regard to legal matters.

Defendant argues individual issues predominate under Prong B because there are relevant individual issues, including "(a) plaintiffs' employment of others to perform work for them, (b) plaintiffs' filing of business tax returns, (c) plaintiffs' business dealings with parties other than [defendant], and (d) whether plaintiffs held themselves out as independent businessmen" (Opp. 8). *First*, defendant's argument is unpersuasive because these factors derive from non-binding, Massachusetts decisions. Although our court of appeals stated this order "may wish to consider authorities from other jurisdictions that apply the [ABC] test," it did not direct us to do so. *Second*, all three considerations under Prong B involve common questions. *Third*, the focus of Prong B is on defining the hirer's business and whether that definition encompasses the hirees' work *for the hirer*. The factors defendant provides, however, go to determining whether hirees were engaged in independent businesses and worked *for themselves* rather than

---

[2] "[A] district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160–61 (1982)).

for the hirer. Thus, the factors defendant raises are relevant only to Prong C — not Prong B. Those individual questions are, therefore, irrelevant to predominance under Prong B.

Defendant also argues that whether unit franchisees established limited liability companies poses individual questions. Again, this would be relevant only to Prong C — whether unit franchisees worked for themselves rather than for the hirer. Such individual questions would not affect predominance under Prong B.

Accordingly, plaintiffs have satisfied FRCP 23(b)(3) as to the misclassification claim under *Dynamex*. The misclassification claim under *Dynamex* is **CERTIFIED**.

\* \* \*

As mentioned above, a different classification test applies for purposes of labor code claims and issues that fall outside of the California wage orders. *Borello* outlined that test:

> While conceding that the right to control work details is the "most important" or "most significant" consideration, the authorities also endorse several "secondary" indicia of the nature of a service relationship.
>
> Thus, we have noted that "strong evidence in support of an employment relationship is the right to discharge at will, without cause." Additional factors have been derived principally from the Restatement Second of Agency. These include: (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee. "Generally, . . . the individual factors cannot be applied mechanically as separate tests; they are intertwined, and their weight depends often on particular combinations."

48 Cal. 3d at 350–51.

Here, plaintiffs have not satisfied FRCP 23(b)(3) as to the misclassification claim under *Borello*. Foremost, plaintiffs have not even briefed whether predominance is satisfied under *Borello*. This alone precludes a finding of predominance — but only as to labor code issues

United States District Court
Northern District of California

that rely on *Borello*. *Haitayan v. 7-Eleven, Inc.*, 2021 WL 757024, at *5–6 (C.D. Cal. Feb. 8, 2021) (Judge Dale S. Fischer).

Moreover, two significant *Borello* factors would require individualized inquiries. "Whether [unit franchisees] engaged in a distinct occupation or business" cannot be determined without asking unit franchisees individually. *Borello*, 48 Cal. 3d at 351. District courts have found this factor "critical" to the predominance analysis. *Bowerman v. Field Asset Servs., Inc.*, 2014 WL 4676611, at *12 (N.D. Cal. Sep. 17, 2014) (Judge William H. Orrick) (denying class certification); *see James*, 338 F.R.D. at 138–39 (N.D. Cal. 2021); *Narayan v. EGL, Inc.*, 285 F.R.D. 473, 480 (N.D. Cal. 2012) (Judge Ronald M. Whyte). Although unit franchisees' contracts contained non-compete provisions, "'the appropriate inquiry . . . is whether the person . . . *actually has* such an independent business, occupation, or profession, not whether he or she *could have* one.'" *Dynamex*, 4 Cal. 5th at 962 n. 30 (emphasis added). Notably, plaintiff Roman actually engaged in an independent business that cleaned houses (Roman Dep. 160). Thus, this order finds the "distinct occupation or business" factor would add significant individualized inquiries to the classification analysis here under *Borello*.

Similarly, "whether or not the [unit franchisees] believe[d] they [were] creating the relationship of employer-employee" is subject to individualized inquiries. *Borello*, 48 Cal. 3d at 351. Our court of appeals stated that "a fair characterization may be that plaintiffs understood themselves to be 'Jan-Pro cleaners' but did not necessarily think they were contracting with a company called 'Jan-Pro Franchising International.'" *Vazquez*, 986 F.3d at 1120. Thus, individual variations in putative class members' legal sophistication and English-language proficiency would be relevant. *See ibid.*; *Bowerman*, 2014 WL 4676611, at *11 (N.D. Cal. 2014). Individual variations in what master franchisees told putative class members about defendant's business would also be relevant. Thus, this order finds that the putative class members' beliefs regarding their relationships with defendant would also add significant individualized inquiries to the classification analysis here under *Borello*.

Further, "the hirer's right to fire at will and the basic level of skill called for by the job, are often of inordinate importance." *Ayala v. Antelope Valley Newspapers*, Inc., 59 Cal. 4th

18

522, 539 (2014). And, "the 'ownership of the instrumentalities and tools' of the job, may be of 'only . . . evidential value,' relevant to support an inference that the hiree is, or is not, subject to the hirer's direction and control." *Ibid.* Thus, the two factors that require individualized inquiries weigh heavy here.

Thus, plaintiffs fail to satisfy predominance for misclassification under *Borello*. Certification of the misclassification claim under *Borello* is **DENIED**.

### B.      LABOR CODE CLAIMS.

Uniform policies and practices of employment misclassification alone are not sufficient to establish that common questions predominate as to liability for labor code claims. *Sotelo v. MediaNews Grp., Inc.*, 207 Cal. App. 4th 639, 655 (2012). Thus, "[e]ven if common questions predominate the threshold question of employee classification, [this order] must still consider whether plaintiffs' individual claims also pass the predominance test." *James*, 338 F.R.D. at 139 (N.D. Cal. 2021) (cleaned up) (citation omitted). For example, "[a] class . . . may establish liability by proving a uniform policy or practice by the employer that has the effect on the group of making it likely that group members will work overtime hours without overtime pay" or will receive less than minimum wage per hour of work. *Brinker*, 53 Cal. 4th at 1024.

