United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

GLORIA ROMAN, GERARDO
VAZQUEZ, and JUAN AGUILAR,

Plaintiffs,

v.

JAN-PRO FRANCHISING
INTERNATIONAL, INC.,

Defendant.

No.  C 16-05961 WHA

**ORDER RE MOTION FOR
CLASS CERTIFICATION
AND MOTIONS FOR
SUMMARY JUDGMENT**

## INTRODUCTION

In this wage-and-hour misclassification action, plaintiffs move for class certification as to all claims.  Plaintiffs and defendant move for summary judgment as to all claims.  Plaintiffs' motion for class certification is **GRANTED IN PART AND DENIED IN PART**.  Plaintiffs' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.  Defendant's motion for summary judgment as to all certified issues is **DENIED**.  A separate order on the instant briefing shall resolve the parties' motions for summary judgment as to the uncertified, individual claims and issues that remain in this action.

## STATEMENT

**1.    PROCEDURAL HISTORY.**

Plaintiffs Gloria Roman, Gerardo Vazquez, and Juan Aguilar performed janitorial services on behalf of defendant Jan-Pro Franchising International, Inc.  Plaintiffs claim

defendant misclassified them and the putative class members as independent contractors.
They allege defendant violated California minimum wage, overtime, expense reimbursement, and unlawful deduction laws, and they seek compensation on behalf of the putative class.

A prior order in this action granted summary judgment in favor of defendant as to the misclassification claim. Plaintiffs appealed that order. During the appeal, the California Supreme Court adopted the "ABC test" for determining employee classification for claims governed by California wage orders. *Dynamex Operations W., Inc. v. Super. Ct.*, 4 Cal. 5th 903 (2018). Thereafter, our court of appeals directed the parties to brief the effect of *Dynamex* on the merits of this case. Our court of appeals did not discuss the factor test outlined in *Borello*, which California courts use to determine employee classification for purposes of non-wage-order claims. *S. G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*, 48 Cal. 3d 341 (1989).

Our court of appeals certified the issue of whether *Dynamex* applied retroactively to the California Supreme Court. The high court answered yes. Based on that answer and the parties' briefing, our court of appeals vacated the previous summary judgment order and remanded for this order to consider the merits in light of *Dynamex*. *Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106, 1110 (9th Cir. 2021). Specifically, our court of appeals stated that this order "should consider all three prongs of the ABC test . . . ." *Id.* at 1122. Our court of appeals also provided significant guidance on whether summary judgment is appropriate as to the misclassification claim. *Id.* at 1122–28.[1]

2.   FACTUAL BACKGROUND.

At all material times, defendant has been an international janitorial cleaning business. It uses a franchising model with three tiers. The top tier consists of defendant, Jan-Pro International, Inc. The middle tier consists of "master franchisees" or "master owners" — regional, third-party entities — to whom defendant sells exclusive rights to use the

---

[1] This action began in the District of Massachusetts in 2008. That district severed plaintiffs' claims and transferred them to this district. Although the District of Massachusetts eventually dismissed the original action (and the Court of Appeals for the First Circuit affirmed), our court of appeals rejected defendant's contention that res judicata or the doctrine of law of the case bar plaintiffs' claims in this severed action.

United States District Court
Northern District of California

trademarked "Jan-Pro" logo.  As of 2009, there were at least 91 master franchisees in the United States.  The bottom tier consists of "unit franchisees" who contract with master franchisees to clean businesses.  Unit franchisees do not contract with defendant.  A given unit franchisee can be an individual or a few partners, and those persons can hire additional workers to help them clean.  The First Circuit explained defendant's franchising model:

> Jan-Pro and its master owners are separate corporate entities, and each has its own staff.  Moreover, master owners may sell or transfer their individual businesses without approval from Jan-Pro.  Jan-Pro also reserves the right to inspect any premises serviced by either the master owner or any of the master owner's [unit] franchisees to ensure the Jan-Pro standards are being maintained.  Still, master owners have their own entity names and internal business structures, and are responsible for their own marketing, accounting, and general operations.
>
> As for master owners and their unit franchisees, under the terms of the model franchise agreement, master owners agree to provide their franchisees with an initial book of business, as well as start-up equipment and cleaning supplies.  Moreover, the master owner furnishes a training program for its unit franchisees.  Once initial set-up and training is complete, the master owner agrees to (1) assist in the unit franchisee's customer relations (by, for example, providing substitute employees or contractors to supply services in the event of an emergency impacting the unit franchisee); (2) provide the unit franchisee with invoicing and billing services; (3) advance the unit franchisee amounts that have been billed but not yet collected from customers; and (4) make available to the unit franchisee any improvement or changes in services or business methods that are made available to other franchisees.  Additionally, the agreement notes that a unit franchisee is at all times an independent contractor solely in business for itself.  As such, the unit franchisee may, for example, hire its own employees and decide what to pay them, as well as decide whether or not to pursue certain business opportunities.

*Depianti v. Jan-Pro Franchising Int'l, Inc.*, 873 F.3d 21, 23–24 (1st Cir. 2017).

Our plaintiffs were and are unit franchisees who purchased their unit franchises from two different master franchisees.  (The master franchisees in question are not parties herein.) Plaintiff Vazquez purchased a unit franchise from New Venture of San Bernardino, LLC, for $2800.  Plaintiff Roman purchased a unit franchise from Connor-Nolan, Inc., for $2800. Plaintiff Aguilar, with a business partner, also purchased a unit franchise from Connor-Nolan, for which he and his partner paid $9000.

The diagram below shows the general structure of defendant's three-tier business. Solid lines represent revenue from cleaning services. Cleaning customers (CCs) pay master franchisees (MFs) for cleaning services based on "pricing agreements" between them. For some cleaning customers, master franchisees supplement the pricing agreements with "bid worksheets," which show calculations of cleaning costs. Master franchisees then pay unit franchisees (UFs) from that revenue (because unit franchisees do the cleaning), with the exception that master franchisees deduct and pay four percent of that revenue to defendant (D). Dotted lines represent revenue from franchise fees. Unit franchisees each pay master franchisees a franchise fee. Then, master franchisees pay ten percent of the franchise fee to defendant. Additionally, master franchisees profit by collecting other fees from unit franchisees, such as "management fees" and "sales and marketing fees" (not depicted), which defendant does not collect.



Plaintiffs seek to certify the following class: all unit franchisees who have signed franchise agreements with master franchisees in the state of California and have performed cleaning services for defendant since December 12, 2004.

This order grants plaintiffs' motion for class certification and summary judgment as to (1) failure to pay minimum wage for mandatory training, (2) failure to reimburse for expenses incurred for (a) required uniforms and (b) necessary cleaning supplies and equipment, and (3) unlawful deductions of (a) management fees and (b) sales and marketing fees for the following group: all unit franchisees who signed a franchise agreement with a master franchisee in the state of California and who performed cleaning services for defendant from December 12, 2004, to the latest date on which a named plaintiff terminated employment.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   This order denies class certification as to the remaining labor code claims and issues.

2   A separate order on the instant briefing shall resolve the parties' motions for summary

3   judgment as to the uncertified, individual claims and issues that remain in this action.

4   This order defers resolving damages until a later phase of the action.

5        This order follows full briefing and oral argument.

6   **ANALYSIS**

7        Here is the relevant legal framework.  The Industrial Welfare Commission of California

8   publishes wage orders that regulate the hours, wages, and working conditions of California

9   employees.  The wage orders encompass some, but not all, of the provisions in the California

10  labor code.

11       Whether a wage order encompasses a labor code claim dictates the applicable

12  misclassification test.  When a wage order encompasses a labor code claim (or a discrete issue

13  within a claim), courts determine employee classification under *Dynamex* for purposes of that

14  claim or issue.  When the wage orders do not cover a labor code claim (or a discrete issue

15  within a claim), such as expense reimbursements for gas and tolls, courts determine employee

16  classification under *Borello* for purposes of that claim or issue.  *See Dynamex*, 4 Cal. 5th

17  at 915–16 n. 5.

18       Given this legal framework, this order proceeds as follows:

19       *First*, this order applies the FRCP 23(a) criteria (numerosity, commonality, typicality,

20  and adequacy) to the misclassification claim and simultaneously to the labor code claims.

21  This order finds the FRCP 23(a) criteria satisfied for all claims.

22       *Second*, this order considers whether plaintiffs have met their burden under

23  FRCP 23(b)(3) to establish predominance and superiority as to the misclassification question

24  under (1) *Dynamex* and (2) *Borello*.  Those considerations show that plaintiffs satisfy

25  FRCP 23(b)(3) for the misclassification question under *Dynamex* but not under *Borello*.

26       This order then applies FRCP 23(b)(3) to each of the labor code claims that rely on

27  misclassification under *Dynamex*.  Those applications show that plaintiffs satisfy

28  FRCP 23(b)(3) for only the following labor code issues:  (1) failure to pay minimum wage for

mandatory training; (2) failure to reimburse for expenses incurred for (a) required uniforms, and (b) necessary cleaning supplies and equipment; and (3) unlawful deductions of (a) management fees, and (b) sales and marketing fees.

*Third*, this order considers whether summary judgment is appropriate, on a class-wide basis, for plaintiffs or for defendant as to the misclassification claim under *Dynamex*. Those considerations show summary judgment in favor of plaintiffs is warranted as to the misclassification claim under *Dynamex*.

*Fourth*, this order considers whether summary judgment is appropriate as to the certified labor code issues. Those considerations show summary judgment in favor of plaintiffs is appropriate as to all certified labor code issues.

*Fifth*, this order denies as moot both parties' motions for summary judgment regarding itemized wage statements.

### 1.    FEDERAL RULE OF CIVIL PROCEDURE 23(a).

Plaintiffs must show that the proposed class action satisfies each of the four prerequisites of FRCP 23(a), which are:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

A district court must do a rigorous analysis to determine whether the requirements of FRCP 23 are satisfied. "Frequently that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011). (cleaned up).

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.   NUMEROSITY.

The proposed class includes all unit franchisees who signed franchise agreements with master franchisees in California since December 2004. Just one master franchisee had over 100 unit franchisees who signed agreements in California during the class period (Dkt. No. 292-17 at 265). Thus, given there were many master franchisees in California, this order finds numerosity is satisfied.

### B.   COMMONALITY.

The commonality element requires that there be a common contention among all class members which is "of such a nature that it is capable of class-wide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores*, 564 U.S. at 350.

Here, the common misclassification contention is necessarily central to the labor code claims because no class member can recover if defendant's classification of unit franchisees as independent contractors was proper. And, defendant relies on the classification of unit franchisees as an affirmative defense to all of plaintiffs' labor code claims (Dkt. No. 245 at 7). This order finds commonality is satisfied.

### C.   TYPICALITY.

"Under [FRCP 23(a)(3)]'s permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

Here, plaintiffs' defining contention is that defendant improperly classified them as independent contractors. That is also the defining contention of the class. Defendant allegedly injured plaintiffs and the putative class members by failing to provide them with minimum wage, overtime pay, and expense reimbursements, and plaintiffs allege unlawful deductions. Those alleged injuries arose from defendant's conduct of classifying plaintiffs and the putative class members as independent contractors. Thus, plaintiffs and the putative class members allege the same injuries arising from the same conduct. Although there may be some differences between plaintiffs' experiences and those of the putative class members, plaintiffs'

7

claims are reasonably co-extensive with those of the putative class members.  This order finds typicality is satisfied.

### D.   ADEQUACY.

As to adequacy, the representative plaintiffs and class counsel cannot have conflicts of interest with the putative class members and must prosecute the action vigorously on behalf of the class.  *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

Here, plaintiffs' lead counsel submitted a declaration describing her qualifications and extensive experience in wage-and-hour litigation, including serving as class counsel in numerous wage-and-hour misclassification actions.  Her law partner also has experience in wage-and-hour litigation (Liss-Riordan Decl. ¶¶ 2–17).