### (i)      Minimum Wage.

California Labor Code Section 1194 provides:

> Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit.

California wage orders encompass claims for minimum wage and overtime under Section 1194. Cal. Indus. Welfare Comm'n, Wage Order Nos. MW-2022, 5-2001(3)(A). *Dynamex*, therefore, provides the applicable test for whether unit franchisees were misclassified for purposes of minimum wage and overtime. 4 Cal. 5th at 913–14. Because this order has found the misclassification question suitable for class treatment under *Dynamex*, this order may

United States District Court
Northern District of California

United States District Court
Northern District of California

consider whether class treatment of plaintiffs' minimum wage and overtime claims is appropriate.

Here, there was no policy regarding minimum wage. Plaintiffs argue the lack of a minimum wage policy alone shows common questions predominate. Not so. The absence of a minimum wage policy is not the same as an existing, unlawful policy. Such an absence could suggest that defendant was unaware of the minimum wage requirement, but it does not evidence an unlawful practice that makes defendant likely to have failed to pay minimum wage. Further, plaintiffs cite *Vaquero v. Ashley Furniture Industries, Inc.*, to support their position. 824 F.3d 1150 (9th Cir. 2016). But *Vaquero* involved an existing, unlawful pay policy: the employer had a policy to not pay employees anything beyond commissions. *Vaquero v. Ashley Furniture Indus., Inc.*, 2013 WL 12172124, at *1 (C.D. Cal. June 17, 2013) (Judge Percy Anderson). The policy guaranteed that the employees would not earn wages for work hours that did not culminate in a sale. By contrast, here, defendant did not have a minimum wage policy that made it likely for unit franchisees not to receive minimum wage. There was no policy at all. Thus, the absence of a minimum wage policy would not be useful to resolve the merits on a class-wide basis.

The only item of common evidence regarding minimum wage comes from deposition testimony. Vice President Thompson of defendant stated that defendant provided master franchisees with a suggested range at which to pay unit franchisees. Thompson stated that range was between $16 and $25 per hour (Thompson Dep. 25). But Thompson also stated that master franchisees had discretion to choose the pay rates for their unit franchisees (*ibid.*). Thus, this common evidence would give rise to individualized inquiries, such as (1) whether a given master franchisee paid its unit franchisees at a different rate than other master franchisees paid their unit franchisees, and (2) whether a given master franchisee paid some of its unit franchisees at a different rate than it did for others of its unit franchisees.

Although the absence of proper time and pay records does not preclude class certification, the burden is on plaintiffs to show that any individual inquiries would be manageable. Other decisions have relied on expert statistical analyses in place of common

20

evidence to establish liability. *E.g.*, *Vaquero*, 824 F.3d at 1155. Here, by contrast, plaintiffs have not provided *any* such evidence by which to efficiently determine the rate of pay for unit franchisees on a class-wide basis. Plaintiffs make only a cursory reference to (1) potential testimony by class members, and (2) "pricing agreements" and "bid worksheets" between master franchisee Connor-Nolan and its cleaning customers.[3] Cursory references will not suffice.

Nevertheless, this order briefly explores the evidence. Each pricing agreement in evidence was between Connor-Nolan and one cleaning customer. The pricing agreements provided the monthly cleaning fee that cleaning customers paid to master franchisees, the number of days per week that unit franchisees cleaned the customers' locations, and a breakdown of the price per type of cleaning (*e.g.*, washing, mopping, sweeping, etc.). From the pricing agreements alone, one could not determine the number of hours a unit franchisee worked or the rate per hour worked (*e.g.*, Dkt. No. 247-3 at 34).

Defendant purportedly implemented a proprietary system for master franchisees to estimate cleaning time and costs. The system, which was based on publicly available standards, estimated cleaning times based on: type of cleaning required; square footage; rate of cleaning; types of equipment and supplies used; and state of the item being cleaned. Based on those standards and the pricing agreements, it is theoretically possible to estimate the number of hours per day unit franchisees spent on specific cleaning services. From there, one could estimate hourly rates using the monthly cleaning fees and the number of days of service per week.

But, as our court of appeals noted, it is unclear whether Connor-Nolan or the many other master franchisees in California used this system to estimate hours. Moreover, using this system would be unmanageable. To check each individual cleaning service against these standards would be inefficient at best. The standard category for "hard floor care" alone contains hundreds of possible cleaning times (Dkt. No. 247-3 at 335–37). Further, the

---

[3] Connor-Nolan was one of many master franchisees in California. Connor-Nolan contracted with plaintiffs Aguilar and Roman, among other unit franchisees.

United States District Court
Northern District of California

United States District Court
Northern District of California

evidence includes several "complaint reports," indicating that plaintiffs Roman and Aguilar did not complete all services on all occasions, which would reduce the estimated number of hours worked. And, given there were potentially thousands of cleaning customers, and each unit franchisee serviced multiple cleaning customers, individualized inquiries would abound.

Some of Connor-Nolan's pricing agreements, but not all, are accompanied by bid worksheets. For pricing agreements not accompanied by bid worksheets, the method outlined above would be the only means of determining hours worked and rates per hour worked. For pricing agreements that are accompanied by bid worksheets, those bid worksheets showed the estimated hours worked and the rate of pay. Connor-Nolan consistently, however, used an hourly rate of $15 to estimate cleaning costs (*e.g.*, Dkt. No. 247-3 at 61–62). This rate is greater than the applicable minimum wage rates that were in place throughout the proposed class period. Cal. Lab. Code § 1182.12.

In sum, there was no uniform pay policy. It would be unmanageable to determine hours worked and rates of pay from the pricing agreements and the cleaning standards. The available bid worksheets are all from Connor-Nolan and show a rate of $15 per hour. This order has no information about whether other master franchisees in California used the cleaning standards or used bid worksheets. And, plaintiffs have not provided any common evidence of liability. Individual inquiries predominate.