Thus far, plaintiffs' counsel have vigorously litigated this case.  Plaintiffs' counsel have deposed defendant's President and Chief Executive Officer, Vice President, Vice President of Field Services, and Director of Training (Dkt. No. 247-4).  They have also successfully appealed the prior order on summary judgment in this matter.

Plaintiffs each submitted declarations stating that they understand their duty to always consider the best interests of the class before their own and to actively participate in the lawsuit.  They also declare that they have no conflicts of interest with the putative class members (Vazquez Decl. ¶ 3; Aguilar Decl. ¶ 3; Roman Decl. ¶ 3).  Defendant has provided no reason to doubt those declarations.  This order finds none.  This order finds adequacy of representation is satisfied.

### E.   DEFENDANT WAIVED THE RIGHT TO ENFORCE ARBITRATION AGREEMENTS.

Defendant argues the named plaintiffs cannot satisfy typicality and adequacy because it has waived the right to arbitrate against the named plaintiffs but not against the absent class members.  This supposed difference is not disqualifying.

The short answer is that an otherwise typical plaintiff ought not be rendered atypical at the whim of a defendant by that defendant simply giving up a defense only against that named plaintiff.  That neat trick will not be blessed.  Otherwise, it could defeat class certification

8

every time.  And, defendant has not actually moved to compel arbitration.  It has only said it intends to do so in the future.

The long answer is that defendant has waived its right to compel arbitration against the absent class members by seeking in court to litigate the merits of its franchise scheme on a *system-wide* basis, *i.e.*, on a class- wide basis.  Having done so, and having now seen how the judicial winds are blowing, defendant should not be allowed to reverse field and play the arbitration card.

This order considers now whether the issue of waiver is properly before the district court. "The court's role under the [Federal Arbitration] Act is . . . limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."  *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).  Our court of appeals has stated:

> [T]he Supreme Court [has] distinguished between two categories of gateway issues on motions to compel arbitration, each of which has a different presumption as to whether a court or an arbitrator should decide.  The first category of gateway issues is a "question of arbitrability" — that is, "whether the parties have submitted a particular dispute to arbitration."  . . . .  These disputes are "for judicial determination unless the parties clearly and unmistakably provide otherwise."  In contrast, the second category — "procedural" issues — is "presumptively not for the judge, but for an arbitrator, to decide."

> \*          \*          \*

> We have made clear that waiver by litigation conduct is part of the first category of gateway issues.

*Martin v. Yasuda*, 829 F.3d 1118, 1122–23 (9th Cir. 2016) (citations omitted).  Thus, here, this order may determine whether defendant has waived the right to enforce the arbitration agreements unless the parties clearly and unmistakably provided otherwise.

Although defendant's incorporation of the American Arbitration Association rules could constitute clear and unmistakable evidence that the parties agreed to arbitrate arbitrability under *Brennan v. Opus Bank*, that decision is off point.  *Brennan* expressly limited its holding to commercial contracts between sophisticated parties.  796 F.3d 1125, 1131 (9th Cir. 2015).  Here, therefore, the employment contracts with janitors fall outside of *Brennan*

(unit franchisees are primarily immigrant workers, of whom many do not speak English). Moreover, although defendant argues the Federal Arbitration Act preempts the sophistication requirement, the Third Circuit decision it cites for support is not binding here.

In *Cox v. Ocean View Hotel Corp.*, an arbitration agreement incorporated the American Arbitration Association rules and included broad language to arbitrate any dispute "arising out of or related to" the agreement. 533 F.3d 1114, 1117 (9th Cir. 2008). Nevertheless, *Cox* held the waiver issue was "properly heard by the district court." *Id.* at 1120. Thus, defendant's argument fails. This order may adjudicate the waiver issue.

This order now considers the merits of whether defendant has waived its right to enforce the arbitration agreements. Our court of appeals has stated:

> [W]here the waiver of the right to compel arbitration implicates questions of arbitrability that "affect the allocation of power" between a court and arbitrator, we have applied a federal law standard for determining whether an arbitration agreement has been waived.

*Newirth by & through Newirth v. Aegis Senior Communities, LLC*, 931 F.3d 935, 940 (9th Cir. 2019) (citation omitted). Because the waiver issue affects the allocation of power between the district court and an arbitrator, the federal law standard applies here.

"Waiver . . . 'is the intentional relinquishment or abandonment of a known right.' To decide whether a waiver has occurred, the court focuses on the actions of the person who held the right . . . ." The Supreme Court recently held "prejudice is not a condition of finding that a party waived its right to . . . compel arbitration under the [Federal Arbitration Act]." So the test for waiver now has only two elements. Thus, "a party waives its contractual right to arbitration if it [1] knew of the right; [and] [2] 'acted inconsistently with that right.'" *Morgan v. Sundance, Inc.*, No. 21-328, 596 U.S. ___ (2022) (citations omitted).

Ninth Circuit precedent provides us with the following general rules regarding acts inconsistent with the right to arbitrate. If, before moving to compel arbitration, a party moves to dismiss on a key merits issue, then the party's action is inconsistent with the right to arbitrate. Moreover, a motion for summary judgment is inconsistent with the right to arbitrate. Conversely, resisting discovery or seeking a stay is not inconsistent with the right to arbitrate.

Failure to raise arbitration as an affirmative defense is not inconsistent with the right to arbitrate.  *Newirth*, 931 F.3d at 942; *Martin*, 829 F.3d at 1125–26; *Britton v. Co-op Banking Grp.*, 916 F.2d 1405, 1413 (9th Cir. 1990); *Freaner v. Valle*, 966 F. Supp. 2d 1068, 1086 (S.D. Cal. 2013) (Judge Janis L. Sammartino); *see Morgan Stanley & Co. LLC v. Couch*, 659 F. App'x 402, 405 (9th Cir. 2016).

Here, defendant has had knowledge of an arbitration defense for well over a decade. One of defendant's motions to dismiss in the District of Massachusetts in 2008 relied on the outcome of an arbitration proceeding between some unit franchisees and their master franchisees (Dkt. No. 17).  Defendant cannot claim ignorance of an arbitration defense.

Moreover, defendant has acted inconsistently with the right to arbitrate.  In two motions to dismiss for failure to state a claim in the District of Massachusetts, defendant sought a victory in court on the misclassification claim and the wage and hour claims — key merits issues (Dkt. Nos. 4, 17).  Although its failure to raise arbitration as an affirmative defense was not, in and of itself, a waiver, defendant has moved for summary judgment three times (Dkt. Nos. 65, 246, 299), which includes two motions in this district.[2]

In fact, defendant's pending motion for summary judgment seeks a *system-wide* victory on the classification issue.  For two and one-half pages, defendant argues its entire franchise system complies with state and federal franchise laws and, therefore, that all unit franchisees — not just the named plaintiffs — were independent contractors rather than employees (Dkt. No. 328 at 21–24).

True, defendant couched that argument as an opposition to plaintiffs' motion for summary judgment on misclassification.  But defendant quoted a Ninth Circuit decision that shows it moved for summary judgment on misclassification on a system-wide basis:

> "The franchise system creates a class of independent businessmen;
> it provides the public with an opportunity to get a uniform product
> at numerous points of sale from small independent contractors,
> rather than from employees of a vast chain."

---

[2]  To ignore defendant's conduct in the District of Massachusetts would not account for "the totality of [defendant's] actions" to seek decisions on the merits.  *Newirth*, 931 F.3d at 941.

United States District Court
Northern District of California

1   (Dkt. No. 328 at 22) (quoting *GTE Sylvania Inc. v. Cont'l T.V., Inc.*, 537 F.2d 980, 999

2   (9th Cir. 1976)).

3       Defendant also made system-wide arguments on the merits prior to the pending motion

4   for summary judgment.  In 2017, defendant moved for and obtained summary judgment on the

5   misclassification issue.  Although that motion sought relief on an individual basis, defendant

6   made the following system-wide argument on the merits:

> Given that [defendant] has a Master Franchise structure, moreover, which inherently means it has no regional control, [defendant] is even further attenuated from the franchise relationships . . . that this court found not to constitute an employment relationship.

10   (Dkt. No. 246 at 18–19).

11       When plaintiffs appealed that summary judgment decision, moreover, defendant sought

12   system-wide relief on the merits.  In its answering brief in 2017, defendant stated:

> [T]he California Supreme Court in *Patterson* duly recognized: "we cannot conclude that franchise operating systems necessarily establish the kind of employment relationship that concerns us here.  A contrary approach would turn business format franchising on its head."  Given this guidance, the district court properly granted summary judgment to [defendant] on [plaintiffs'] employment misclassification claims and attendant Labor Code violations.

18   (App. Br. 13–14) (quoting *Patterson v. Domino's Pizza, LLC*, 60 Cal. 4th 474, 499 (2014)).

19   The foregoing intentional acts doom defendant's argument here.

20       When all a defendant does is bring a motion aimed at the individual circumstances of a

21   single, named plaintiff, it would perhaps be unfair to say that that motion amounts to a class-

22   wide motion or that a class-wide waiver of arbitration has occurred.  But when, as here, a

23   defendant brings a motion aimed at vindicating its system-wide practices, then it is effectively

24   seeking class-wide relief, even if a class has not yet been certified.  Bringing such a system-

25   wide motion on the merits in a court is inconsistent with arbitration on the merits.  Once a

26   defendant seeks system-wide vindication of its practices in a court and on the merits, therefore,

27   it has waived any right to compel an arbitration on the merits.  And, this is true regardless of

28   whether a class has yet been certified.  To hold otherwise would allow a defendant to litigate

1    the system-wide merits of an individual case, see which way the judicial winds are blowing,

2    and then, if the winds seem unfavorable, reverse field and demand arbitration against all absent

3    class members once a class is certified.

4        Defendant, however, argues that until a class is certified, there is no occasion to arbitrate

5    against absent class members.  Defendant cites *Moser v. Benefytt*, 8 F.4th 872 (9th Cir. 2021),

6    for support.  In that action, the defendant corporation asserted a personal jurisdiction defense at

7    the class certification stage.  Specifically, the defendant, which was not a California resident,

8    argued the California district court would not have specific personal jurisdiction over claims by

9    non-California-resident class members for unlawful telemarketing.  The defendant argued,

10   therefore, the district court could not certify a nation-wide class.  But the district court rejected

11   the defendant's argument, holding the defendant had waived the defense by failing to raise it at

12   the motion to dismiss stage pursuant to FRCP 12(g)(2).  The district court then certified a

13   nation-wide class.  *Moser v. Health Ins. Innovations, Inc.*, 2019 WL 3719889, at *4 (S.D. Cal.

14   Aug. 7, 2019) (Judge William Q. Hayes).

15       Our court of appeals, however, reversed and remanded for the district court to reconsider.

16   It held the defendant had not waived its personal jurisdiction defense because the defense had

17   not been available at the motion to dismiss stage.  Namely, the absent class members were not

18   parties to the action prior to class certification, so the defendant could not have imposed a

19   personal jurisdiction defense on them prior to class certification.  *Moser*, 8 F.4th at 877.

20       Similarly, our defendant argues our absent class members are not parties to this action

21   prior to class certification, so the right to arbitrate against them has not matured.

22   Thus, defendant argues it could not have waived its arbitration defense as to absent class

23   members prior to class certification.

24       But *Moser* is inapposite.  There, the defendant did not have an opportunity to bring a

25   personal jurisdiction defense against absent class members until the class certification stage.