True, individualized inquiries regarding damages do not preclude class certification. *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010). But the foregoing analysis goes to whether plaintiffs can prove liability in the first place, *i.e.*, whether the wages paid to unit franchisees were below minimum wage or whether unit franchisees were paid for all hours of cleaning work.

*          *          *

There are, however, two issues deriving from the minimum wage claim susceptible to common proof: (1) failure to pay unit franchisees for travel time between cleaning locations; and (2) failure to pay unit franchisees for mandatory training.

*Travel Time.* The history of the definition of "hours worked" in the wage orders indicates that travel time during work is compensable. In 1943, Wage Order 7NS stated "'hours employed' includes all time during which . . . an employee is required or instructed to travel on the employer's business after the beginning and before the end of her workday." *Frlekin v. Apple Inc.*, 8 Cal. 5th 1038, 1048 (2020). Construing the wage orders liberally, this order finds that travel time from one cleaning client to another during the workday is governed by the wage orders and, therefore, *Dynamex*. *See* 4 Cal. 5th 953.[4] Thus, because predominance has been established for misclassification under *Dynamex*, this order may consider whether certification of the travel time issue is appropriate.

To that end, all three plaintiffs declare they did not receive compensation for travel time (Vazquez Decl. ¶ 9, Aguilar Decl. ¶ 8, Roman Decl. ¶ 9). Plaintiff Vazquez stated he cleaned two customer locations on each of Monday through Thursday, and he cleaned three customer locations on Fridays (Vazquez Dep. 108). And, plaintiff Roman cleaned some customer locations on the same days of the week (*e.g.*, Dkt. Nos. 247-3 at 167, 178). None of the pricing agreements account for travel time (*see* Dkt. No. 247-3 at 34–187). For unit franchisees to have been able to service multiple customers in a single day, unit franchisees must have taken some time to travel between customers. And, any individual questions about the amount of travel time would be relevant to only damages, which cannot be a basis for precluding class certification. This order finds common questions shall predominate as to the travel time issue.

*Mandatory Training.* Defendant's standard, unit-franchisee agreement provided that each unit franchisee must attend an "initial mandatory training program" (*e.g.*, Dkt. No. 292-11 § 5(A)). At least plaintiff Vazquez declares he did not receive pay for this mandatory training (Vazquez Decl. ¶ 7). Whether a trainee has a right to minimum wage under California law is a question common to all unit franchisees. Moreover, based on testimony of defendant and putative class members, one could determine a common time duration for the training program.

---

[4] This finding does not apply to time unit franchisees spent commuting from their homes before the workday or to their homes after the workday. Plaintiffs have not shown that such time is compensable.

United States District Court
Northern District of California

Thereafter, one could pay each putative class member at the same rate for the time required to attend the training program.

Thus, the travel time and mandatory training issues are **CERTIFIED**. Certification of all other issues deriving from the minimum wage claim, including wages for cleaning work, is **DENIED**.

### (ii)    *Overtime.*

Plaintiffs' claim for overtime pay fails the predominance standard. To determine liability, one would have to determine whether the unit franchisees worked in excess of eight hours per day or 40 hours per week. Cal. Lab. Code § 510. Plaintiffs do not provide *any* common evidence making it likely that unit franchisees worked overtime hours. Without common evidence, one would have to use the unmanageable methods described above to determine hours worked. Moreover, one would have to account for days and weeks when unit franchisees worked for multiple customers, which would entail comparing the dates of service of all the customers of each unit franchisee. But plaintiffs do not present *any* means of efficiently and accurately estimating overtime hours given these individualized inquiries. Certification of the overtime claim is **DENIED**.

### (iii)    *Expense Reimbursements.*

Labor Code Section 2802(a) provides:

> An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful.

The California wage orders encompass two issues deriving from plaintiffs' expense reimbursement claim. Wage Order 5-2001(9) states that, if wearing uniforms is a condition of employment, employers must provide uniforms to their employees. The same wage order states an employer must provide to their employees tools and equipment necessary for performance of their jobs. *Ibid.* Thus, certification of those two issues relies on plaintiffs showing predominance of their misclassification claim under *Dynamex*, which plaintiffs have

already done. That other district court decisions have found otherwise is not persuasive. In the view of this order, decisions that have found otherwise have failed to construe the wage orders liberally to protect California workers. Thus, plaintiffs need only further show that common questions predominate as to liability for those issues.

Plaintiffs have done so. Master franchisees provided an initial set of cleaning supplies and equipment to each of their unit franchisees (*e.g.*, Dkt. No. 292-12 § 6(A)). But unit franchisees had to replace all supplies and equipment with their own funds (*ibid.*). Deposition testimony of defendant's President and Chief Executive Officer confirms this common practice (Kissane Dep. 157). Deposition testimony also reveals that defendant required unit franchisees to wear the "Jan-Pro" logo when they worked, and unit franchisees had to pay for compliant uniforms themselves (*id.* 173). Thus, common questions will predominate adjudication of liability on these issues. And, individualized questions as to how much each unit franchisee is owed goes to damages, which does not defeat predominance.

\*         \*         \*

The remaining issues deriving from plaintiffs' expense reimbursement claim, such as insurance and gas, rely on the *Borello* misclassification standard because they do not arise under the California wage orders. *See Dynamex*, 4 Cal. 5th 903, 915–16, n. 5. Because plaintiffs have failed to show predominance for misclassification under *Borello*, plaintiffs cannot show predominance for any of those issues that rely on *Borello*. *See Haitayan*, 2021 WL 757024, at \*5–6.

Plaintiffs' arguments that the remaining expense reimbursement issues rely on the ABC test are incorrect. *First*, plaintiffs assert "the Legislature has now codified the ABC test with respect to the entire labor code . . . and that statute applies retroactively" (Opp. 8). Namely, plaintiffs refer to Labor Code Section 2775, or "AB5," which codified the ABC test. AB5 extended the reach of the ABC test to the labor code *generally* and to "violations of [the] code *relating to* wage orders." *Ibid.*; Cal. Lab. Code § 2785(a) (emphasis added). Thus, plaintiffs argue that, even if the wage orders do not encompass the remaining expense reimbursement

United States District Court
Northern District of California

issues, those issues still rely on the ABC test because (1) they arise out of the labor code generally or relate to wage orders, and (2) AB5 was retroactive.