26   As our court of appeals reasoned, personal jurisdiction inherently "'entails a court's power

27   over the parties before it,'" and absent class members are not parties to an action prior to class

28   certification.  Moreover, as to the named plaintiff, "there were no claims the district court

13

could have dismissed on personal jurisdiction grounds when it decided [the defendant]'s motion to dismiss because . . . there was specific personal jurisdiction over [the named plaintiff's] claims against [the defendant]."  The defendant, therefore, would not have been expected to raise personal jurisdiction prior to the class certification stage.  8 F.4th at 877–78 n. 2 (citation omitted).

By contrast, here, we are dealing with arbitration.  Defendant could have moved to compel our named plaintiffs to arbitrate.  It did not.  Defendant then sought system-wide vindication of its practices in court and on the merits.  It has, therefore, sought system-wide vindication even though a class has not yet been certified.  After a trip to our court of appeals, it now realizes the judicial winds may not be favorable, so defendant seeks to reverse field and arbitrate.

*Moser* did not involve any attempt to have it both ways; to test the waters in court before playing the arbitration card.  That is the critical distinction.

Having found that all the requirements of FRCP 23(a) are met as to all claims, this order next considers whether the requirements of FRCP 23(b)(3) are met.

### 2.     FEDERAL RULE OF CIVIL PROCEDURE 23(b)(3).

Plaintiffs seek certification under FRCP 23(b)(3), which requires they show:

> [T]he questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

"[T]he likely difficulties in managing a class action" are pertinent to this inquiry. FRCP 23(b)(3)(D).  "Commonly referred to as 'manageability,' this consideration encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit."  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974) (citation omitted).  This order, therefore, "must determine whether the elements necessary to establish liability are susceptible of common proof or, if not, whether there are ways to manage effectively proof of any elements that may require individualized evidence."  This inquiry "can

turn on the precise nature of the element and require resolution of disputed legal or factual issues affecting the merits." *Brinker Rest. Corp. v. Super. Ct.*, 53 Cal. 4th 1004, 1024 (2012).

This order must first consider whether FRCP 23(b)(3) is satisfied for the misclassification claim under *Dynamex*. It must then consider the same for the misclassification claim under *Borello*. Thereafter, it must consider whether FRCP 23(b)(3) is satisfied for the labor claims.

### A. MISCLASSIFICATION CLAIM.

"To employ . . . has three alternative definitions. It means: (a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." *Martinez v. Combs*, 49 Cal. 4th 35, 64 (2010) (emphasis in original). In *Dynamex*, the California Supreme Court clarified that the "suffer or permit to work" standard is met when an employer fails to satisfy the requirements of the ABC test. The high court explained:

> The ABC test presumptively considers all workers to be employees, and permits workers to be classified as independent contractors only if the hiring business demonstrates that the worker in question satisfies each of three conditions:
>
> (a) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and*
>
> (b) that the worker performs work that is outside the usual course of the hiring entity's business; *and*
>
> (c) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

4 Cal. 5th at 955–56 (emphasis in original). The ABC test applies only when a California wage order encompasses the relevant labor code claim. *Id.* at 915–16. Yet the "'suffer or permit to work standard in California wage orders' is meant to be 'exceptionally broad,'" and the wage orders are to be "'liberally construed in a manner that serves their remedial purposes.'" *Vazquez*, 986 F.3d at 1122 (citing *id.* at 952–53).

Our court of appeals laid out the considerations for Prong B of the ABC test:

> Analytically, courts have framed the Prong B inquiry in several ways. They have considered whether the work of the employee is necessary to or merely incidental to that of the hiring entity, whether the work of the employee is continuously performed for the hiring entity, and what business the hiring entity proclaims to be in.

*Id.* at 1125.

Plaintiffs need only show, "given the factual setting of the case, if . . . plaintiffs' general allegations are true, common evidence could suffice to make out a prima facie case for the class." *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005). "Under the [ABC test], if the employer cannot satisfy *just one* prong of the test, the inquiry into employment status ends." Thus, if plaintiffs show "that common evidence will resolve Prong [B], they have made a prima facie showing that they *can* win their case based on evidence common to the class." Such a finding is sufficient to satisfy predominance as to the misclassification claim, as the Seventh Circuit further explained:

> [C]ertifying the class for purposes of Prong [B] would substantially advance the litigation, regardless of whether the common evidence on Prong [B] turns out in [plaintiffs'] or [defendant's] favor. If answered in [plaintiffs'] favor, all of [defendant's] couriers would have to be classified as employees, . . . eliminating the need for any individualized factfinding. If answered in [defendant's] favor, [defendant] would not have to litigate its satisfaction of Prong [B] against every individual plaintiff, promoting efficiency. . . . . Regardless of which party wins, the common answer on Prong [B] "represents a significant aspect of the case and . . . can be resolved for all members of the class in a single adjudication."

*Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1060 (7th Cir. 2016) (emphasis in original) (citations omitted).

Here, common questions predominate under Prong B. Defendant classified all unit franchisees as independent contractors. It provided a standard franchise agreement to master franchisees (Dkt. No. 359-1 at 143; Kissane Dep. 56–59), and master franchisees had a common practice of using that agreement as a template for their agreements with unit franchisees (*see* Dkt. Nos. 292-11, 292-12, 292-13). Although unit franchisees' agreements did not always contain every provision of defendant's template agreement, "[i]n most ways . . .

plaintiffs' agreements substantially follow[ed] [defendant's] requirements." *Vazquez*, 986 F.3d at 1119.

The policies within the template agreement were, therefore, applicable to all unit franchisees. Those common policies will help to adjudicate the misclassification question. The term of unit franchisees' agreements, for example, was ten years (Dkt. No. 359-1 at 147; *see* Dkt. No. 292-11 § 18). This will help to determine, on a class-wide basis, whether unit franchisees "continuously performed" work for defendant for purposes of Prong B. *Vazquez*, 986 F.3d at 1125.

Moreover, "what business [defendant] proclaim[ed] to be in" for purposes of Prong B is susceptible to common proof, as defendant's statements on its website and advertisements were equally applicable to all unit franchisees. *Ibid.*

And, whether unit franchisees' work was necessary or merely incidental to that of defendant is susceptible to common proof. All unit franchisees did the same work on behalf of defendant: they cleaned small businesses. Based on the common nature of unit franchisees' work, this order can determine the "necessary to or merely incidental" inquiry under Prong B for all unit franchisees in one fell swoop. *Ibid.*

Whether Prong A or Prong C is susceptible to common proof does not affect class certification here. As the discussion of the merits below will show, there is no genuine dispute of material fact as to Prong B, and summary judgment in favor of plaintiffs on the misclassification issue is warranted. Thus, irrespective of any decision on Prong A or Prong C, the unit franchisees were employees. Common questions under Prong B will, therefore, predominate. *See Costello*, 810 F.3d at 1060; *James v. Uber Techs., Inc.*, 338 F.R.D. 123, 139 (N.D. Cal. 2021) (Judge Edward M. Chen).[3]

Even if summary judgment were granted in favor of defendant on Prong B on a class-wide basis, such an outcome would significantly advance the litigation. In that scenario,

---

[3] "[A] district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160–61 (1982)).

United States District Court
Northern District of California

defendant would not have to litigate Prong B as to each individual plaintiff, promoting efficiency.  *See ibid.*

For the same reasons, superiority is required only as to Prong B.  And, that too is satisfied for Prong B.  It would be inefficient to try the misclassification issue on an individual basis for the numerous putative class members here when common questions predominate.  *See* Alan Wright & Arthur R. Miller, 7AA Fed. Prac. & Proc. Civ. § 1778 (3d ed. 2022).  Moreover, plaintiffs are correct in pointing out:  (1) the chilling effect that fear of employer retaliation will have on unit franchisees deciding whether to file individual lawsuits; and (2) the difficulty for unit franchisees to bring individual claims, given that the vast majority of them are unsophisticated with regard to legal matters.

Defendant argues individualized issues predominate under Prong B, including "plaintiffs' employment of others to perform work for them," "plaintiffs' filing of business tax returns," "plaintiffs' business dealings with parties other than [defendant]," "whether plaintiffs held themselves out as independent businessmen," and whether unit franchisees established limited liability companies (Opp. 24–25).  That argument is unpersuasive.  *First*, all three considerations under Prong B involve common questions.  *Second*, the focus of Prong B is on defining the hirer's business and whether that definition encompasses the hires' work *for the hirer*.  The issues defendant raises, however, go to determining whether hirees were engaged in independent businesses and worked *for themselves* rather than for the hirer.  Thus, the issues defendant raises are relevant only to Prong C — not Prong B.

Accordingly, plaintiffs have satisfied FRCP 23(b)(3) as to the misclassification claim under *Dynamex*.  The misclassification claim under *Dynamex* is **CERTIFIED**.

\*          \*          \*

As mentioned above, a different classification test applies for purposes of labor code claims and issues that fall outside of the California wage orders.  *Borello* outlined that test:

> While conceding that the right to control work details is the "most important" or "most significant" consideration, the authorities also endorse several "secondary" indicia of the nature of a service relationship.

Thus, we have noted that "strong evidence in support of an employment relationship is the right to discharge at will, without cause."  Additional factors have been derived principally from the Restatement Second of Agency.  These include:  (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.  "Generally, . . . the individual factors cannot be applied mechanically as separate tests; they are intertwined, and their weight depends often on particular combinations."

48 Cal. 3d at 350–51 (citations omitted).

Here, plaintiffs have not satisfied FRCP 23(b)(3) as to the misclassification claim under *Borello*.  Foremost, plaintiffs have not even briefed whether predominance is satisfied under *Borello*.  This alone precludes a finding of predominance — but only as to labor code issues that rely on *Borello*.  *Haitayan v. 7-Eleven, Inc.*, 2021 WL 757024, at *5–6 (C.D. Cal. Feb. 8, 2021) (Judge Dale S. Fischer).

Moreover, two significant *Borello* factors would require individualized inquiries.  "Whether [unit franchisees] engaged in a distinct occupation or business" cannot be determined without asking unit franchisees individually.  48 Cal. 3d at 351.  District courts have found this factor "critical" to the predominance analysis.  *Bowerman v. Field Asset Servs., Inc.*, 2014 WL 4676611, at *12 (N.D. Cal. Sep. 17, 2014) (Judge William H. Orrick) (denying class certification); *see James*, 338 F.R.D. at 138–39; *Narayan v. EGL, Inc.*, 285 F.R.D. 473, 480 (N.D. Cal. 2012) (Judge Ronald M. Whyte).  Although unit franchisees' contracts contained non-compete provisions, "'the appropriate inquiry . . . is whether the person . . . *actually has* such an independent business, occupation, or profession, not whether he or she *could have* one.'"  *Dynamex*, 4 Cal. 5th at 962 n. 30 (emphasis added) (citation omitted).  Notably, plaintiff Roman actually engaged in an independent business that cleaned houses (Roman Dep. 160).  Thus, this order finds the "distinct occupation or business" factor would add significant individualized inquiries to the classification analysis here under *Borello*.

United States District Court
Northern District of California

19

Similarly, "whether or not the [unit franchisees] believe[d] they [were] creating the relationship of employer-employee" is subject to individualized inquiries.  *Borello*, 48 Cal. 3d at 351.  Our court of appeals stated that "a fair characterization may be that plaintiffs understood themselves to be 'Jan-Pro cleaners' but did not necessarily think they were contracting with a company called 'Jan-Pro Franchising International.'"  *Vazquez*, 986 F.3d at 1120.  Thus, individual variations in putative class members' legal sophistication and English-language proficiency would be relevant.  *See ibid.*; *Bowerman*, 2014 WL 4676611, at *11.  Individual variations in what master franchisees told putative class members about defendant's business would also be relevant.  Thus, this order finds that the putative class members' beliefs regarding their relationships with defendant would also add significant individualized inquiries to the classification analysis here under *Borello*.