But only *Dynamex* was retroactive. And, *Dynamex* applied only to wage orders. 4 Cal. 5th at 913–14. Thus, to the extent that AB5 covered claims arising out of the labor code generally or relating to wage orders, AB5 was an expansion of *Dynamex*. That expansion was not retroactive. AB5 applied only to "work performed on or after January 1, 2020." Cal. Lab. Code § 2785(c). Because all three of our plaintiffs terminated their work with defendant by 2017, AB5's expansion of *Dynamex* does not apply here. Thus, issues not covered under the wage orders, even if they relate to wage orders or arise out of the labor code generally, rely on *Borello* in this action.

*Second*, plaintiffs contend *Gonzales v. San Gabriel Transit, Inc.*'s finding that "failure to reimburse expenses . . . in violation of [Labor Code] Section 2802 is encompassed by Wage Order No. 9(8)" is binding on this order. 40 Cal. App. 5th 1131, 1137 (2019). But *Becerra* disagreed with *Gonzales*, finding the wage orders do not cover certain issues under Section 2802. 69 Cal. App. 5th at 934. The California appellate court involved in *Dynamex* even found the wage orders do not cover gas expenses under Section 2802. *Dynamex*, 4 Cal. 5th 903, 915–16, n. 5. As California appellate courts are split on this issue, this order may follow either route.

*Third*, this order finds that neither Wage Order 9-2001(8) nor Wage Order 5-2001(8) covers the remaining expense reimbursement issues. Those wage order sections prohibit employers from requiring reimbursement "*from* an employee;" they do not mandate that employers give reimbursements *to* employees. *Ibid.* (emphasis added).

### (iv)    Unlawful Deductions.

Labor Code Section 221 provides "[i]t shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Construing the wage orders "liberally . . . in a manner that serves [their] remedial purposes," and considering that the suffer or permit to work standard is "exceptionally broad,"

this order finds that Wage Order 5-2001(8) encompasses Labor Code Section 221. *Dynamex*, 4 Cal. 5th at 952–53. That wage order provides:

> No employer shall make any deduction from the wage . . . for any cash shortage, breakage, or loss of equipment, unless it can be shown that the shortage, breakage, or loss is caused by a dishonest or willful act, or by the gross negligence of the employee.

Wage Order 5-2001(8). That other district court decisions have found otherwise is not persuasive. In the view of this order, decisions that have found otherwise have failed to construe the wage orders liberally to protect California workers.

Moreover, our court of appeals recognized that "*Dynamex* favorably cited two Massachusetts decisions that applied the ABC test in the franchise context," one of which was *Awuah v. Coverall North America, Inc.*, 952 N.E.2d 890 (Mass. 2011). *Vazquez*, 986 F.3d at 1123–24. In *Awuah*, the Supreme Judicial Court of Massachusetts stated:

> [W]e address "franchise fees," *i.e.*, the initial and additional fees that [the plaintiff] agreed to pay [the defendant] in order to enter into what the judge has determined to be a direct employment relationship with [the defendant]. Our view is that fees such as these constitute "special contracts," not usual between employers and employees. In substance, they operate to require employees to buy their jobs from employers, and in that respect we think they violate public policy.

952 N.E.2d at 900. Given both our court of appeals and the California Supreme Court cited *Awuah* favorably, this order finds *Awuah* persuasive. Thus, Wage Order 5-2001(8), construed liberally, encompasses unlawful deductions under Labor Code Section 221 as to franchise fees and as to fees taken from unit franchisees' cleaning revenue. As defendant does not benefit from the remaining fees that master franchisees deduct from unit franchisees, those fees are not subject to this action and are uncertifiable.

Thus, certification of the unlawful deduction claim relies on plaintiffs showing predominance of their misclassification claim under *Dynamex*, which plaintiffs have already done. In turn, plaintiffs need only further show that common questions predominate as to liability.

Plaintiffs have done so. All of plaintiffs' agreements with their master franchisees included a franchise fee (*e.g.*, Dkt. No. 292-11 § 7). Those agreements, of course, were based

on defendant's standard template that master franchisees used uniformly. Defendant uniformly collected four percent of all revenue from unit franchisees' cleaning services from unit franchisees' wages (Kissane Dep. 33; Dkt. No. 313-2; *see* Dkt. Nos. 292-2 § 4.7). Defendant also uniformly collected ten percent of all franchise fees that unit franchisees paid to master franchisees (*ibid.*). Thus, there is sufficient common evidence to adjudicate liability for unlawful deductions on a class-wide basis.

### *(v)    Wage Statements.*

Additionally, plaintiffs request damages for defendant's failure to provide itemized wage statements under Labor Code Section 226. This issue is governed by Wage Order 5-2001(7). But plaintiffs failed to claim such a violation in the operative complaint. As discussed below, this order construes plaintiffs' actions as a request to amend pursuant to FRCP 15(b), but this order denies that request for undue delay and prejudice to defendant. Thus, the Section 226 issue is not certifiable.

This order **CERTIFIES**: (1) plaintiffs' expense reimbursement claim, but only as to the issues of (a) required uniforms, and (b) necessary cleaning supplies and equipment; and (2) plaintiffs' unlawful deduction claim, but only as to the issues of (a) franchise fee royalties, and (b) cleaning revenue royalties. Certification of other issues deriving from the expense reimbursement and unlawful deduction claims is **DENIED**. Certification of plaintiffs' request for failure to provide itemized wage statements is **DENIED AS MOOT**.

### 3.    SUMMARY JUDGMENT AS TO MISCLASSIFICATION.

As discussed above, Prong B of the ABC test is susceptible to common proof. This order now turns to the merits of Prong B, aided by the guidance of our court of appeals. Thereafter, this order briefly addresses Prong A and Prong C.