Further, "the hirer's right to fire at will and the basic level of skill called for by the job, are often of inordinate importance."  And, "the 'ownership of the instrumentalities and tools' of the job, may be of 'only . . . evidential value,' relevant to support an inference that the hiree is, or is not, subject to the hirer's direction and control."  Thus, the two factors that require individualized inquiries weigh heavy here.  *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 539 (2014) (citations omitted).

Thus, plaintiffs fail to satisfy predominance for misclassification under *Borello*. Certification of the misclassification claim under *Borello* is **DENIED**.

## B. LABOR CODE CLAIMS.

Uniform policies and practices of employment misclassification alone are insufficient to establish that common questions predominate as to liability for labor code claims.  *Sotelo v. MediaNews Grp., Inc.*, 207 Cal. App. 4th 639, 654–55 (2012).  Thus, "[e]ven if 'common questions predominate the threshold question of employee classification,' [this order] must still consider whether 'plaintiffs' individual claims also pass the predominance test.'"  *James*, 338 F.R.D. at 139 (citations omitted).  For example, "[a] class . . . may establish liability by proving a uniform policy or practice by the employer that has the effect on the group of

making it likely that group members will work overtime hours without overtime pay" or will receive less than minimum wage per hour of work. *Sotelo*, 207 Cal. App. 4th at 654.

California wage orders encompass claims for minimum wage and overtime under Labor Code Sections 1194 and 510. Cal. Indus. Welfare Comm'n, Wage Ord. Nos. MW-2022, 5-2001(3)(A). *Dynamex*, therefore, provides the applicable test for whether unit franchisees were misclassified for purposes of minimum wage and overtime. 4 Cal. 5th at 913–14. Because this order has found the misclassification question suitable for class treatment under *Dynamex*, this order may consider whether class treatment of plaintiffs' minimum wage and overtime claims is appropriate.

### *(i)* *Minimum Wage.*

Labor Code Section 1194 provides:

> Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit.

Here, there was no policy regarding minimum wage. Plaintiffs argue the lack of a minimum wage policy alone shows common questions predominate. Not so. The absence of a minimum wage policy is not the same as an existing, unlawful policy. Such an absence could suggest that defendant was unaware of the minimum wage requirement, but it does not evidence an unlawful practice that makes defendant likely to have failed to pay minimum wage. Further, plaintiffs cite *Vaquero v. Ashley Furniture Industries, Inc.*, 824 F.3d 1150 (9th Cir. 2016), to support their position. But *Vaquero* involved an existing, unlawful pay policy: the employer had a policy to not pay employees anything beyond commissions. The policy guaranteed that the employees would not earn wages for work hours that did not culminate in a sale. *Vaquero v. Ashley Furniture Indus., Inc.*, 2013 WL 12172124, at *1 (C.D. Cal. June 17, 2013) (Judge Percy Anderson). By contrast, here, defendant did not have a minimum wage policy that made it likely for unit franchisees not to receive minimum wage.

There was no policy at all. Thus, the absence of a minimum wage policy would not be useful to resolve the merits on a class-wide basis.

The only item of common evidence regarding minimum wage comes from deposition testimony. Vice President Thompson of defendant stated that defendant provided master franchisees with a suggested range at which to pay unit franchisees. That range was between $16 and $25 per hour. But master franchisees had discretion to choose the pay rates for their unit franchisees (Thompson Dep. 25). Thus, this evidence would raise individualized inquiries, such as (1) whether a given master franchisee paid its unit franchisees at a different rate than other master franchisees paid their unit franchisees, and (2) whether a given master franchisee varied the rates of pay amongst its own unit franchisees.

Although the absence of proper time and pay records does not preclude class certification, the burden is on plaintiffs to show that any individual inquiries would be manageable. Other decisions have relied on expert statistical analyses in place of common evidence to establish liability. *See, e.g.*, *Vaquero*, 824 F.3d at 1155. Here, by contrast, plaintiffs have not provided *any* such evidence by which to efficiently determine the rate of pay for unit franchisees on a class-wide basis. Plaintiffs make only a cursory reference to (1) potential testimony by class members, and (2) "pricing agreements" and "bid worksheets" between master franchisee Connor-Nolan and cleaning customers.[4] Cursory references will not suffice.

Nevertheless, this order briefly explores the evidence. Each pricing agreement in evidence was between Connor-Nolan and one cleaning customer. The pricing agreements provided the monthly cleaning fee that cleaning customers paid to master franchisees, the number of days per week that unit franchisees cleaned the customers' locations, and, sometimes, a breakdown of the price per type of cleaning (*e.g.*, washing, mopping, sweeping, etc.). From the pricing agreements alone, one could not determine the number of hours a unit franchisee worked or the rate per hour worked (*see, e.g.*, Dkt. No. 247-3 at 34).

---

[4] Connor-Nolan was one of many master franchisees in California. Connor-Nolan contracted with plaintiffs Aguilar and Roman, among other unit franchisees.

Additionally, there are documents that state plaintiff Roman's gross cleaning revenue and all deductions for certain months between 2004 and 2008 (Dkt. No. 313-2 at 2–3). But, again, those documents do not provide a means of calculating hours worked.

Defendant purportedly implemented a proprietary system for master franchisees to estimate cleaning times and costs. The system, which was based on publicly available standards, estimated cleaning rates (square feet per hour) based on: type of cleaning required; types of equipment and supplies used; and state of the item being cleaned. Based on those standard rates and the square footage of each customer location, it is theoretically possible to estimate the number of hours per day unit franchisees spent cleaning each customer location. From there, one could estimate hourly rates using the monthly cleaning fees and the number of days of service per week.

But, as our court of appeals noted, it is unclear whether Connor-Nolan or the many other master franchisees in California used this system to estimate hours. Moreover, using this system would be unmanageable. To check each individual cleaning service against the standard rates would be inefficient at best. The standard category for "hard floor care" alone contains hundreds of possible cleaning rates (Dkt. No. 247-3 at 335–37). Further, the evidence includes several "complaint reports," indicating that plaintiffs Roman and Aguilar did not complete all services on all occasions, which would reduce the estimated number of hours worked (*see, e.g.*, *id.* at 87, 167). Moreover, some unit franchisees had third-party individuals help them clean certain locations, which would reduce the estimated time such unit franchisees spent cleaning (*see, e.g.*, Roman Dep. 35). And, given there were potentially thousands of cleaning customers, and each unit franchisee serviced multiple cleaning customers, individualized inquiries would abound.

Some of Connor-Nolan's pricing agreements, but not all, are accompanied by bid worksheets. For pricing agreements not accompanied by bid worksheets, the method outlined above would be the only means of determining hours worked and rates of pay. For pricing agreements that are accompanied by bid worksheets, those bid worksheets showed estimated hours worked and rates of pay. Connor-Nolan, however, consistently used an hourly rate of

United States District Court
Northern District of California

$15 to estimate cleaning costs (*see, e.g.*, Dkt. No. 247-3 at 61–62).  This rate exceeds all applicable minimum wage rates throughout the proposed class period.  Lab. Code § 1182.12.

In sum, there was no uniform pay policy.  It would be unmanageable to determine hours worked and rates of pay from the pricing agreements and cleaning standards.  The available bid worksheets are all from Connor-Nolan and show a rate of $15 per hour.  This order has no information about whether other master franchisees in California used the cleaning standards or bid worksheets.  And, plaintiffs have not provided any common evidence of liability.  Individualized inquiries predominate.

True, individualized inquiries regarding damages calculations alone do not preclude class certification.  *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010).  But the foregoing analysis goes to whether plaintiffs can prove liability in the first place, *i.e.*, whether the wages paid to unit franchisees were below minimum wage or whether unit franchisees were paid for all hours of cleaning work.

***Travel Time.***  One issue deriving from the minimum wage claim that deserves separate consideration from the above is travel time.  But that issue is also uncertifiable.

To be sure, the history of the definition of "hours worked" in the wage orders indicates that travel time during work is compensable.  In 1943, Wage Order 7NS stated "'hours employed' includes all time during which . . . an employee is required or instructed to travel on the employer's business after the beginning and before the end of her workday."  *Frlekin v. Apple Inc.*, 8 Cal. 5th 1038, 1048 (2020).  Construing the wage orders liberally, this order finds that travel time from one cleaning customer to another during the workday is governed by the wage orders and, therefore, *Dynamex*.  *See* 4 Cal. 5th at 953.[5]

But predominance as to liability for travel time is not satisfied.  It is true that none of the pricing agreements account for travel time (*see id.* at 34–187).  And, for unit franchisees to have been able to service multiple customers in a single day, unit franchisees must have taken some time to travel between customers.  But, as relevant here, the pricing agreements show

---

[5]  This finding does not cover time unit franchisees spent commuting from their homes before the workday or to their homes after the workday.  Plaintiffs have not shown such time is compensable.

United States District Court
Northern District of California

only the days of the week and the initial month of service for each customer location. For defendant to be found liable to a given unit franchisee, therefore, one would have to compare all the unit franchisee's pricing agreements. Defendant would not be liable to the unit franchisee unless and until we locate two pricing agreements with matching weekdays and dates of service.[6] This would have to be repeated for every unit franchisee. Moreover, unit franchisees sometimes sent their own workers to clean certain locations (*see, e.g.*, Roman Dep. 35), and unit franchisees sometimes altered their schedules with their customers (Roman Dep. 144; Vazquez Dep. 94). Those issues could affect the liability determinations and would require that unit franchisees provide information based on their unaided memories.

Thus, individualized issues would predominate as to liability for travel time pay.

***Mandatory Training.*** There is, however, one issue deriving from the minimum wage claim susceptible to common proof: failure to pay unit franchisees for mandatory training. Defendant's standard unit-franchisee agreement provided that each unit franchisee must attend an "initial training program" (Dkt. No. 359-1 at 145, *see* Dkt. No. 292-11 § 5(A)). Plaintiff Vazquez declares he did not receive pay for this mandatory training (Vazquez Decl. ¶ 7). Plaintiff Aguilar testified that he underwent safety training, and there is no evidence that he was paid for that time (Aguilar Dep. 29–30). Whether defendant must pay minimum wage for training time under California law is, therefore, a question common to all unit franchisees. Moreover, based on defendant's standard times for the training program, testimony of defendant, and testimony of a sample of putative class members, one could determine a common time duration for the training program (Dkt. No. 359-1 at 122). Thereafter, one could pay each class member at the same rate for the time required to complete the training program.

Thus, the mandatory training issue is **CERTIFIED**. Certification of all other issues deriving from the minimum wage claim, including wages for cleaning work and travel time, is **DENIED**.

---

[6] Establishing the dates of service for a given unit franchisee for a given customer location would entail comparing the pricing agreement for that customer to other records (if there are any) showing the unit franchisee's last date of service for that customer. This poses an additional layer of individualized inquiry.

United States District Court
Northern District of California

### (ii)     Overtime.

Plaintiffs' claim for overtime pay fails the predominance standard.  To determine liability, one would have to determine whether the unit franchisees worked in excess of eight hours per day or 40 hours per week.  Lab. Code § 510.  Plaintiffs do not provide *any* common evidence making it likely that unit franchisees worked overtime hours.  Without common evidence, one would have to use the unmanageable methods described above to determine hours worked.  But plaintiffs do not present any means of efficiently and accurately estimating overtime hours given those individualized inquiries.  Certification of the overtime claim is DENIED.

### (iii)     Expense Reimbursements.

Labor Code Section 2802(a) provides:

> An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful.