Summary judgment is proper when the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). Material facts are those that "might affect the outcome of the suit" under the governing, substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

United States District Court
Northern District of California

28

(1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ibid.*

The record is viewed in the light most favorable to the nonmoving party, and "'all reasonable inferences that may be drawn from the facts placed before the court must be drawn'" in favor of the nonmoving party. *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065 (9th Cir. 2003) (citations omitted). The judge does not make credibility determinations or weigh the evidence. *Anderson*, 477 U.S. at 255. A trial court may consider only admissible evidence. FRCP 56(c).

Here, both parties have moved for summary judgment. Defendant, however, has the burden of persuasion at trial to satisfy the ABC test. *Dynamex*, 4 Cal. 5th at 964. A finding against defendant on any prong directs a finding of an employer-employee relationship.

### (i)    *Prong B of the ABC Test.*

Prong B requires the employer to show "that the worker performs work that is outside the usual course of the hiring entity's business . . . ." *Dynamex*, 4 Cal. 5th at 964. Our court of appeals identified three considerations relevant to Prong B: (1) whether the work of the hiree is necessary to or merely incidental to that of the hirer; (2) whether the hiree continuously performs work for the hirer; and (3) what business the hirer proclaims to be in. *Vazquez*, 986 F.3d at 1125.

*First*, this order considers whether the work of unit franchisees was necessary or merely incidental to the work of defendant. Our court of appeals stated that "[i]n some cases, this inquiry can be conducted through a common-sense observation of the nature of the businesses." *Vazquez*, 986 F.3d at 1125. "In other cases, courts view the 'necessary' versus 'incidental' distinction in more economic terms." Where the hirer's revenue is dependent on the amount of work that the hirees perform, the hirees are deemed necessary to the hirer's work. *Id.* at 1126.

Here, as a matter of common sense, unit franchisees remained at all times necessary to defendant's business. Defendant's business depended on unit franchisees performing cleaning services. Without a consistent supply of unit franchisees, defendant's business would have

United States District Court
Northern District of California

29

cratered. And, defendant earned four percent of all cleaning revenue that master franchisees collected from unit franchisees (Kissane Dep. 34). Defendant's revenue, therefore, depended on the amount of work that unit franchisees performed.

Defendant does not dispute these common-sense conclusions. Rather, defendant states our court of appeals' decision is "no longer good law" (Opp. 19). Defendant construes our court of appeals' decision to mean that an entity is an employer whenever it derives an economic benefit from its workers (*ibid.*). Defendant's argument is a stretch. Our court of appeals stated that whether a hirer earns revenue based on hirees' output is only a consideration in the misclassification analysis. Our court of appeals' decision is still good law.

*Second*, this order considers whether unit franchisees continuously performed work for defendant. Here, unit franchisees did not "perform incidental services for [an] otherwise unrelated business[]." *Vazquez*, 986 F.3d at 1126. Rather, they performed cleaning services "on a regular or continuous basis, without regard to the substantiality of the activity in relation to [defendant's] other business activities." *Id.* at 1127. As plaintiffs point out, unit franchisees signed standard agreements for ten-year terms (*e.g.*, Dkt. No. 292-12 § 18). They continuously — not occasionally — performed cleaning services. And, as shown below, defendant was in the business of cleaning, so unit franchisees' services were necessary — not incidental — to a related business.

Defendant contends that our court of appeals' approach is "unreasonable at best" because it would not be economically feasible for a franchisor to contract with a franchisee for "'a term too short for the franchisee to recoup his or her investment'" (Opp. 21) (citation omitted). But our court of appeals' approach is reasonable because it "helps capture the distinction between independent contractor arrangements designed to evade requirements placed on employers and traditional contractors like electricians and plumbers, who perform incidental services for otherwise unrelated businesses." *Vazquez*, 986 F.3d at 1126. And, again, whether unit franchisees continuously worked for defendant is but one consideration under Prong B.

*Third*, this order considers whether defendant held itself out as a cleaning business. Of importance to this inquiry is how defendant described itself in public advertisements and

United States District Court
Northern District of California

30

websites. *Vazquez*, 986 F.3d at 1127. As our court of appeals stated, defendant's "website and advertisements . . . promote[d] [defendant] as being in the business of cleaning." *Ibid.* Defendant's website described defendant as an "'environmentally responsible commercial cleaning company'" that provided "'cleaning services.'" *Ibid.* Furthermore, in defendant's contracts with its master franchisees, defendant described itself as "in the business of *operating* and franchising *comprehensive cleaning and maintenance businesses . . .*" (Dkt. No. 292-2 § 1) (emphasis added).

Moreover, our court of appeals was "skeptical" of defendant's argument that it was in the business of franchising rather than cleaning:

> "Franchising is not in itself a business, rather a company is in business of selling goods or services and uses the franchise model as a means of distributing the goods or services to the final end user without acquiring significant distribution costs."

*Ibid.* (citation omitted). This order also finds defendant's argument unconvincing. Defendant was plainly in the business of selling cleaning services. To conclude otherwise would ignore the entire foundation of defendant's business. Decisions of Massachusetts courts are not binding here and are unpersuasive on this issue.

Defendant also argues that treating unit franchisees as employees would be inconsistent with California and federal franchise regulations. But the Federal Trade Commission Franchise Rule states that "[a] law is not inconsistent with [the rule] if it affords prospective franchisees equal or greater protection . . . ." 16 C.F.R. § 436.10(b). The ABC test affords franchisees greater protection by broadening the definition of "suffer or permit to work." Thus, this order finds franchise regulations consistent with finding unit franchisees to be employees under the ABC test. *See Goro v. Flowers Food, Inc.*, 2021 WL 4295294, at *10–11 (S.D. Cal. Sep. 21, 2021) (Judge Todd W. Robinson).