The California wage orders encompass two issues that derive from plaintiffs' expense reimbursement claim.  Wage Order 5-2001(9)(A) states that, if wearing uniforms is a condition of employment, an employer must provide uniforms to its employees.  The same wage order states an employer must provide to its employees tools and equipment necessary for the performance of their jobs.  Thus, certification of those two issues relies on plaintiffs showing predominance of their misclassification claim under *Dynamex*, which plaintiffs have already done.  Thus, plaintiffs need only further show that common questions predominate as to liability for those issues.

As to both issues, plaintiffs satisfy predominance.  Deposition testimony reveals defendant required all unit franchisees to wear the "Jan-Pro" logo when they worked (Kissane Dep. 173).  Cleaning supplies and equipment, moreover, were necessary for all unit franchisees to work.  And, defendant had a common practice of failing to replace unit franchisees' cleaning supplies and uniforms (Kissane Dep. 157).

Defendant argues, however, that it supplied an initial set of uniforms and cleaning supplies to each unit franchisee. But that is misleading. Defendant had a common practice *not* to provide a unit franchisee with those items *unless* the unit franchisee paid the franchise fee up front and in full (Dkt. No. 359-1 at 148). Thus, defendant cannot avoid liability on a class-wide basis.

That practice nevertheless raises an individualized liability issue — whether each unit franchisee paid the franchise fee up front and in full. But by simply looking at each unit franchisee's initial payment in his or her franchise agreement, one could conclude whether each unit franchisee received an initial set of equipment and uniforms. Thus, one could efficiently determine liability. Individualized issues would not predominate.

Defendant next argues that individualized issues would predominate as to damages. Specifically, defendant argues damages calculations would be "excessively difficult" because: (1) unit franchisees may have used their cleaning supplies for work at businesses not affiliated with defendant; (2) customers sometimes provided cleaning supplies to unit franchisees; and (3) unit franchisees may not have records of cleaning supply purchases. Defendant's argument is unconvincing. *Bowerman v. Field Asset Serv., Inc.*, 39 F.4th 652, 663 (9th Cir. 2022).

True, *Bowerman* reversed class certification where damages calculations were "excessively difficult." But its discussion of damages calculations was dicta. *Bowerman* held that class certification was inappropriate because "class members failed to demonstrate . . . *liability* was subject to common proof" and because "class members [could not] show that the whole class suffered damages traceable to their alleged misclassification." By contrast, the "excessive difficulty" of calculating damages was neither necessary nor sufficient to reverse on certification. That difficulty was a problem *Bowerman* only "sought to avoid." 39 F.4th at 662–663 (emphasis added).

The rule in this circuit remains that "damages calculations *alone* cannot defeat certification." *Yokoyama*, 594 F.3d at 1094 (emphasis added). Here, moreover, damages calculations would not be excessively difficult. There is a list of initial equipment that defendant would have given to qualifying unit franchisees, which is common evidence to

1   calculate damages (Dkt. No. 359-1 at 169).  At least Connor-Nolan kept records showing

2   deductions for cleaning equipment that it sold to unit franchisees, which is another useful tool

3   to estimate damages (Dkt. No. 313-2 at 2).  And, any receipts from unit franchisees would also

4   help us estimate damages.

5       True, Wage Order 5-2001(9)(B) provides an exception:  "an employee whose wages are

6   at least two (2) times the minimum wage provided herein may be required to provide and

7   maintain hand tools and equipment customarily required by the trade or craft."  But that

8   exception is inapplicable here.  The Industrial Welfare Commission has stated that "[t]his

9   exception is quite narrow and is limited to hand (as opposed to power) tools and personal

10  equipment, such as tool belts or tool boxes, that are needed by the employee to secure those

11  hand tools."  None of the unit franchisees here used hand tools, tool belts, or tool boxes.

12  Thus, the exception does not raise individualized issues here.  Indus. Welfare Comm'n,

13  *Statement as to the Basis*, at 19, https://www.dir.ca.gov/iwc/Statementbasis.pdf.

14                          *          *          *

15      The remaining issues that derive from plaintiffs' expense reimbursement claim —

16  insurance and gas expenses — rely on the *Borello* misclassification standard because they do

17  not arise under the California wage orders.  *See Dynamex*, 4 Cal. 5th at 915–16 n. 5; *Moreno v.*

18  *JCT Logistics, Inc.*, 2019 WL 3858999, at *8, *12 (C.D. Cal. May 29, 2019) (Judge Jesus G.

19  Bernal).  Because plaintiffs have failed to show predominance for misclassification under

20  *Borello*, plaintiffs cannot show predominance for any of those issues that rely on *Borello*.

21  *See Haitayan*, 2021 WL 757024, at *5–6.

22      Plaintiffs' arguments that the remaining expense reimbursement issues rely on the ABC

23  test are incorrect.

24      *First*, plaintiffs assert "the Legislature has now codified the ABC test with respect to the

25  entire labor code . . . and that statute applies retroactively" (Opp. 8).  Namely, plaintiffs refer to

26  Labor Code Section 2775, or "AB5," which codified the ABC test.  AB5 extended the reach of

27  the ABC test to the labor code *generally* and to "violations of [the] code *relating to* wage

28  orders."  *Ibid.*; Lab. Code § 2785(a) (emphasis added).  Thus, plaintiffs argue that, even if the

United States District Court
Northern District of California

28

wage orders do not encompass the remaining expense reimbursement issues, those issues still rely on the ABC test because (1) they arise out of the labor code generally or relate to wage orders, and (2) AB5 was retroactive.

But only *Dynamex* was retroactive. And, *Dynamex* applied only to wage orders. 4 Cal. 5th at 913–14. Thus, to the extent that AB5 covered claims arising out of the labor code generally or relating to wage orders, AB5 was an expansion of *Dynamex*. That expansion was not retroactive. AB5 applied only to "work performed on or after January 1, 2020." Lab. Code § 2785(c). Because all three of our plaintiffs terminated their work with defendant by 2017, AB5's expansion of *Dynamex* does not apply here. Thus, issues not covered under the wage orders, even if they relate to wage orders or arise out of the labor code generally, rely on *Borello* in this action.

Moreover, whether existing law provides that the ABC test applies to claims *relating to* the wage orders is inconsequential. This order finds that neither Wage Order 9-2001(8) nor Wage Order 5-2001(8) is related to the remaining expense reimbursement issues. Those wage order sections prohibit employers from requiring reimbursement "*from* an employee;" they do not mandate that employers give reimbursements *to* employees. (Emphasis added). And, neither section refers to automobile or insurance expenses.

*Second*, plaintiffs contend *Gonzales v. San Gabriel Transit, Inc.* is binding here, which found that "failure to reimburse expenses . . . in violation of [Labor Code] Section 2802 is encompassed by Wage Order No. 9(8)." 40 Cal. App. 5th 1131, 1157 (2019). But *Becerra v. McClatchy Co.* disagreed with *Gonzales*, finding the wage orders do not cover certain issues under Section 2802. 69 Cal. App. 5th 913, 934 (2021). Even the California appellate court that heard *Dynamex* found the wage orders do not cover gas expenses under Section 2802. 4 Cal. 5th at 915–16 n. 5. (The California Supreme Court did not express a view on that issue.) As California appellate courts are split on this issue, this order may follow either route.[7]

---

[7] Plaintiffs also cite *Duffey v. Tender Heart Home Care Agency, LLC*, to support their position. But *Duffey* did not apply the ABC test to a misclassification claim for purposes of the Domestic Worker Bill of Rights. It applied *Borello*. 31 Cal. App. 5th 232, 254 (2019).

As to only the issues of reimbursement for uniforms and cleaning supplies, the expense reimbursement claim is CERTIFIED.  Certification of all other issues deriving from the expense reimbursement claim is DENIED.

### (iv)     Unlawful Deductions.

The California wage orders encompass unlawful deductions for operational expenses under Labor Code Section 221.  That section provides "[i]t shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee."  To that end, Wage Order 5-2001(8) provides:

> No employer shall make any deduction from the wage . . . for any cash shortage, breakage, or loss of equipment, unless it can be shown that the shortage, breakage, or loss is caused by a dishonest or willful act, or by the gross negligence of the employee.

Regarding cash shortages, breakage, and loss of equipment under former Wage Order 5-57, the California Supreme Court stated in 1962 that "[i]t does not seem unjust to require the employer to bear such losses *as expenses of management*."  Moreover, a California court of appeal recently recognized that that Supreme Court decision was "based on the impermissibility of transferring to the employee, by way of wage deductions, the financial burden of business expenses that otherwise would be borne by the employer."  That court of appeal found that certain operational expenses "appear[ed] on their face to be for standard business practices, not chargeable to an employee," including "promotional mailers and stationery . . . and advertisements."  *Kerr's Catering Serv. v. Dep't of Indus. Rels.*, 57 Cal. 2d 319, 329 (1962) (emphasis added); *Davis v. Farmers Ins. Exch.*, 245 Cal. App. 4th 1302, 1334–35 (2016); *see Prachasaisoradej v. Ralphs Grocery Co.*, 42 Cal. 4th 217, 232 (2007).

Here, plaintiffs allege defendant unlawfully deducted a "management fee" and a "sales and marketing fee" from unit franchisees' pay.  As *Kerr* and *Davis* demonstrate, former Wage Order 5-57 supported that an employer may not shift operational expenses for managing and advertising its business to its employees.  Thus, construing the wage orders "liberally . . . in a manner that serves [their] remedial purposes," and considering that the suffer or permit to work standard is "exceptionally broad," this order finds that Wage Order 5-2001(8)

1   encompasses Labor Code Section 221 for purposes of the management fee and the sales and

2   marketing fee.  *Dynamex*, 4 Cal. 5th at 952–53.

3        Thus, certification of the unlawful deduction claim for those issues relies on plaintiffs

4   showing predominance of their misclassification claim under *Dynamex*, which plaintiffs have

5   already done.  Plaintiffs need only further show predominance for the management fee and the

6   sales and marketing fee claims.  Plaintiffs have done so.

7        **Management Fee.**  Defendant had a uniform policy of providing a template agreement to

8   all master franchisees, which master franchisees used to create their agreements with unit

9   franchisees.  That template agreement provided that the master franchisee would deduct a

10  management fee from its unit franchisee's pay (Dkt. No. 359-1 at 150).  All of plaintiffs'

11  agreements with their master franchisees, moreover, included deductions for management fees

12  (*see, e.g.*, Dkt. No. 292-12 § 7(D)).  Plaintiff Roman and Massachusetts-plaintiff Giovani

13  Depianti suffered such deductions (Dkt. No. 313-2 at 2–3, 8).  Based on this common evidence

14  and the master franchisees' records, predominance for liability is satisfied.

15       As to damages for management fees, defendant had a common policy that master

16  franchisees would deduct five percent of each unit franchisee's gross cleaning revenue per

17  month (Dkt. No. 359-1 at 150).  Thus, the total amount owed to the class would be:

18  five percent of the total gross revenue of all master franchisees in California during the class

19  period.  (Master franchisees must have records of their gross revenue for purposes of filing

20  taxes and verifying such information with defendant.)  One could provide each unit franchisee

21  with exact damages by summing all deductions for management fees based on master

22  franchisee records (*see* Dkt. No. 313-2 at 2–3, 8).

23       **Sales and Marketing Fee.**  Similarly, defendant's template agreement (and all of

24  plaintiffs' agreements) provided that the master franchisee would deduct a sales and marketing

25  fee from the unit franchisee's pay (Dkt. No. 359-1 at 149; Dkt. No. 292-12 § 7(B)).[8]  Thus, one

26

27  _____

    [8] Specifically, master franchisees were to impose a sales and marketing fee for all "additional
28  customer accounts" that master franchisees provided to unit franchisees.  Whether an account was
    an additional customer account depended on the amount of gross annual revenue guaranteed to the
    unit franchisee.  As a master franchisee provided a unit franchisee with more customer accounts,

could determine liability and exact damages based on defendant's common practices and master franchisees' records of fee deductions.