Finally, defendant argues the ABC test requires that plaintiffs show defendant was the "hiring entity." But *People v. Uber Technologies, Inc.*, a California appellate decision, expressly rejected this argument. *Uber Technologies* found the phrase "hiring entity" was "intended to be expansive for reasons specific to California wage and hour laws and the

United States District Court
Northern District of California

longstanding social safety net objectives of those laws in this state." And, defendant's suggestion that this order must decide whether the cleaning customers or defendant was the hiring entity would present an "artificial choice" resting on a "false dichotomy." It is possible that unit franchisees rendered services to both defendant and the cleaning customers. 56 Cal. App. 5th 266, 287–88 (2020).

In sum, on their motion for summary judgment, plaintiffs have met their burden to show an absence of a genuine dispute of material fact as to all three considerations under Prong B. Defendant has failed to raise a genuine dispute of material fact. No reasonable juror could find in favor of defendant on any of the three considerations. Furthermore, on its own motion for summary judgment, defendant has failed to meet its initial burden to show an absence of a genuine dispute of material fact. Because defendant has failed to satisfy Prong B, this order finds unit franchisees were employees of defendant. Summary judgment for plaintiffs on the misclassification claim under *Dynamex* is **GRANTED**. Defendant's motion for summary judgment as to misclassification under *Dynamex* is **DENIED**.

### *(ii)    Prong A of the ABC Test.*

Although the above is sufficient to find in favor of plaintiffs on the misclassification claim, this order briefly considers the remaining prongs of the ABC test. Prong A requires the hirer to show "that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of the work and in fact." *Dynamex*, 4 Cal. 5th at 955. "[A] business need not control the precise manner or details of the work in order to be found to have maintained the necessary control that an employer ordinarily possesses over its employees." *Id.* at 958.[5] That the hirer dictates how the work is to be performed is significant to this inquiry. *See id.* n. 27.

Here, defendant had the contractual "right to establish company policies and/or procedures pertaining to the operation of [master franchisees'] franchised business . . . or the business of any unit franchisee" (Dkt. No. 292-2 § 4.28). Defendant had the contractual right

---

[5] *Borello* is more stringent. The first factor in *Borello* requires the hirer to control the details of the hirees' work. 48 Cal. 3d at 351.

United States District Court
Northern District of California

to inspect master and unit franchisees' premises to ensure quality of service (*id.* § 4.29). By contract, unit franchisees were subject to a mandatory training program, through which defendant dictated how unit franchisees were to perform cleaning services (*e.g.*, Dkt. No. 292-12 § 5). And, unit franchisees were subject to a non-compete provision (*e.g.*, *id.* § 19). Thus, unit franchisees were not free from defendant's control and direction under contract.

"As a practical matter," however, there may have been "less control at all levels than what is contemplated in the agreements." *Vazquez*, 986 F.3d at 1120. Plaintiff Roman engaged in an independent business that cleaned houses, contravening the non-compete provision (Roman Dep. 160). Defendant's Vice President testified that "[defendant]'s officials rarely make site visits to its master franchisees" (Thompson Dep. 39). "They also rarely, if ever, inspect the books and records of their master franchisees" (*ibid.*). *Vazquez*, 986 F.3d at 1120. Although defendant provided a proprietary system for master franchisees to use to estimate cleaning hours, defendant counters that master franchisees did not use that system (Opp. 16). *Ibid.* Further, one master franchisee declared defendant "has declined to get involved" with "compliance matters relating to our business" (Dkt. No. 247-3, Conner Decl. ¶ 5).

As to both defendant and plaintiffs' motion for summary judgment, this order finds there are genuine disputes of material fact regarding control that preclude summary judgment on Prong A. Thus, Prong A is not amenable to summary judgment.

### (iii)    *Prong C of the ABC Test.*

Prong C requires the hirer to show "that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed." *Dynamex*, 4 Cal. 5th at 955. Furthermore:

> Courts in other states that apply the ABC test have held that the fact that the hiring business permits a worker to engage in similar activities for other businesses is not sufficient to demonstrate that the worker is "'customarily engaged in an independently established . . . business'" for purposes of [Prong C]. . . . . "[T]he appropriate inquiry under [Prong C] is whether the person engaged in covered employment actually has such an independent business, occupation, or profession, not whether he or she could have one."

33

*Id.* at 962 n. 30.

Here, at least plaintiff Roman actually engaged in an independent business that cleaned houses (Roman Dep. 160). Plaintiffs' argument that unit franchisees, such as plaintiff Roman, expanded defendant's customer base by engaging in independent businesses is invalid. By definition, unit franchisees who engaged in independent businesses did not provide customers to defendant's separate business. Moreover, this order finds plaintiff Roman's housekeeping business to be "of the same nature" as defendant's commercial cleaning business. *Dynamex*, 4 Cal. 5th at 962, n. 30. Both businesses involved janitorial work. Plaintiffs do not cite case law that distinguishes between housekeeping and commercial cleaning. And, that unit franchisees agreed not to compete with defendant is irrelevant under Prong C. *Dynamex*, 4 Cal. 5th at 962, n. 30. Thus, as to defendant's motion, there is no genuine dispute of material fact that defendant satisfies Prong C. Thus, Prong C is amenable to summary judgment in favor of defendant.

Of course, this order's findings regarding Prong A and Prong C do not alter the conclusion that defendant cannot satisfy Prong B. All unit franchisees were employees under *Dynamex*.

### (iv)    The Joint Employer Test Does Not Apply.

Defendant argues the joint employer test applies here instead of the ABC test. Defendant's argument relies on the following language: "'Where a party is the agent of misclassification, it may be directly liable under the ABC test, even where it utilizes a proxy to make arrangements with its employees.'" *Vazquez*, 986 F.3d at 1124 (quoting *Depianti v. Jan-Pro Francising Int'l, Inc.*, 990 N.E.2d 1054, 1068 n. 17 (Mass. 2013)). Defendant further asserts that, in three-tier systems, ordinarily the middle tier is the agent of misclassification. *See Jinks v. Credico (USA), LLC*, 177 N.E.3d 509, 516 (Mass. 2021). According to defendant, however, there are two exceptions under which the top tier is the agent of misclassification: "first, where the law of corporate disregard is applicable and, second, where an entity has engaged in an 'end run' around its wage law obligations." *Ibid.* Defendant argues that, because plaintiffs have not met either exception, defendant is not the agent of misclassification.