Defendant argues, however, that predominance for liability is not satisfied because master franchisees were free not to charge management fees and sales and marketing fees. But defendant has not pointed to any evidence that suggests master franchisees did not charge such fees. Moreover, by looking at a sample of franchise agreements for each master franchisee, one can readily determine whether each master franchisee had a policy of deducting such fees. There is, thus, sufficient common evidence to adjudicate liability for unlawful deductions as to (1) management fees and (2) sales and marketing fees on a class-wide basis.

***Chargeback Fee.*** Plaintiffs also request that this order certify the issue of chargeback fees. At the hearing, plaintiffs represented that defendant had a common policy to impose chargeback fees on unit franchisees whenever customers failed to pay for cleaning services. Such a fee might fall under the wage orders as a deduction for a cash shortage. But, regardless, plaintiffs' post-hearing briefing failed to point to a common policy regarding such a fee (*see* Dkt. No. 368). Neither does this order find such a provision in any of plaintiffs' individual agreements. And, plaintiffs' declarations fail to address such a fee. Thus, there is no evidence supporting this theory of chargeback fees.

It seems, however, that the chargeback fee to which plaintiffs referred was called a "service fee." Defendant's template agreement provided that a master franchisee could assess a service fee of $50 for every hour that the master franchisee spent rectifying a customer complaint (Dkt. No. 359-1 at 150). That comports with a fee in plaintiff Roman's pay statement, described as: "Service Fee - [Customer Name] . . . Charge Backs . . . $50.00" (Dkt. No. 313-2 at 2). Such a fee, however, does not fall within the wage orders because it does not represent a routine operational expense. As such, it relies on the *Borello* misclassification standard. Because plaintiffs have failed to show predominance for

the unit franchisee's expected annual revenue would increase. After the unit franchisee's expected annual revenue surpassed the guaranteed annual revenue, any new customer account that the master franchisee provided was deemed "additional."

United States District Court
Northern District of California

1   misclassification under *Borello*, plaintiffs cannot show predominance for chargebacks

2   (*i.e.*, service fees).  *See Haitayan*, 2021 WL 757024, at *5–6.

3                              *              *              *

4       The remaining issues deriving from plaintiffs' unlawful deduction claim — franchise

5   fees, royalty fees, and insurance fees — rely on the *Borello* misclassification standard because

6   they do not arise under the California wage orders.  Because plaintiffs have failed to show

7   predominance for misclassification under *Borello*, plaintiffs cannot show predominance for the

8   remaining unlawful deduction issues.  *See Haitayan*, 2021 WL 757024, at *5–6.

9       As to only the issues of management fees and sales and marketing fees, the unlawful

10  deduction claim is **CERTIFIED**.  Certification of all other issues deriving from the unlawful

11  deduction claim is **DENIED**.

12                        *(v)      Wage Statements.*

13      Additionally, plaintiffs request damages for defendant's failure to provide itemized wage

14  statements under Labor Code Section 226.  This issue is governed by Wage Order 5-2001(7).

15  But plaintiffs failed to claim such a violation in the operative complaint.  As discussed below,

16  this order construes plaintiffs' actions as a request to amend pursuant to FRCP 15(b), but this

17  order denies that request for undue delay and prejudice to defendant.  Thus, the Section 226

18  issue is not certifiable.

19      This order **CERTIFIES**:  (1) plaintiffs' minimum wage claim, but only as to the issue of

20  mandatory training; (2) plaintiffs' expense reimbursement claim, but only as to the issues of

21  (a) required uniforms, and (b) necessary cleaning supplies and equipment; and (3) plaintiffs'

22  unlawful deduction claim, but only as to the issues of (a) management fees, and (b) sales and

23  marketing fees.  Certification of the overtime claim and other issues deriving from the

24  minimum wage, expense reimbursement, and unlawful deduction claims is **DENIED**.

25  Certification of a claim for itemized wage statements is **DENIED AS MOOT**.

26

27

28

United States District Court
Northern District of California

33

### 3.    SUMMARY JUDGMENT AS TO MISCLASSIFICATION.

As discussed above, Prong B of the ABC test is susceptible to common proof.  This order now turns to the merits of Prong B, aided by the guidance of our court of appeals.  Thereafter, this order briefly addresses Prong A and Prong C.

Summary judgment is proper when the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FRCP 56(a).  Material facts are those that "might affect the outcome of the suit" under the governing, substantive law.  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The record is viewed in the light most favorable to the nonmoving party, and "'all reasonable inferences that may be drawn from the facts placed before the court must be drawn'" in favor of the nonmoving party.  *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065 (9th Cir. 2003) (citations omitted).  The judge does not make credibility determinations or weigh the evidence.  *Anderson*, 477 U.S. at 255.  A trial court may consider only admissible evidence.  FRCP 56(c).

Here, both parties have moved for summary judgment.  Defendant, however, has the burden of persuasion at trial to satisfy the ABC test.  *Dynamex*, 4 Cal. 5th at 964.  A finding against defendant on any prong directs a finding of an employer-employee relationship.

#### A.    PRONG B OF THE ABC TEST.

Prong B requires the employer to show "that the worker performs work that is outside the usual course of the hiring entity's business . . . ."  *Ibid.*  Our court of appeals identified three considerations relevant to Prong B:  (1) whether the work of the hiree is necessary or merely incidental to that of the hirer; (2) whether the hiree continuously performs work for the hirer; and (3) what business the hirer proclaims to be in.  *Vazquez*, 986 F.3d at 1125.

*First*, this order considers whether the work of unit franchisees was necessary or merely incidental to the work of defendant.  Our court of appeals stated that "[i]n some cases, this inquiry can be conducted through a common-sense observation of the nature of the

businesses." "In other cases, courts view the 'necessary' versus 'incidental' distinction in more economic terms." Where the hirer's revenue is dependent on the amount of work that the hirees perform, the hirees are deemed necessary to the hirer's work. *Id.* at 1125–26.

Here, as a matter of common sense, unit franchisees remained at all times necessary to defendant's business. Defendant's business depended on unit franchisees performing cleaning services. Without a consistent supply of unit franchisees, defendant's business would have cratered. And, defendant earned four percent of all cleaning revenue that master franchisees collected from unit franchisees (Kissane Dep. 34). Defendant's revenue, therefore, depended on the amount of work that unit franchisees performed.

Defendant does not dispute these common-sense conclusions. Rather, defendant states our court of appeals' decision is "no longer good law." Defendant construes our court of appeals' decision to mean that an entity is an employer whenever it derives an economic benefit from its workers (Opp. 20). Defendant's argument is a stretch. Our court of appeals stated that one consideration in the misclassification analysis is whether a hirer earns revenue based on hirees' output. Our court of appeals' decision is still good law.

*Second*, this order considers whether unit franchisees continuously performed work for defendant. Here, unit franchisees did not "perform incidental services for [an] otherwise unrelated business[]." Rather, they performed cleaning services "on a regular or continuous basis, without regard to the substantiality of the activity in relation to [defendant's] other business activities." *Vazquez*, 986 F.3d at 1126. As plaintiffs point out, the template unit franchisee agreement provided for a ten-year term (Dkt. No. 359-1 at 144; *see* Dkt. No. 292-11 § 18). Unit franchisees continuously — not occasionally — performed cleaning services. And, as shown below, defendant was in the business of cleaning, so unit franchisees' services were for a related business.

Defendant contends that our court of appeals' approach is "unreasonable at best" because it would not be economically feasible for a franchisor to contract with a franchisee for "'a term too short for the franchisee to recoup his or her investment'" (Opp. 21) (citation omitted). But our court of appeals' approach is reasonable because it "helps capture the distinction between

35

independent contractor arrangements designed to evade requirements placed on employers and traditional contractors like electricians and plumbers, who perform incidental services for otherwise unrelated businesses." *Vazquez*, 986 F.3d at 1126. And, again, whether unit franchisees continuously worked for defendant is but one consideration under Prong B.

*Third*, this order considers whether defendant held itself out as a cleaning business. Of importance to this inquiry is how defendant described itself in public advertisements and websites. As our court of appeals stated, defendant's "websites and advertisements . . . promote[d] [defendant] as being in the business of cleaning." And, defendant's website described defendant as an "'environmentally responsible commercial cleaning company'" that provided "'cleaning services.'" *Vazquez*, 986 F.3d at 1127. Furthermore, in defendant's contracts with its master franchisees, defendant described itself as "in the business of *operating and franchising comprehensive cleaning and maintenance businesses . . .*" (Dkt. No. 292-2 § 1) (emphasis added).

Moreover, our court of appeals was "skeptical" of defendant's argument that it was in the business of franchising rather than cleaning:

> "Franchising is not in itself a business, rather a company is in business of selling goods or services and uses the franchise model as a means of distributing the goods or services to the final end user without acquiring significant distribution costs."

*Vazquez*, 986 F.3d at 1127 (citation omitted). This order also finds defendant's argument unconvincing. Defendant was plainly in the business of selling cleaning services. To conclude otherwise would ignore the entire foundation of defendant's business. The prior summary judgment order in this action, which our court of appeals vacated, did not conclude otherwise.

Defendant argues that, at the least, the question of whether it satisfies Prong B should be submitted to a jury. It cites numerous pages of its officers' deposition testimony for the proposition that its usual course of business was supporting master franchisees — not cleaning. True, the testimony shows that defendant's officers provided training, advice on regulatory compliance, and general business guidance to master franchisees (Dkt. No. 247-4 at 10–164). But, at best, that evidence goes to only the third consideration laid out in *Vazquez* — what

36

business the hirer proclaims to be in.  The other two considerations hurt defendant's case.

Moreover, as to the third consideration, defendant did not hold itself out *to the public* as

supporting master franchisees.  It held itself out as a cleaning business.  Thus, the officers'

deposition testimony does not raise a genuine dispute as to Prong B.

Defendant also argues that treating unit franchisees as employees would be inconsistent

with California and federal franchise regulations.  But the Federal Trade Commission

Franchise Rule states that "[a] law is not inconsistent with [the rule] if it affords prospective

franchisees equal or greater protection . . . ."  16 C.F.R. § 436.10(b).  The ABC test affords

franchisees greater protection by broadening the definition of "suffer or permit to work."

Thus, this order finds franchise regulations consistent with finding unit franchisees to be

employees under the ABC test.  *See Goro v. Flowers Food, Inc.*, 2021 WL 4295294, at *10–11

(S.D. Cal. Sep. 21, 2021) (Judge Todd W. Robinson).

Finally, defendant argues the ABC test requires that plaintiffs show defendant was the

"hiring entity."  But *People v. Uber Technologies, Inc.*, a California appellate decision,

expressly rejected this argument.  *Uber Technologies* found the phrase "hiring entity" was

"intended to be expansive for reasons specific to California wage and hour laws and the

longstanding social safety net objectives of those laws in this state."  And, defendant's

suggestion that this order must decide whether the cleaning customers or defendant was the

hiring entity would present an "artificial choice" resting on a "false dichotomy."  It is possible

that unit franchisees rendered services to both defendant and the cleaning customers.  56 Cal.

App. 5th 266, 287–88 (2020).

In sum, on their motion for summary judgment, plaintiffs have met their burden to show

an absence of a genuine dispute of material fact as to all three considerations under Prong B.