34

For that reason, defendant states the ABC test cannot apply. Rather, defendant seeks to apply the joint employer test.

Defendant's argument fails for a number of reasons. *First*, our court of appeals instructed this order to apply the ABC test. *Vazquez*, 986 F.3d at 1122. To ignore a mandate from our court of appeals and to employ a different test would contravene our judicial process.

*Second*, neither our court of appeals nor *Dynamex* required that the hirer be the "agent of misclassification" before the ABC test can apply. Although California adopted Massachusetts' ABC test, that does not imply that subsequent Massachusetts decisions regarding the ABC test are binding on this order.

*Third*, even if there were an "agent of misclassification" standard, defendant was, in fact, the agent of misclassification. The Massachusetts Supreme Judicial Court stated that the top tier is the agent of misclassification if it "'design[s] and implement[s] the contractual framework under which [the bottom-tier] was misclassified as an independent contractor,' specifically to evade obligations under the wage laws." *Jinks*, 177 N.E.3d at 517 (quoting *Depianti*, 990 N.E.2d at 1068 n. 17). This would amount to an "end run" around the top tier's wage law obligations. *Ibid.*

Defendant did just that. Defendant designed and implemented a contractual framework — through its standard agreement — that classified unit franchisees as independent contractors. Unlike *Jinks*, in which the middle-tier classified the plaintiffs as independent contractors "[w]ithout any apparent input from [the top-tier]," here, defendant — the top tier — classified the unit franchisees as independent contractors. In fact, master franchisees' agreements with unit franchisees "substantially *follow[ed] [defendant]'s requirements*" by "describ[ing] the unit franchisee[s] as independent contractor[s] . . . ." *Vazquez*, 986 F.3d at 1119–20 (emphasis added). Thus, the ABC test would apply even if this order were to follow *Jinks*.

Having found that unit franchisees were employees of defendant under *Dynamex*'s ABC test, this order next considers whether any of the certified substantive issues are amenable to summary judgment.

35

### 4.    SUMMARY JUDGMENT AS TO CERTIFIED LABOR CODE ISSUES.

This order has certified the following issues for class treatment: (1) whether defendant is liable to unit franchisees for failure to pay for (a) travel time during the work day, and (b) mandatory training; (2) whether defendant is liable to unit franchisees for failure to reimburse them for (a) required uniforms, and (b) necessary cleaning supplies and equipment; and (3) whether defendant unlawfully deducted from unit franchisees' wages (a) franchise fee royalties, and (b) cleaning revenue royalties. These are discussed in turn.

### A.    TRAVEL TIME.

As defendant suffered or permitted unit franchisees to work under *Dynamex*, this order finds that unit franchisees are entitled to minimum wage under Labor Code Section 1194 for travel time between cleaning customer locations during the workday. *See Armenta v. Osmose, Inc.*, 135 Cal. App. 4th 314, 324 (2005); *Dynamex*, 4 Cal. 5th at 953.[6] Defendant, as stated above, fails to raise a genuine dispute of material fact as to whether it suffered or permitted unit franchisees to work under Prong B.

Thus, as to plaintiffs' motion for summary judgment, there is no genuine dispute of material fact, and summary judgment in favor of plaintiffs as to minimum wage for travel time is **GRANTED**. Defendant's motion for summary judgment fails to meet its burden and, as to the travel time issue, is **DENIED**.

### B.    MANDATORY TRAINING.

Plaintiffs have pointed to no published California decision that explicitly recognizes an employee's right to minimum wage for mandatory training; this order finds none. But "California courts have long recognized that California's wage laws are patterned on federal statutes and that authorities construing those federal statutes provide persuasive guidance to state courts." *Armenta*, 135 Cal. App. 4th at 322. "A review of our labor statutes reveals a clear legislative intent to protect the minimum wage rights of California employees to a greater extent than federally." *Id.* at 324.

---

[6] Unit franchisees, however, are not entitled to minimum wage for time commuting from their homes before the workday or to their homes after the workday. Plaintiffs have not shown that such time is compensable.

Under the Fair Labor Standards Act, a hirer must meet six elements to show that its trainees do not qualify for minimum wage for mandatory training. *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1006 (N.D. Cal. 2010) (Judge Edward M. Chen); *see Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947). One such element is that "[t]he employer that provides the training derives no immediate advantage from the activities of the trainees, and on occasion his operations may actually be impeded." *Harris*, 753 F. Supp. 2d at 1006. In other words, "where the company is the primary beneficiary of the trainee's labors, an employment relationship exists and federal minimum wage and overtime laws apply." Cal. Prac. Guide Emp. Litig. § 11-B (Mar. 2022) (citing *McLaughlin v. Ensley*, 877 F.2d 1207, 1209–10 (4th Cir. 1989)).

Here, defendant required master franchisees to train all unit franchisees on proper cleaning methods (Dkt. No. 292-2 § 4.22). Defendant also provided master franchisees with manuals regarding cleaning and safety to provide to unit franchisees (Dkt. Nos. 292-15, 292-16). Master franchisees, in turn, required unit franchisees to attend a training program on proper cleaning methods (*e.g.*, Dkt. No. 292-13 § 3(B)). At least plaintiff Vazquez declares that he attended such a training program, and defendant did not pay him for his time in training (Vazquez Decl. ¶ 7). Defendant, however, fails to provide any evidence disputing the above facts.

Defendant was the primary beneficiary of the mandatory trainings. Defendant reinforced proper cleaning techniques to ensure satisfactory services and to establish goodwill with customers. And, it outlined safety protocols to decrease its risk for tort liability. Thus, this order finds that unit franchisees who underwent mandatory training are entitled to minimum wage under California Labor Code Section 1194.