Defendant has failed to raise a genuine dispute of material fact.  No reasonable juror could find

in favor of defendant on any of the three considerations.  Furthermore, on its own motion for

summary judgment, defendant has failed to meet its initial burden to show an absence of a

genuine dispute of material fact.  Because defendant has failed to satisfy Prong B, this order

finds unit franchisees were employees of defendant.  Summary judgment for plaintiffs on the

1   misclassification claim under *Dynamex* is **GRANTED**.  Defendant's motion for summary

2   judgment as to misclassification under *Dynamex* is **DENIED**.

3             **B.     PRONG A OF THE ABC TEST.**

4        Although the above is sufficient to find in favor of plaintiffs on the misclassification

5   claim, this order briefly considers the remaining prongs of the ABC test.  Prong A requires the

6   hirer to show "that the worker is free from the control and direction of the hirer in connection

7   with the performance of the work, both under the contract for the performance of the work and

8   in fact."  *Dynamex*, 4 Cal. 5th at 955.  "[A] business need not control the precise manner or

9   details of the work . . . to have maintained the necessary control that an employer ordinarily

10  possesses over its employees."  *Id.* at 958.  That the hirer dictates how the work is to be

11  performed is significant to this inquiry.  *See id.* n. 27.

12       Here, defendant had the contractual "right to establish company policies and/or

13  procedures pertaining to the operation of [master franchisees'] franchised business . . . or the

14  business of any unit franchisee" (Dkt. No. 292-2 § 4.28).  Defendant had the contractual right

15  to inspect master and unit franchisees' premises to ensure quality of service (*id.* § 4.29).

16  By contract, unit franchisees were subject to a mandatory training program, through which

17  defendant dictated how unit franchisees were to perform cleaning services (Dkt. No. 359-1

18  at 145).  And, unit franchisees were subject to a non-compete provision (Dkt. No. 359-1

19  at 157).  Thus, unit franchisees were not free from defendant's control and direction under

20  contract for the performance of the work.

21       "As a practical matter," however, there may have been "less control at all levels than

22  what is contemplated in the agreements."  *Vazquez*, 986 F.3d at 1120.  Plaintiff Roman

23  engaged in an independent business that cleaned houses, contravening the non-compete

24  provision (Roman Dep. 160).  The testimony of defendant's Vice President supports that

25  "[defendant]'s officials rarely make site visits to its master franchisees."  "They also rarely, if

26  ever, inspect the books and records of their master franchisees" (*see* Thompson Dep. 39–41).

27  *Vazquez*, 986 F.3d at 1120.  Although defendant provided a proprietary system for master

28  franchisees to use to estimate cleaning hours, defendant counters that master franchisees could

United States District Court
Northern District of California

1    choose not to use that system (Kissane Dep. 42–43).  Further, one master franchisee declared

2    defendant "has declined to get involved" with "compliance matters relating to our business"

3    (Dkt. No. 247-3, Conner Decl. ¶ 5).

4        As to both defendant and plaintiffs' motion for summary judgment, this order finds there

5    are genuine disputes of material fact regarding control that preclude summary judgment on

6    Prong A.  Thus, Prong A is not amenable to summary judgment.

7                    *C.    PRONG C OF THE ABC TEST.*

8        Prong C requires the hirer to show "that the worker is customarily engaged in an

9    independently established trade, occupation, or business of the same nature as that involved in

10   the work performed."  *Dynamex*, 4 Cal. 5th at 955–56.  Furthermore:

> Courts in other states that apply the ABC test have held that the
> fact that the hiring business permits a worker to engage in similar
> activities for other businesses is not sufficient to demonstrate that
> the worker is "'customarily engaged in an independently
> established . . . business'" for purposes of [Prong C]. . . .
> "[T]he appropriate inquiry under [Prong C] is whether the person
> engaged in covered employment actually has such an independent
> business, occupation, or profession, not whether he or she could
> have one."

16   *Id.* at 962 n. 30 (citations omitted).

17       Here, at least plaintiff Roman actually engaged in an independent business that cleaned

18   houses (Roman Dep. 160).  Plaintiffs' argument that unit franchisees, such as plaintiff Roman,

19   expanded defendant's customer base by engaging in independent businesses is invalid.  By

20   definition, unit franchisees who engaged in independent businesses did not provide customers

21   to defendant's separate business.  Moreover, this order finds plaintiff Roman's housekeeping

22   business to be "of the same nature" as defendant's commercial cleaning business.  Both

23   businesses involved janitorial work.  Plaintiffs do not cite case law that distinguishes between

24   housekeeping and commercial cleaning.  And, that unit franchisees agreed not to compete with

25   defendant is irrelevant under Prong C.  *Dynamex*, 4 Cal. 5th at 962 n. 30.  Thus, as to

26   defendant's motion, there is no genuine dispute of material fact that defendant satisfies

27   Prong C.  Thus, Prong C is amenable to summary judgment in favor of defendant.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Of course, this order's findings regarding Prong A and Prong C do not change that

2    defendant cannot satisfy Prong B.  All unit franchisees were employees under *Dynamex*.

3    **D.    THE BUSINESS-TO-BUSINESS EXCEPTION DOES NOT APPLY.**

4    Defendant argues *Borello* is the correct test under the business-to-business exception.

5    Labor Code Section 2776 provides, in part:

> 6    Section 2775 and the holding in *Dynamex* do not apply to a bona
> fide business-to-business contracting relationship, as defined
> 7    below, under the following conditions:
>
> 8    (a) If an individual acting as a sole proprietor, or a business entity
> formed as a partnership, limited liability company, limited
> 9    liability partnership, or corporation ("business service
> provider") contracts to provide services to another such business
> 10   or to a public agency or quasi-public corporation ("contracting
> business"), the determination of employee or independent
> 11   contractor status of the business services provider shall be
> governed by *Borello*, if the contracting business demonstrates
> 12   that all of the following criteria are satisfied:  [list of (1)–(12)].

13   Here, defendant asserts that unit franchisees were business service providers who

14   contracted to provide services to master franchisees (contracting businesses).  But common

15   evidence shows at least one of the statute's criteria is unmet.  Subsection (a)(10) requires that

16   "[t]he business service provider can negotiate its own rates."  But common evidence shows

17   unit franchisees could not negotiate their own rates.  Defendant's CEO testified that "[e]ach

18   master franchisee determines the pricing [of cleaning contracts] based on local conditions . . ."

19   (Kissane Dep. 39).  Defendant's Vice President confirmed that "the masters . . . [i]t's their

20   discretion what they input [into defendant's payment formula]" (Thompson Dep. 25).

21   Because less than all of the statute's criteria are met, the exception does not apply.

22   *Dynamex*, not *Borello*, is the applicable misclassification test here.

23   **E.    THE JOINT EMPLOYER TEST DOES NOT APPLY.**

24   Defendant argues the joint employer test applies here instead of the ABC test.

25   Defendant's argument relies on the following language:  "'Where a party is the agent of

26   misclassification, it may be directly liable under the ABC test, even where it utilizes a proxy to

27   make arrangements with its employees.'"  *Vazquez*, 986 F.3d at 1124 (quoting *Depianti v. Jan-*

28   *Pro Franchising Int'l, Inc.*, 990 N.E.2d 1054, 1068 n. 17 (Mass. 2013)).  Defendant further

40

asserts that, in three-tier systems, ordinarily the middle tier is the agent of misclassification. According to defendant, however, there are two exceptions under which the top tier is the agent of misclassification:  "first, where the law of corporate disregard is applicable and, second, where an entity has engaged in an 'end run' around its wage law obligations."  *Jinks v. Credico (USA), LLC*, 177 N.E.3d 509, 516 (Mass. 2021).  Defendant argues that, because plaintiffs have not met either exception, defendant is not the agent of misclassification. For that reason, defendant states the ABC test cannot apply.

Defendant's argument fails for a number of reasons.  *First*, our court of appeals instructed this order to apply the ABC test.  *Vazquez*, 986 F.3d at 1122.  To ignore a mandate from our court of appeals and to employ a different test would contravene our judicial process. *Second*, neither our court of appeals nor *Dynamex* required that the hirer be the "agent of misclassification" before the ABC test can apply.

*Third*, even if there were an "agent of misclassification" standard in California, defendant was, in fact, the agent of misclassification.  The Massachusetts Supreme Judicial Court stated that the top tier is the agent of misclassification if it "'design[s] and implement[s] the contractual framework under which [the bottom-tier] was misclassified as an independent contractor,' specifically to evade obligations under the wage laws."  This would amount to an "end run" around the top tier's wage law obligations.  *Jinks*, 177 N.E.3d at 517 (quoting *Depianti*, 990 N.E.2d at 1068 n. 17).

Defendant did just that.  Defendant designed and implemented a contractual framework — through its template agreement — that classified unit franchisees as independent contractors.  Unlike *Jinks*, in which the middle-tier classified the plaintiffs as independent contractors "[w]ithout any apparent input from [the top-tier]," here, defendant — the top tier — classified unit franchisees as independent contractors.  In fact, master franchisees' agreements with unit franchisees "substantially *follow[ed] [defendant]'s requirements*" by "describ[ing] the unit franchisee[s] as independent contractor[s] . . . ."  *Vazquez*, 986 F.3d at 1119–20 (emphasis added).  Thus, the ABC test would apply even if there were an "agent of misclassification" standard in California.

United States District Court
Northern District of California

Having found that unit franchisees were employees of defendant under *Dynamex*'s ABC test, this order next considers whether any of the certified labor code issues are amenable to summary judgment.

### 4. SUMMARY JUDGMENT AS TO CERTIFIED LABOR CODE ISSUES.

This order has certified the following issues for class treatment:  (1) whether defendant is liable to unit franchisees for failure to pay for mandatory training; (2) whether defendant is liable to unit franchisees for failure to reimburse them for (a) required uniforms, and (b) necessary cleaning supplies and equipment; and (3) whether defendant unlawfully deducted from unit franchisees' wages (a) management fees, and (b) sales and marketing fees.  These are discussed in turn.

### A. MANDATORY TRAINING.

Plaintiffs have pointed to no published California decision that explicitly recognizes an employee's right to minimum wage for mandatory training; this order finds none. But "California courts have long recognized that California's wage laws are patterned on federal statutes and that authorities construing those federal statutes provide persuasive guidance to state courts."  "A review of our labor statutes reveals a clear legislative intent to protect the minimum wage rights of California employees to a greater extent than federally." *Armenta*, 135 Cal. App. 4th at 322, 324.

Under the Fair Labor Standards Act, a hirer must meet six elements to show that its trainees do not qualify for minimum wage for mandatory training.  One such element is that "[t]he employer that provides the training derives no immediate advantage from the activities of the trainees, and on occasion his operations may actually be impeded."  *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1006 (N.D. Cal. 2010) (Judge Edward M. Chen); *see Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947).  In other words, "where the company is the primary beneficiary of the trainee's labors, an employment relationship exists, and federal minimum wage and overtime laws apply."  Cal. Prac. Guide Emp. Litig. § 11-B (Mar. 2022) (citing *McLaughlin v. Ensley*, 877 F.2d 1207, 1209–10 (4th Cir. 1989)).

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Here, defendant required master franchisees to train all unit franchisees on proper cleaning methods (Dkt. No. 292-2 § 4.22).  Defendant also provided master franchisees with manuals regarding cleaning and safety to provide to unit franchisees (Dkt. Nos. 292-15, 292-16).  Master franchisees, in turn, required unit franchisees to attend a training program on proper cleaning methods (Dkt. No. 359-1 at 145).  Plaintiff Vazquez declares that he attended such a training program, and defendant did not pay him for training time (Vazquez Decl. ¶ 7).  Plaintiff Aguilar also took part in a training (Aguilar Dep. 29–30).  Defendant, however, fails to provide evidence disputing the above facts.