Thus, as to plaintiffs' motion for summary judgment, there is no genuine dispute of material fact, and summary judgment in favor of plaintiffs on the mandatory training issue is **GRANTED**. Defendant's motion for summary judgment fails to meet its burden and, as to the mandatory training issue, is **DENIED**.

37

United States District Court
Northern District of California

### C.      EXPENSE REIMBURSEMENTS.

Master franchisees provided an initial set of cleaning supplies and equipment to each of their unit franchisees (*e.g.*, Dkt. No. 292-12 § 6(A)).  But unit franchisees had to replace all supplies and equipment with their own funds (*ibid.*).  Deposition testimony of defendant's President and Chief Executive Officer confirms this common practice (Kissane Dep. 157).  Deposition testimony also reveals that defendant required unit franchisees to wear the Jan-Pro logo when they worked, and unit franchisees had to pay for compliant uniforms themselves (*id.* 173).  Moreover, all three plaintiffs declare that they paid for uniforms, cleaning supplies, and cleaning equipment themselves (Vazquez Decl. ¶ 9, Aguilar Decl. ¶ 8, Roman Decl. ¶ 9).  Defendant does not dispute any of the above facts.

Thus, as to plaintiffs' motion for summary judgment, there is no genuine dispute of material fact, and summary judgment in favor of plaintiffs for reimbursement for uniforms, cleaning supplies, and cleaning equipment is **GRANTED**.  Defendant's motion for summary judgment fails to meet its burden and, as to those issues, is **DENIED**.

### D.      UNLAWFUL DEDUCTIONS.

Defendant required master franchisees to pay defendant four percent of all revenue from unit franchisees' cleaning work and ten percent of all franchise fees that unit franchisees paid to master franchisees (Dkt. No. 292-2 § 4.7).  (The diagram on page four herein depicts that pay scheme.)  Deposition testimony reveals that was a uniform practice (Kissane Dep. 33).  And, master franchisees made the deductions directly from unit franchisees' wages (Dkt. No. 312-2).  Defendant does not dispute any of the above facts.

Thus, as to plaintiffs' motion for summary judgment, there is no genuine dispute of material fact, and summary judgment in favor of plaintiffs for four percent of all cleaning revenue and ten percent of all franchise fees is **GRANTED**.  Defendant's motion for summary judgment fails to meet its burden and, as to those issues, is **DENIED**.

### 5.      PLAINTIFFS' REQUEST TO AMEND THE PLEADINGS.

Plaintiffs did not claim violations of Labor Code Section 226 in the operative complaint (*see* Second Amd. Compl.).  Nevertheless, plaintiffs move for summary judgment under that

section. Thus, this order construes plaintiffs' motion as a request to amend the pleadings out of time pursuant to FRCP 15(b). *Apache Survival Coal. v. U.S.*, 21 F.3d 895, 910 (9th Cir. 1994). Whether plaintiffs may expand their complaint by adding a claim raised for the first time on summary judgment lies within the district court's discretion. *See Brass v. Cnty. of L.A.*, 328 F.3d 1192, 1197 (9th Cir. 2003).

"When considering a motion for leave to amend, a district court must consider whether the proposed amendment results from undue delay, is made in bad faith, will cause prejudice to the opposing party, or is a dilatory tactic." *Chodos v. W. Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002). Although our court of appeals has acknowledged that "leave to amend should normally be 'freely given,' once a case has progressed to the summary judgment stage 'the liberal pleading standards are inapplicable.'" *Soublet v. Cnty. of Alameda*, 2019 WL 12517063, at *8 (N.D. Cal. Dec. 6, 2019) (Judge Jon S. Tigar) (citations omitted). "'Simply put, summary judgment is not a procedural second chance to flesh out inadequate proceedings.'" *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) (citation omitted).

Here, plaintiffs have had over a decade to amend their complaint to include a claim under Labor Code Section 226. In fact, plaintiffs have amended their complaint twice. But plaintiffs have never claimed a violation of Section 226. Thus, plaintiffs have unduly delayed.

Moreover, to allow plaintiffs to amend the complaint now would prejudice defendant. This order has found that defendant waived its arbitration argument because of its delay. It would be unfair to allow plaintiffs to amend their complaint after delaying for the same duration as defendant did.

Although plaintiffs' conduct does not appear to be dilatory or made in bad faith, it is within this order's discretion to deny plaintiffs' request to amend for inexcusable delay. *See Brass*, 328 F.3d at 1197. As to Labor Code Section 226, both parties' motions for summary judgment are, therefore, **DENIED AS MOOT**.

United States District Court
Northern District of California

**CONCLUSION**

For the foregoing reasons, and to the extent stated herein, this tentative order would: **GRANT IN PART AND DENY IN PART** plaintiffs' motion for class certification; **GRANT IN PART AND DENY IN PART** plaintiffs' motion for summary judgment; and **DENY** defendant's motion for summary judgment as to all certified claims and issues.

This tentative order would **GRANT** plaintiffs' motion for class certification as to (1) failure to pay minimum wage for (a) travel time during the work day and (b) mandatory training, (2) failure to reimburse for expenses incurred for (a) required uniforms and (b) necessary cleaning supplies and equipment, and (3) unlawful deductions of (a) franchise fee royalties and (b) cleaning revenue royalties for the following group:  all unit franchisees who signed a franchise agreement with a master franchisee in the state of California and who performed cleaning services for defendant from December 12, 2004, to the latest date on which a named plaintiff terminated employment.  This tentative order would **DENY** class certification as to the remaining labor code claims and issues.  This tentative order would **GRANT** summary judgment in favor of plaintiffs on all certified claims and issues.  As to Labor Code Section 226, this tentative order would **DENY AS MOOT** both parties' motions for summary judgment. A separate order on the instant briefing would resolve the parties' motions for summary judgment as to the uncertified, individual claims and issues that remain in this action.

A trial on the class damages issues would be held on **SEPTEMBER 12, 2022**, with a final pretrial conference on **SEPTEMBER 7, 2022**.

**IT IS SO ORDERED.**

Dated: May 13, 2022.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

40