Defendant was the primary beneficiary of the mandatory trainings.  Defendant reinforced proper cleaning techniques to ensure satisfactory services and to establish goodwill with customers.  In other words, defendant's trainings "buil[t] and ke[pt] customer trust by ensuring consistency and uniformity in the quality of goods and services."  Without such trust, defendant's business would have faltered for lack of customers.  Moreover, defendant included safety protocols in the trainings to decrease its risk for tort liability.  And, although defendant counterargues that unit franchisees benefited because defendant gave them "access to resources [they] otherwise would not have [had]," defendant's argument describes the benefits to unit franchisees of entering into the franchise relationship — not the benefits of the *trainings*.  Thus, defendant's counterargument is off point.  *Patterson*, 60 Cal. 4th at 490.

Defendant was the primary beneficiary of the trainings.  This order finds that defendant is liable for minimum wage pay to unit franchisees who underwent mandatory training.

Thus, as to plaintiffs' motion for summary judgment, there is no genuine dispute of material fact, and summary judgment in favor of plaintiffs on the mandatory training issue is **GRANTED**.  Defendant's motion for summary judgment fails to meet its burden and, as to the mandatory training issue, is **DENIED**.

### *B.     EXPENSE REIMBURSEMENTS.*

"[T]he elements of a [Labor Code] Section 2802 claim are:  '(1) the employee made expenditures or incurred losses; (2) the expenditures or losses were incurred in direct consequence of the employee's discharge of his or her duties, or obedience to the directions of

the employer; and (3) the expenditures or losses were necessary.'" *USS-Posco Indus. v. Case*, 244 Cal. App. 4th 197, 205 (2016) (citation omitted).

Deposition testimony reveals defendant required unit franchisees to wear the "Jan-Pro" logo when they worked. Unit franchisees also needed cleaning equipment to work. Each unit franchisee had to pay for an initial set of cleaning supplies and uniforms unless he or she paid all franchise fees up front (Dkt. No. 359-1 at 151). Unit franchisees also had to pay for all replacement cleaning supplies and uniforms themselves (Kissane Dep. 173). Moreover, all three of plaintiffs' declarations state they "made expenditures" for uniforms and cleaning supplies, and defendant did not reimburse them for such expenses (Vazquez Decl. ¶ 9; Aguilar Decl. ¶ 8; Roman Decl. ¶ 9). In fact, their franchise agreements confirm that fact because none of them paid their franchise fees in full and up front (*see, e.g.*, Dkt. No. 292-11 § 7(A)). Plaintiffs incurred such expenses "in direct consequence of the . . . discharge of [their] duties" to clean businesses. And, such expenses were "necessary" for plaintiffs to secure employment and to clean businesses. *USS-Posco*, 244 Cal. App. 4th at 205. Defendant does not dispute the above facts. All elements of Labor Code Section 2802 are satisfied.

Thus, as to plaintiffs' motion for summary judgment, there is no genuine dispute of material fact, and summary judgment in favor of plaintiffs for reimbursement for uniforms and cleaning supplies is **GRANTED**. Defendant's motion for summary judgment fails to meet its burden and, as to those issues, is **DENIED**.

### C. UNLAWFUL DEDUCTIONS.

"Under Labor Code Sections 221 and 224, the employer bears the burden of establishing that . . . deductions are authorized by law." Employers may not make deductions from wages "'except in very narrowly defined circumstances provided by statute.'" In fact, "'[d]ebiting an employee's earned wages to cover a normal operating expense of the employer is not allowed in California.'" California courts have found deductions to cover advertising and management expenses unlawful. *Davis*, 245 Cal. App. 4th at 1334, 1336–37 (citations omitted); *see Kerr*, 57 Cal. 2d at 329.

United States District Court
Northern District of California

1       Here, defendant had a uniform policy of providing a template agreement to all master

2   franchisees, which master franchisees used to create their agreements with unit franchisees.

3   That template agreement provided that the master franchisee would deduct a management fee

4   and a sales and marketing fee from its unit franchisees' pay (Dkt. No. 359-1 at 149–150).

5   All of plaintiffs' agreements with their master franchisees, moreover, included deductions for

6   management fees and sales and marketing fees (*see, e.g.*, Dkt. No. 292-11 §§ 7(B), 7(D)).

7   And, master franchisees made the deductions directly from unit franchisees' wages (Dkt. No.

8   313-2 at 2–3, 8).  Defendant does not dispute the above facts.  Thus, this order finds defendant

9   liable for unlawfully deducting both management fees and sales and marketing fees under

10  Labor Code Section 221.  *See Davis*, 245 Cal. App. 4th at 1336–37.

11      Defendant argues the fees did not constitute deductions at all.  Defendant asserts the

12  franchise agreements defined unit franchisees' wages as the cleaning costs less the contractual

13  fees.  Thus, defendant states the contractual fees were used to calculate final wages, from

14  which it did not thereafter make deductions.  But *Quillian v. Lion Oil Co.* rejected a similar

15  argument regarding a deduction from an employee's bonus, which the employee expressly

16  agreed to in writing:

17          Appellant herein describes the subject bonus as a calculated
            amount consisting of the computed sales component less the
18          computed shortage component and argues that no deductions are
            made from the final computation.  It appears to this court that this
19          is merely a clever method of circumventing the statutory definition
            of wages. . . .  Rather than call [the bonus] a commission and then
20          deduct for shortages, in contravention to *Kerr*, appellant deducts
            shortages from the payment and calls the final result a bonus.
21          Appellant then self-righteously proclaims that no deductions were
            made from the bonus.  Unfortunately, the result is the same.  The
22          [employee] carries the burden of losses . . . .

23  *Quillian* held the bonus scheme contravened public policy.  96 Cal. App. 3d 156, 162–63

24  (1979) (citing *Kerr*, 57 Cal. 2d 319).

25      Likewise, this order finds defendant's argument unconvincing.  "[Defendant] cannot

26  avoid a finding that its . . . policy is unlawful simply by asserting that the deduction is just a

27  step in its calculation of [wages]."  *Hudgins v. Neiman Marcus Grp., Inc.*, 34 Cal. App. 4th

28  1109, 1124 (1995).

United States District Court
Northern District of California

45

Defendant also argues the deductions were lawful under Labor Code Section 224. In relevant part, that section provides:

> The provisions of [Labor Code] Section[] 221 . . . shall in no way make it unlawful for an employer to withhold or divert any portion of an employee's wages . . . when a deduction is expressly authorized in writing by the employee to cover insurance premiums, hospital or medical dues, or other deductions not amounting to a rebate or deduction from the standard wage arrived at . . . pursuant to wage agreement . . . .

True, unit franchisees agreed in writing to the deductions. "That fact, however, is not dispositive: 'The one tool that is not available to the employer is an employment agreement by which it requires its employees to consent to unlawful deductions from their wages.'" "'Even if a contract exists, an employer cannot shift the cost of doing business to an employee.'" *Davis*, 245 Cal. App. 4th at 1332–33 (citations omitted).

The management fee and the sales and marketing fee were unlawful. Those fees impermissibly shifted the cost of defendant's routine operational expenses to unit franchisees. Thus, the fact that unit franchisees consented to those fees is irrelevant. *See Davis*, 245 Cal. App. 4th at 1333; *Quillian*, 96 Cal. App. 3d at 163.

Finally, defendant argues it is not liable for management fees and sales and marketing fees because it never deducted or received those fees; master franchisees deducted and retained them. It is true that plaintiffs have not provided case law to establish defendant's liability for fees it did not receive. But defendant implemented the system that resulted in misclassification. Defendant then encouraged master franchisees to make such deductions by giving them a template agreement that included those fees (Dkt. No. 359-1 at 143). In the interest of fairness and justice, defendant must be held liable.

In turn, as to plaintiffs' motion for summary judgment, there is no genuine dispute of material fact, and summary judgment in favor of plaintiffs for management fees and sales and marketing fees is **GRANTED**. Defendant's motion for summary judgment fails to meet its burden and, as to those issues, is **DENIED**.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 5. PLAINTIFFS' REQUEST TO AMEND THE PLEADINGS.

Plaintiffs did not claim violations of Labor Code Section 226 in the operative complaint (*see* Second Amd. Compl.). Nevertheless, plaintiffs move for summary judgment under that section. Thus, this order construes plaintiffs' motion as a request to amend the pleadings out of time pursuant to FRCP 15(b). *Apache Survival Coal. v. U.S.*, 21 F.3d 895, 910 (9th Cir. 1994). Whether plaintiffs may expand their complaint by adding a claim raised for the first time on summary judgment lies within the district court's discretion. *See Brass v. Cnty. of L.A.*, 328 F.3d 1192, 1197 (9th Cir. 2003).

"When considering a motion for leave to amend, a district court must consider whether the proposed amendment results from undue delay, is made in bad faith, will cause prejudice to the opposing party, or is a dilatory tactic." *Chodos v. W. Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002). Although "leave to amend should normally be 'freely given,' once a case has progressed to the summary judgment stage 'the liberal pleading standards are inapplicable.'" *Soublet v. Cnty. of Alameda*, 2019 WL 12517063, at *8 (N.D. Cal. Dec. 6, 2019) (Judge Jon S. Tigar) (citations omitted). "'Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.'" *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) (citation omitted).

Here, plaintiffs have had over a decade to amend their complaint to include a claim under Labor Code Section 226. In fact, plaintiffs have amended their complaint twice. But plaintiffs have never claimed a violation of Section 226. Thus, plaintiffs have unduly delayed.

Moreover, to allow plaintiffs to amend the complaint now would prejudice defendant. This order has found that defendant waived its right to arbitrate. Defendant's delay in asserting that right supported our finding. It would be unfair to allow plaintiffs to amend their complaint after delaying for the same duration as defendant did.

Although plaintiffs' conduct does not appear to be dilatory or made in bad faith, it is within this order's discretion to deny plaintiffs' request to amend for inexcusable delay. *See Brass*, 328 F.3d at 1197. As to Labor Code Section 226, both parties' motions for summary judgment are, therefore, **DENIED AS MOOT**.

**CONCLUSION**

For the foregoing reasons, and to the extent stated herein, plaintiffs' motion for class certification is **GRANTED IN PART AND DENIED IN PART**.  Plaintiffs' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.  Defendant's motion for summary judgment as to all certified issues is **DENIED**.

Specifically, this order **GRANTS** plaintiffs' motion for class certification as to (1) failure to pay minimum wage for mandatory training, (2) failure to reimburse for expenses incurred for (a) required uniforms and (b) necessary cleaning supplies and equipment, and (3) unlawful deductions of (a) management fees and (b) sales and marketing fees for the following group: all unit franchisees who signed a franchise agreement with a master franchisee in the state of California and who performed cleaning services for defendant from December 12, 2004, to the latest date on which a named plaintiff terminated employment.  The limit on the class period is proper because plaintiffs cannot show that their experience was similar to that of persons who worked for defendant after the last of plaintiffs was terminated.  This order **DENIES** class certification as to the remaining labor code claims and issues.

This order **GRANTS** summary judgment in favor of plaintiffs on all certified issues.  As to Labor Code Section 226, this order **DENIES AS MOOT** both parties' motions for summary judgment.  A separate order on the instant briefing shall resolve the parties' motions for summary judgment as to the uncertified, individual claims and issues that remain.

The parties shall please provide a form of class notice for approval.  They shall also provide a plan of distribution (which must include first-class mail) and a timetable for distribution of notice and for opt outs.  Given the need for these steps, trial and the pretrial conference shall not be held in September.  Those events shall be set for early 2023.  Counsel shall meet and confer and propose a window of trial dates convenient to both sides.

**IT IS SO ORDERED.**

Dated:  August 2, 2022.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE